UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                   Case No. 18-cr-145-pp

LISA HOFSCHULZ, and
ROBERT HOFSCHULZ,

      Defendants.

**ORDER OVERRULING OBJECTIONS (DKT. NO. 42), ADOPTING JUDGE DUFFIN'S REPORT AND RECOMMENDATION (DKT. NO. 37) AND DENYING MOTION TO SUPPRESS (DKT. NO. 33)**

The grand jury returned a fourteen-count indictment charging Lisa and Robert Hofschulz with distributing controlled substances outside a professional medical practice without a legitimate medical purpose. Dkt. No. 1. Some eight months later, it returned a superseding indictment that added a death-resulting charge against only Lisa Hofschulz. Dkt. No. 29.

Lisa Hofschulz filed a motion to suppress evidence, arguing that law enforcement had failed to preserve certain evidence it knew to be exculpatory. Dkt. No. 34. Magistrate Judge William E. Duffin issued a report and recommendation that this court deny the motion to suppress, dkt. no. 37, to which the defendant timely objected, dkt. no. 42. The court will overrule the objections, adopt Judge Duffin's report and recommendations and deny the motion.

1

I.  **BACKGROUND**

   A.  Facts

Judge Duffin crafted his recitation of the facts from the police and medical examiner reports that the defendant submitted with her motion to suppress. Dkt. No. 37 at 2-3 (citing Dkt. Nos. 34-1, 34-2, 34-3). The defendant has not objected to Judge Duffin's recitation of the facts. Rather, her objection states that "[i]n lieu of a detailed factual background," she is incorporating and adopting the facts and arguments she'd stated in the motion to suppress. Dkt. No. 42 at 7. Oddly, she then went on to articulate a detailed factual background. Id. at 7-9. Because this court only reviews those portions of a magistrate judge's report and recommendation to which a party specifically objects (see Federal Rule of Criminal Procedure 59), the court will work from Judge Duffin's facts. He wrote:

> On November 21, 2015, Officers Joel Bunkelman and Samphanh Luangphaxayachack of the Milwaukee Police Department "were dispatched to a 'Dead on Entry' call" at a residential address. (ECF No. 34-3 at 4.) They found F.E. dead "on the floor of a bedroom located on the second floor." (*Id.*) They interviewed F.E.'s sister, Barbara Strehlow, who stated that she last saw F.E. alive at 9:30 p.m. the night before and that "he was very intoxicated." (*Id.*)
>
> Officer Bunkleman reported that F.E.'s "prescription[s] for Morphine and Oxycodone were filled on 11/19/15." (ECF No. 34-3 at 4.) "The Morphine had 19 pills short of [i]ts regular use and the Oxycodone was approximately 85 short of its regular use." (*Id.*) He also reported that "[t]here was $640.00 dollars in US currency that was located in the drawer next to the bed . . . all in $20 denominations." (*Id.*) The money "was given to [F.E.'s niece] who is a Milwaukee Police Officer." (*Id.*) Officer Bunkelman concluded his report stating, "[T]his case is closed." (*Id.*)

> Milwaukee County Medical Examiner Investigator Anne-Marie Eschle "responded to the scene and took control of the body[,] [and] [t]he body was then transported to have an autopsy performed." (ECF No. 34-3 at 4.) Eschle observed "[a] mostly full 750 mL bottle of Old Thompson American Whiskey and a partial 1 pint 8 ounce bottle of Corona beer" on a TV tray. (ECF No. 34-2 at 4.) Strehlow "admitted to getting [F.E.] a bottle of whiskey as [Strehlow] . . . was worried he would go out while he was drunk and get his own." (*Id.*) "The oxycodone 30 (mg) was filled on 11/19/15 for 150 pills . . . [and] [t]here were only 50 left." (*Id.*) "The Morphine sulfate (60 mg) was also filled on 11/19/15 for 60 pills . . . [and] [t]here were 35 remaining." (*Id.*) Strehlow stated that she "knew her brother to abuse medications but also believe[d] he may have been selling them as well." (*Id.* at 6.) F.E.'s mediations "were not taken by [the Milwaukee Police Department] as the family indicated they would take them to the pharmacy to be destroyed." (*Id.* at 4.)
>
> An autopsy was performed on F.E. body, and the results from a toxicology report confirmed the presence of "Morphine (free)" at 50 mcg/L, oxycodone at 840 mcg/L, and oxymorphone at 60 mcg/L. (ECF No. 34-2 at 10-11.) F.E.'s death certificate lists "[a]cute mixed drug intoxication (Oxycodone and Morphine)" as the "immediate cause of death." (*Id.* at 8.)

Dkt. No. 37 at 2-3.

### B. Procedural Background

#### 1. *Judge Duffin's Report and Recommendation* (Dkt. No. 37)

Judge Duffin observed that the defendant sought suppression of the toxicology report, the autopsy report and any evidence pertaining to the cause of F.E.'s death. Id. at 3-4. The motion hinged on the defendant's contention that law enforcement had failed to preserve bottles of alcohol, pill bottles and pills, and cash, and had failed to properly test F.E. for the presence of alcohol before determining the cause of his death. Id. The defendant had argued that in a "distribution causing death" case, the government had to prove knowing and

intentional distribution, and death caused by use of that drug. See dkt. no. 34 at 1 (citing Burrage v. United States, 571 U.S. 204 (2014)). She argued that retention of the pills and medication bottles would have allowed her to determine the number of pills in the bottle and determine whether she had prescribed them. Id. at 6. She contended that the failure to preserve the bottles of alcohol prohibited her from determining the amount of alcohol F.E. had consumed. Id. The defendant asserted that the failure to retain the cash prohibited her from determining whether the case was related to a drug sale. Id. Finally, she argued that the medical examiner improperly failed to test F.E.'s body to determine his blood alcohol level at the time of his death. Id.

Judge Duffin applied the standard articulated in Arizona v. Youngblood, 488 U.S. 51 (1988), where the Supreme Court said that a criminal defendant has not suffered a denial of due process as a result of the government's failure to preserve potentially exculpatory evidence unless the defendant can show bad faith on the part of the police. Dkt. No. 37 at 6 (citing United States v. Cherry, 920 F.3d 1126, 1140 (7th Cir. 2019)). He observed that "'[t]o establish a *Youngblood* violation, [the defendant] must show that the government acted in bad faith, that the exculpatory nature of the evidence was apparent, and that the evidence could not be obtained elsewhere.'" Id. (quoting Tabb v. Christianson, 855 F.3d 757, 768 (7th Cir. 2017)).

Judge Duffin found that the defendant had not presented evidence that the officers and/or the medical examiner had acted in bad faith. Id. He noted that while the defendant criticized the methods used by police, "'criticism of

police methods does not by itself establish a constitutional violation.'" Id. at 7 (citing Hart v. Mannina, 798 F.3d 578, 588 (7th Cir. 2015)). He reasoned that even assuming that the alcohol bottles, medication bottles, pills, cash and potential presence of alcohol in F.E.'s system could all be considered exculpatory, the defendant had not presented any evidence that the exculpatory nature of those items would have been apparent before their destruction. Id. He noted that the officers and medical examiners may have been aware that alcohol could have been a contributing factor in F.E.'s death, but that "there is nothing to suggest that they were aware of a potential investigation into the prescriber of F.E.'s medication." Id. Judge Duffin observed that the police reports did not suggest that anyone be investigated and that Officer Bunkelman concluded his report by stating, "'This case is closed.'" Id. at 7 (quoting dkt. no. 34-3 at 4). Judge Duffin recommended this court deny the motion to suppress because there was no evidence that the government had acted in bad faith and because the exculpatory nature of the evidence was not apparent before its destruction. Id. at 8.

    2.  *The Defendant's Objection* (Dkt. No. 42)

The defendant first objects that the government acted in bad faith. Dkt. No. 42 at 9. In support of this objection, she argues that the government actors would have known that the evidence "would play a significant role in Defendant's case" because "F.E. was a reported alcoholic, drug abuser, and drug dealer who at or near the time of his death was heavily intoxicated and apparently died of drug and alcohol abuse." Id. at 10. She also disagrees with

5

Judge Duffin's finding that the investigators would not have been aware of the potential of an investigation. Id. She alleges that on November 23, 2015—two days after F.E.'s death—"the M.E.'s office was inquiring about Defendant." Id. (citing dkt. no. 34-2 at 6). She references the medical examiner's January 4, 2018 report, which stated that on November 23, 2015, an employee of the Medical Examiner's office spoke to someone at Tosa Pain Management and was told that "[t]here is no NP Hofschulz that works at this location any more. Google search turned up nothing as well. [F.E.] wasn't seen at this location in over a year they said." Id. at 8-9 (citing dkt. no. 34-2 at 6). Finally, the defendant contends that the way law enforcement disposed of the evidence "suggests some animus or an effort to suppress exculpatory evidence." Id. at 10. She says that because law enforcement allowed the victim's family to dispose of the medication, rather than taking it "to a pharmacy or other approved disposal site," there was no official record about how the medication was disposed of. Id. She asserts that if the investigators had preserved the medications, those medications "may have demonstrated that F.E. had medications that were not prescribed to him." Id.

  The defendant next argues that if the court agrees with Judge Duffin that the exculpatory nature of the evidence wasn't apparent to the investigators, "the proper course is to hold an evidentiary hearing to determine whether the officers acted with "'official animus' or a 'conscious effort to suppress exculpatory evidence.'"" Id. at 11 (citing Jones v. McCaughtry, 965 F.2d 473, 477 (7th Cir. 1992)). She contends that "when determining whether a party

6

acted in bad faith, an evidentiary hearing should be held." Id. (citing United States v. Salem, 578 F.3d 682, 690 (7th Cir. 2009)). The defendant asserts that if Judge Duffin believed that the exculpatory nature of the evidence was not apparent to the investigators, "the appropriate course of action would have been to order an evidentiary hearing on the police's reasoning for turning over dangerous controlled opiate medication and cash likely used in the commission of illegal drug distributions to the family of the deceased for disposal." Id. at 12. She argues that an evidentiary hearing would allow her to question the on-scene officers about whether their actions complied with standard procedure. Id.

### 3. *The Government's Response* (Dkt. No. 43)

The government responds that the defendant has done nothing more than restate the arguments in the suppression motion—she still has not presented any evidence of bad faith. Dkt. No. 43 at 4. The government opined that, in assuming without deciding that the evidence was exculpatory and deciding the motion on the ground that the investigators had no reason to know it would be needed in a future investigation, Judge Duffin had decided the motion "on the cleanest, most obvious ground." Id. at 5. Acknowledging that this court could adopt the recommendation on that basis alone, the government nonetheless argued that the defendant had not demonstrated that the alcohol bottles, medication bottles or cash were either exculpatory or not otherwise available. Id.

The government contends that because the medical examiner tested F.E.'s body for alcohol, "it is not clear how the presence or absence of additional bottles of alcohol is relevant to whether the oxycodone and morphine [the defendant] distributed to F.E. was the 'but for' cause of his death." Id. It asserts that if the defendant plans to argue that alcohol caused F.E.'s death, she can call F.E.'s sister or the scene investigators to testify about the presence of the bottles. Id. The government asserts that because the defendant can obtain live testimony about the lost evidence, she can't sustain a bad-faith claim. Id.

As to the pill bottles and pills, the government says that there are photos of the prescription bottles reflecting the prescription numbers and the pharmacy that filled them. Id. at 6. It asserts that the pharmacy records and F.E.'s medical records would show what had been prescribed to him, and the on-scene investigators' pill count would show how many pills remained in each bottle. Id.

Finally, the government questions how having the actual, physical cash would allow the defendant to figure out if the cash was related to a drug sale and asserts that the defendant can call witnesses to testify as to how much cash was present at the scene. Id.

Next, the government argues that Judge Duffin correctly concluded that there was no evidence indicating that the investigators were aware of a potential investigation into the prescriber of F.E.'s medication. Id. As for the November 23, 2015 contact between the medical examiner's office and the

person at Tosa Pain Management, the government says that it was a routine call by the medical examiner's office to a medical provider of a decedent to obtain information to assist in an accurate autopsy, not a contact by a police officer conducting a criminal investigation. Dkt. No. 43 at 7. As for the way the investigators disposed of the evidence, the government reiterates that the officers were not aware of any possible future investigation and it asserts that "allowing a family member to dispose of medication is not suspicious or unusual." Id. at 8. The government emphasizes that the investigators took the steps one would expect them to take in investigating what they believed to be an accidental overdose—they interviewed the decedent's sister, took photos of the scene, and turned the body over to the medical examiner for an autopsy. Id.

The government also opposes the defendant's request for an evidentiary hearing. It contends that the defendant waived her right to an evidentiary hearing by not asking Judge Duffin to hold one. Id. at 8. It argues that if this court does not find that the defendant waived her right to a hearing, she still has not proffered enough evidence to show that there are disputed issues of material fact that that a hearing would allow the court to resolve. Id. at 9 (citing United States v. McGaughy, 485 F.3d 965, 969 (7th Cir. 2007)). The government points out that the defendant wants a hearing for the purpose of determining bad faith—essentially, she is seeking a Franks hearing. Id. at 10 (citing Franks v. Delaware, 438 U.S. 154 (1978)). It argues that a defendant is not entitled to a Franks hearing unless she can make a substantial preliminary

9

showing of bad faith, citing United States v. Williams, 718 F.3d 644, 649 (7th Cir. 2013). Id.

Finally, "in the interest of completeness," the government says that even if the court finds that law enforcement acted in bad faith by not preserving the evidence, the appropriate remedy is not to suppress the evidence. Id. at 10-11. The government points out that the suppression motion asked the court to suppress the toxicology report, autopsy report, death certificate and any testimony or forensic evidence as to the cause of F.E.'s death. Id. at 11. The government asserts that the effect of such a broad ruling would be dismissal of the charges against the defendant—too drastic a sanction. Id.

The defendant did not file a reply.

## II.   STANDARD OF REVIEW

Rule 59(b) governs the referral of motions to suppress to magistrate judges. Fed. R. Crim. P. 59(b). When reviewing a magistrate judge's recommendation, the district judge must review *de novo* the recommendations of the magistrate judge to which a party timely objects. 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b)(2), (3). The court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. §636(b)(1).

## III.  ANALYSIS

In Youngblood, the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."

Youngblood, 488 U.S. at 58. Where a defendant charges the government with failing to preserve potentially exculpatory evidence, the Seventh Circuit has established a three-pronged test: the defendant must show "(1) bad faith by the government, (2) the exculpatory nature of the evidence was apparent before its destruction, and (3) that [s]he could not obtain the same evidence anywhere else." United States v. Fletcher, 634 F.3d 395, 407 (7th Cir. 2011); see also Tabb v. Christianson, 855 F.3d 757, 768 (7th Cir. 2017). Bad faith on behalf of the government "requires more than carelessness, it requires a 'conscious effort to suppress exculpatory evidence.'" Fletcher, 634 F.3d at 409 (quoting United States v. Chaparro-Alcantara, 226 F.3d 616, 624 (7th Cir. 2000)).

The defendant has not offered any evidence or argument that at the time of the November 21, 2015 discovery of F.E.'s body, the police officers and other law enforcement professionals investigating the scene were aware of or should have been aware of a potential investigation into the prescriber of the decedent's medication (or into anyone else, for that matter). Police officer Joel Bunkelman reported to the medical examiner that "there was no sign of trauma and nothing suspicious at the scene." Dkt. No. 34-2 at 4. Bunkelman's report indicated that when he arrived at the scene, he was told by an EMT who had reported to the scene that F.E. had been dead for some ten to twelve hours and he had been pronounced him dead at 2:43 p.m. Dkt. No. 34-3 at 4. The decedent's sister (who lived next door) had reported seeing him alive some seventeen hours earlier, and had reported that he had numerous health problems and "struggled with severe alcoholism and also abuse[d] pain

11

medication." Id. The sister reported that when she'd last seen F.E., he was "very intoxicated." Id. Bunkelman reported that both F.E.'s morphine and oxycodone prescriptions were short a significant number of pills. Id. He reported no signs of suicide. Id. The cash—$640—was in a drawer next to F.E.'s bed. Id. After describing the arrival of the medical examiner and the transport of the body, Bunkelow concluded, "[t]his case is closed." Id.

There is nothing whatsoever about the circumstances Bunkelow described that would give him, or anyone else, reason to suspect that further investigation might be necessary. The decedent's own sister reported that she'd seen him very drunk and that he struggled with alcoholism and abused pain pills, and a significant number of pain pills were missing from the decedent's prescriptions. That, combined with the defendant's health problems, pointed to an accidental overdose. Indeed, the defendant has not suggested that F.E.'s death was anything other than an accidental overdose. Rather, she suggests that somehow Bunkelman and the other investigators should have suspected that whoever gave F.E. the pain medication might end up being investigated. It's not clear to the court why the investigators would have suspected this.

The defendant sees significance in the fact that two days *after* Bunkelman investigated the scene, someone from the medical examiner's office contacted Tosa Pain Management and asked whether the defendant worked there. The defendant does not explain how the fact that someone from the *medical examiner's* office asked after the defendant two days *after* the police completed their investigation shows that the police would know two days

12

earlier that the medical examiner would make such an inquiry. The government has offered a benign explanation—in a case involving what appeared to be an overdose, the medical examiner contacted the prescriber as part of the autopsy procedure. That may be what happened. But even if the court assumes that the contact is evidence of some governmental suspicion of the defendant, the defendant does not explain how it proves that the investigators were aware of that governmental suspicion *two days earlier*.

The defendant's argument that law enforcement should not have allowed the decedent's family to dispose of the drugs is nothing more than criticism of law enforcement methods—which does not itself show bad faith. Hart, 798 F.3d at 588. And the defendant makes contradictory arguments. On one hand, she objects that because the family disposed of the pills, there is no record of how the pills were disposed of. The court does not see why such a record would matter. On the other hand, she asserts that law enforcement should have maintained the pills, speculating that doing so might have enabled the defendant to figure out whether she prescribed them. Even if that is true, it doesn't demonstrate how the investigators on the scene should have known that the defendant was likely to become the target of an investigation.

Given the fact that a defendant arguing bad faith has to show a conscious effort on the part of law enforcement to destroy (or here, fail to preserve) exculpatory evidence, the court notes that the defendant has not explained what motive the scene investigators would have had for failing to preserve the evidence. Whose ox would they have been trying to gore? Why

13

would officers conducting a routine death investigation decide to tinker with evidence at a scene that gave every indication of accidental overdose?

Judge Duffin is correct—even if the alcohol bottles, pill bottles and cash somehow constitute "exculpatory" evidence (and the court isn't sure how they would), the defendant has not presented an iota of evidence to show that the investigators knew that the evidence would be needed in the future.

While it need not reach the issue, the court observes that the defendant's insistence that the "proper" course of action is for this court to hold an evidentiary hearing borders on frivolous. This court's Criminal Local Rule 12(c) states,

> If a motion seeks an evidentiary hearing, the movant must provide in the motion a short, plain statement of the legal issue or issues at stake and specific grounds for relief in the motion and, after a conference with the non-movant, provide a description of the material disputed facts that the movant claims require an evidentiary hearing. The movant also must provide an estimate of the in-court time necessary for the hearing. The non-movant may file a response opposing an evidentiary hearing within 3 days after filing of a movant's motion seeking an evidentiary hearing. The non-movant's response must include a short, plain statement of why that party believes that an evidentiary hearing is unnecessary.

Neither the defendant's motion to suppress nor her supporting memorandum ask for an evidentiary hearing, much less comply with Criminal L.R. 12(c). She implies that Judge Duffin should have ordered such a hearing *sua sponte*, and that because he didn't, it is this court's obligation to do so. She is wrong on both counts.

"Arguments not made before a magistrate judge are normally waived." United States v. Melgar, 227 F.3d 1038, 1040 (7th Cir. 2000). "A willingness to

consider new arguments at the district court level would undercut the rule that the findings in a magistrate judgment's report and recommendation are taken as established unless the party files objections to them." Id.

Even if there were some factual dispute that an evidentiary hearing would have helped resolve—and there isn't—the defendant waived her right to an evidentiary hearing by failing to request one and by failing to comply with Criminal L.R. 12(c).

## IV. CONCLUSION

The court **OVERRULES** the defendant's objections to Judge Duffin's report and recommendation. Dkt. No. 42.

The court **ADOPTS** Judge Duffin's report and recommendation, dkt. no. 37, and **ORDERS** that the defendant's motion to suppress is **DENIED**, dkt. no. 33.

The court has calendared the final pretrial conference for September 19, 2019 at 1:30 p.m. in Courtroom 222, and the trial (estimated to last seven days) for October 7, 2019 at 8:30 a.m., also in Courtroom 222. Dkt. No. 32. The court issued its standard pretrial scheduling order on January 31, 2019. Dkt. No. 28.

Dated in Milwaukee, Wisconsin this 19th day of July, 2019.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**United States District Judge**