UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

                                  Case No. 18-cr-145-pp

  v.

LISA HOFSCHULZ, and
ROBERT HOFSCHULZ,

        Defendants.

**ORDER DENYING SECOND MOTION TO CONTINUE (DKT. NO. 80), DENYING MOTION TO RECONSIDER REQUEST TO CONTINUE (DKT. NO. 85), GRANTING MOTION TO WITHDRAW AS COUNSEL (DKT. NO. 85), DEFERRING RULING ON MOTION FOR COMPETENCY EVALUATION (DKT. NO. 83) AND IMPOSING COSTS**

The court was scheduled to begin the trial in this case Tuesday, February 18, 2020 at 8:30 a.m. Although the trial has been scheduled since September 18, 2019, <u>see</u> dkt. no. 59, the trial did not begin Tuesday morning. This order explains the events that led to the court allowing the withdrawal of counsel for defendant Lisa Hofschulz, which necessitated an adjournment of the trial. It also defers ruling on defendant Lisa Hofschulz's motion for a competency evaluation and imposes costs on Attorney Beau Brindley.

I.     **Procedural History**

     A.    <u>Events Prior to Attorney Beau Brindley's Appearance</u>

The grand jury returned the indictment in June 2018, charging both defendants with one count of conspiracy to distribute drugs such as Oxycodone and Methadone outside of a professional medical practice, and

1

charging Lisa Hofschulz with thirteen substantive counts of distribution, four of which also included Robert Hofschulz. Dkt. No. 1. The arraignment and plea took place on July 19, 2018; Attorney Brent D. Nistler appeared for Lisa Hofchulz and Attorney Jonathan Smith appeared for Robert Hofschulz. Dkt. No. 6. The case proceeded relatively uneventfully for four months. On November 30, 2018, however, Attorney Ronald W. Chapman, II, L.L.M., of Chapman Law Group in Troy, Michigan, filed a notice of appearance on behalf of Lisa Hofschulz.[1] Dkt. No. 19.

On February 26, 2019, the grand jury returned a superseding indictment. Dkt. No. 29. The charges were identical to those in the original indictment with one exception: a fifteenth count charged Lisa Hofschulz with knowingly and intentionally distributing Oxycodone and Morphine to an individual whose death resulted from the use of those drugs. Id. at 8. That new charge carried a mandatory minimum sentence of twenty years. Dkt. No. 32 at 2. At the arraignment on the superseding indictment, the magistrate judge scheduled a final pretrial conference for September 19, 2019 and a trial (expected to last seven days) for October 7, 2019. Dkt. No. 32.

Lisa Hofschulz timely filed a motion to suppress evidence. Dkt. No. 33. The motion was signed by both Attorney Chapman and Attorney Nistler. Id. at 2. After full briefing, the magistrate judge recommended that this court deny

---

[1] Mr. Chapman's web site indicates that he is a "highly sought-after healthcare defense attorney by . . . practitioners nationally who are facing suspicion or charges of . . . unlawful prescribing." https://www.chapmanlawgroup.com/ attorney/ronald_chapmanII/ He lists among his achievements the acquittal after trial of a prominent physician charged with running "pill mills." Id.

the motion to suppress. Dkt. No. 37. Attorneys Chapman and Nistler objected on Lisa Hofschulz's behalf, dkt. no. 42, the government responded, dkt. no. 43, and this court overruled Hofschulz's objection and denied the motion to suppress, dkt. no. 44.

The court issued its order denying the motion to suppress on July 19, 2019. Dkt. No. 44. On August 2, 2019—two weeks after the court denied the motion to suppress, and eight months after he had made his appearance— Attorney Chapman filed a motion to withdraw from representing Lisa Hofschulz. Dkt. No. 45. Attorney Chapman recounted that he had been contacted by Attorney Nistler in November 2018 to appear as co-counsel, but stated that there had been "an irrevocable breakdown in the attorney-client relationship," and that Lisa Hofschulz had "made her intention clear that she wishe[d] to continue her case with attorney Brent Nistler." Id. at 2. Attorney Chapman represented that he was "unable to move forward with representation." Id. He told the court that he was not aware of "any expected delays" and that the government would not be prejudiced by his withdrawal. Id. He also stated that "[d]efendant's retained counsel, Brent Nistler has no object [sic] to this motion." Id. Although the October 7 trial was only two months away, the court granted the motion, dkt. no. 48; Attorney Nistler remained counsel of record.

Meanwhile, the government had filed an unopposed motion for an extension of time to file the joint pretrial report. Dkt. No. 47. The government cited a change in the trial team—one prosecutor had become U.S. Attorney and

the other was moving. Id. The government asked, without opposition, that the court give the parties an extra week to file the final pretrial report. Id. The court granted the motion and adjourned the final pretrial conference to September 26, 2019. Dkt. No. 49.

When Attorney Brent Nistler first appeared for Lisa Hofschulz, he had his own firm, Nistler Law Office, S.C. in Wauwatosa, Wisconsin. See, e.g., Dkt. No. 13. As of at least May 31, 2019, Attorney Nistler still listed the Wauwatosa address for his firm. Dkt. No. 42. In July 2019, however, Attorney Nistler joined the law firm of Hansen Reynolds.[2] On August 20, 2019—not quite three weeks after Attorney Chapman moved to withdraw—Attorney James F. Cirincione filed a notice of appearance for Lisa Hofschulz. Dkt. No. 50. Attorney Cirincione's notice indicated that he was with the law firm of Hansen Reynolds in Milwaukee. Id. Attorney Cirincione filed his notice of appearance five weeks prior to the final pretrial conference.

On September 18, 2019—a month after Attorney Cirincione filed his notice of appearance, and a week before the final pretrial conference—Lisa Hofschulz filed a motion asking the court to adjourn the October 7, 2019 trial for ninety days. Dkt. No. 58. The motion was signed by Attorney Nistler and Attorney Cirincione, both of whom by then were with the Hansen Reynolds firm. Id. at 1. The motion noted that the deadline for disclosing the identities of

---

[2] The court did not know of that move at the time, and there is no indication of the July move date on the docket; Attorney Nistler made this representation to the court at a hearing on September 18, 2019, which the court describes in this order.

experts was looming, and that while Lisa Hofschulz had anticipated calling an expert named Dr. Robert Odell, Odell had "contacted counsel for Defendant at approximately 9:20 A.M. on September 18, 2019, and unexpectedly informed counsel that he would be unable to testify in this matter." Id. at 2. The motion also represented that the government recently had produced 3,000 pages of documents "containing information that is relevant to the Defendant's ability to present a defense and potentially exculpatory." Id. The motion indicated that the defendant needed the adjournment "in order to evaluate other physicians who may be able to testify as an expert in this matter and consider the relevance of the material recently produced by the government to her defense." Id. at 2-3.

Concerned about receiving a motion to adjourn less than three weeks before trial, the court held a hearing the same day. Dkt. No. 59. Attorneys Nistler and Cirincione appeared for Lisa Hofschulz. Id. at 1. The court's usual practice is to attach the audio recording of the hearing to the docket; it did not do so for the September 18 hearing for reasons explained below. The court has since reviewed the audio from the hearing, however, and the arguments the parties made at that hearing are relevant to the motions the court decides in this order. Some of the facts recounted below are memorialized in the court's written minutes; others come from the court's review of the audio recording.

Defense counsel explained that the defendant had planned to call an expert, but had learned only that morning that the expert would not testify. Counsel also reiterated that the government recently had produced a

significant amount of exculpatory discovery. Defense counsel told the court that the defense had been surprised to learn that the expert, Dr. Odell, would not testify, and that it had filed the motion to adjourn within two hours of learning that fact. After citing case law in support of his request, Attorney Nistler explained that while he understood the reasons the government was objecting to the adjournment, his client was facing life in prison. He stated that he was seeking an adjournment of only three months, that the need for the adjournment was not foreseeable and that given the loss of the expert that day, there was no way the defense could identify a new expert by the next day's disclosure deadline. He noted that the superseding indictment had been returned only seven months ago, and that this was the first time the defense had requested an adjournment.

The court noted that Mr. Nistler had not stated that Dr. Odell had a conflict with the trial date; rather, he'd stated that Dr. Odell would not be testifying, period. Attorney Nistler confirmed that fact. He explained that Dr. Odell had been brought into the case by Attorney Chapman, and that Dr. Odell had received the medical records from Attorney Chapman in July (a couple of months earlier). When the court asked whether defense counsel had anticipated that Odell would be testifying, Attorney Nistler indicated that he was reluctant to discuss that. Counsel did confirm that the defense had retained Odell and that he'd been paid to be an expert for the defense. The court asked Attorney Nistler to confirm that as result of whatever he'd learned

from Odell earlier that day, the defense no longer had an expert witness. Nistler confirmed that fact.

The government walked the court through the factors the Seventh Circuit said courts should consider in exercising its discretion to adjourn a trial date. The prosecutor began by noting that the defense had had ample time to prepare for the trial. She reminded the court that the grand jury had returned the original indictment June 28, 2018—over a year earlier—and stated that the government had informed the defense at that time that it would be seeking to supersede that indictment to add a "death resulting" count against Ms. Hofschulz. She noted that the October 7 trial date had been on the calendar for ten months—since January 2019. She explained that the government had disclosed the identities of its experts and produced their reports early in the case. Given that, and given the fact that the defense had not explained why Dr. Odell would not testify, the government expressed skepticism about the defense team's claim that it had learned only this morning that it had no expert, and expressed skepticism about whether the expert truly was not available.

The government explained that it had learned that the day before, the University Medical Center had issued an adverse action against Odell, revoking his membership and privileges because of something that had happened with some of his patients. The prosecutor told the court that the adverse action proceedings had started some time ago, in the summer, but that defense counsel had elected to keep Odell as a witness because the defense team felt confident the issues relating to the possible adverse action would be resolved in

Odell's favor. When the adverse action was handed down the day before, the government told the court, the defense had contacted the government and asked whether it would agree to an adjournment. Counsel said that while the government was not willing to agree to an adjournment, it informed the defense that it would agree not to cross-examine Odell on the adverse action or the circumstances leading to it, taking that issue "off the table." The government pointed out that despite that agreement, the defense had today filed this motion to adjourn.

The government argued that this motion was the latest in a series of "machinations" in which the defense had engaged to try to obtain an adjournment. She explained that when her predecessor counsel, AUSA Zachary Corey, had moved to Madison, the government had contacted the defense team and requested a short adjournment to allow the new prosecutor to get up to speed. The defense denied that request. So, counsel said, the government "moved heaven and earth" to get three new prosecutors to clear their dockets and get up to speed on the case, to be ready to go to trial on October 7. The prosecutor recounted that several weeks later, however, defense counsel had contacted the government seeking an adjournment. The government refused, having by that time begun trial preparation in earnest. It was at that point, the prosecutor told the court, that Attorney Cirincione made his appearance. Once Attorney Cirincione appeared, counsel told the court, the defense team had expressed to the government its belief that Attorney Cirincione's participation in the case might cause the undersigned to recuse herself, resulting in an

adjournment regardless of whether the government agreed. The prosecutor noted that the court had not recused, but reiterated that the next significant event was the adverse action by the University Medical Center against Odell, which took place the day before the defense filed its motion to adjourn.

Regarding the alleged production of thousands of pages of exculpatory evidence, government counsel explained that most of the records it had produced were Veterans' Administration medical records for F.E., the individual referenced in Count Fifteen, the "death-resulting" count against Lisa Hofschulz. She argued that these records had nothing to do with Hofschulz's prescriptions or the cause of F.E.'s death, and told the court that the government was not going to use the records. She stated that the government had obtained the records in an abundance of caution, *for* the defense. The prosecutor observed that if the defense had thought these records important, it could have sought a court order to obtain them. The government did that instead, and as a courtesy, provided the records to the defense team. The prosecutor also pointed out that because Hofschulz was treating F.E., she ought to have seen his medical records from other treatment providers, or at least ought to have known that he was being treated by others.

The prosecutor emphasized that an adjournment would impact the victims. She told the court that several testifying witnesses had developed addictions as a result of Hofschulz's prescription practices; they had been forced to detox and rebuild their lives. There were other victims whom the government would not be calling to testify, but who had a deep interest in

seeing the case resolved expeditiously. Some of the testifying witnesses had to travel from a distance for trial preparation, and would have to do so again for trial. Counsel also expressed concern for the public, noting that the Hofschulz's pain clinic continued to operate under Mr. Hofschulz's direction, and that while Lisa Hofschulz was prohibited from prescribing medication, she continued to practice medicine with one of the other doctors at the pain clinic who *could* prescribe.[3]

Finally, the government informed the court that the defense never had provided the government with a written report from Odell, saying that no such report existed. The government had no idea what the substance of Odell's testimony would have been, or whether his testimony even would have been admissible or relevant. Noting that the defense claimed it was asking for a mere ninety-day adjournment, the prosecutor questioned whether the defense would be able to find anyone to say what the defense wanted that person to say within ninety days. The prosecutor also noted that she had looked at this court's upcoming trial calendar, and suspected that the court would not be able to schedule an adjourned trial date in ninety days. She reiterated that the government opposed the adjournment, but asked that if the court felt the adjournment was necessary, it select a date as soon as possible, make that trial date a "firm" date, and set a deadline far in advance of that date for the

---

[3] In the July 2018 bond study, Lisa Hofschulz reported that she co-owned Clinical Pain Consultants in Milwaukee with Robert Hofschulz, her former husband, and that she'd co-owned the business since 2015. Dkt. No. 3 at 2. At that time, she worked full-time as a psychiatric nurse practitioner for Dr. James Halikas in Naples, Florida, where she lives. Id.

parties to disclose the identities of experts, their reports and the summaries of their testimony.

Before hearing any further argument, the court addressed the appearance of Attorney Cirincione. The court indicated that it was "no secret" that Attorney Cirincione had served as a law clerk for the court.[4] The court explained that some courts had rules about how long after the conclusion of a clerkship a former clerk could appear before his or her judge; the court explained that it had a practice of recusing itself from cases involving former law clerks for two years after the conclusion of the clerkship. The court observed that the defense team may have been concerned that the court would recuse itself due to Attorney Cirincione's having clerked for the court, but noted that it had been more than two years since Attorney Cirincione's clerkship had concluded, which was why it had not recused itself.

At this point, defense counsel offered to disclose to the court, off the record, the reason for Odell's unavailability. The court asked government counsel, the co-defendant and his counsel to leave the courtroom, then heard from counsel for Lisa Hofschulz off the record. After calling all parties back into the courtroom, the court reluctantly adjourned the trial, expressing its concern that the defendant would need to present an expert on best practices and prescription standards, and that it had concluded that Odell could not be that witness. Dkt. No. 59 at 2. The court adjourned the final pretrial conference to

---

[4] Attorney Cirincione clerked for the undersigned from March 2015 to March 2017.

January 31, 2020 and the trial to February 18, 2020—a firm trial date five months out. Id. The court ordered the parties to disclose the identities of their expert witnesses no later than December 20, 2019; that they file motions *in limine* by January 17, 2020 (with responses due by January 24, 2020), and that they file the final pretrial report by January 24, 2020. Id.

### B. Events After Attorney Brindley's Appearance

Nine days after the hearing at which the court agreed to adjourn the trial for five months, it received a motion to substitute counsel filed by Attorney Beau B. Brindley as "Attorney for Defendant." Dkt. No. 60. The motion—a paragraph long—asked the court to "withdraw the appearance of current counsel" and substitute Attorney Brindley and Attorney Michael J. Thompson, "her counsel of choice," to represent Lisa Hofschulz. Id. The government responded that it had no objection to the substitution, *if* it did not result in further adjournment of the trial date. Dkt. No. 61. Attorney Brindley promptly filed a four-page reply indicating that he was scheduled to begin a jury trial in United States v. Ferguson, Case No. 18-cr-734 in the Northern District of Illinois on February 10, 2020. Id. at 1. He stated that Ferguson was a multi-defendant trial scheduled to last two weeks, "making it impossible for the undersigned to conduct trial for Ms. Hofschulz as currently scheduled on February 18." Id. The remainder of the motion cited cases from the Supreme Court and the Eighth Circuit (as well as two cases from the Seventh Circuit) in support of Brindley's contention that Lisa Hofschulz had a right to counsel of her choice and that a court's "myopic insistence" on proceeding in the face of a

valid continuance request would violate the Due Process Clause and Lisa Hofschulz's Sixth Amendment rights. Id. at 1-3. He concluded by asking the court to adjourn the February 18, 2020 trial date. Id. at 3.

The court was concerned about these newest developments. Attorney Chapman had come and gone. The government had sought a short adjournment upon losing its lead trial counsel, to which the defense had refused to agree. Later, the defense had sought an adjournment for its own reasons; when the government declined that request, Attorney Cirincione had appeared (and the government implied that the defendant had brought him on in the hope that the undersigned would recuse herself, thus forcing an adjournment that the government opposed). The court had granted the defendant's opposed motion to adjourn and given the defendant five more months to prepare for trial, only to have her ask to shed Attorneys Nistler and Cirincione a week later in favor of Attorney Brindley. Like the government, the court opposed adjourning the trial date again, especially given its assertion that the February 18, 2020 trial date was firm. So it scheduled a hearing for October 15, 2019 at 3:00 p.m. to hear argument on the motion to substitute counsel/adjourn the trial.

On October 11, 2019, in what was to become a pattern, Attorney Brindley filed a motion to adjourn the October 15, 2019 hearing. Dkt. No. 63. He told the court that on October 15, he was to be in trial in People v. Henderson, Case No. 18-cr-5102 (Cook County), and that the State's Attorney had confirmed that the trial was going to proceed as scheduled. Id. at 1. He

13

stated that "[d]ue to other matters scheduled the following week," he wanted the court to set the hearing for "October 25, 2019, if that date is convenient to the Court." <u>Id.</u>

Rather than go through the contortions of trying to find a time or date that worked for Attorney Brindley, his co-counsel, the government and the court, the court denied as moot the motion to adjourn the October 15 hearing, deferred ruling on the motion to substitute counsel and gave Lisa Hofschulz a deadline of October 25, 2019 to advise the court whether (a) she wanted to find a different lawyer who would be available to try the case on February 18, 2020 or (b) Attorney Brindley could arrange his calendar to be available for trial on that date. Dkt. No. 64. The court made these rulings in a seven-page order that explained in detail the history of the case to date and the concerns that militated against adjournment, including the fact that "[t]he court ha[d] protected the February 18, 2020 trial date and ha[d] scheduled no other hearings during [that] time, even though that means scheduling sentencing hearings into May and June." <u>Id.</u> at 6. The court stated, "If the defendant wants Attorney Brindley to represent her, that is her choice, but if that is the choice she makes, Attorney Brindley should be prepared to proceed to trial on February 18, 2020." <u>Id.</u> at 6-7.

A week later, Lisa Hofschulz, through Attorney Brindley, filed a status report affirming that she wanted Attorney Brindley to represent her, emphasizing that he was her counsel of choice and indicating that Brindley had confirmed "that, if necessary, he will be ready and available to try this case

on February 18, 2020 as scheduled." Dkt. No. 65. Given that representation, the court granted the motion to substitute Attorney Brindley for Attorneys Nistler and Cirincione; as of October 22, 2019—just shy of four months from the February 18, 2020 trial date—Attorney Brindley took over as counsel of record for Lisa Hofschulz. Dkt. No. 66.

The remainder of October and November passed with no filings from Attorney Brindley, as did the first three weeks of December. Recall that when it adjourned the October 7 trial at the request of Attorneys Nistler and Cirincione, the court had ordered the parties to disclose the identities of their expert witnesses by December 20, 2019. Dkt. No. 59 at 2. On December 20, the government filed its notice, disclosing the identities of four potential experts and providing *curriculum vitae* for three of them. Dkt. Nos. 69, 69-1 to 69-3. Attorney Brindley did not file anything, even though the purported reason Lisa Hofschulz had requested an adjournment of the October 7 trial was to be able to secure an expert.

Recall that when it adjourned the October 7 trial, the court ordered the parties to file motions *in limine* by January 17, 2020. Dkt. No. 59 at 2. On Janaury 17, 2020, the government filed consolidated motions *in limine*. Dkt. No. 70. There was radio silence from Attorney Brindley.

Recall that when the court adjourned the October 7 trial, it ordered the parties to file their final pretrial report (including exhibit lists, witness lists, proposed *voir dire* questions and proposed jury instructions) by January 24, 2020. Dkt. No. 59 at 2. On January 24, 2020, the government and *Robert*

Hofschulz filed a joint pretrial report. Dkt. No. 71. The second paragraph of that motion stated:

> The United States makes no representation that this Pretrial Report represents the position, or agreement, of Defendant, Lisa Hofschulz. Although the United States has made several efforts to communicate with Lisa Hofschulz's counsel over the past several weeks, those efforts have, thus far, been unsuccessful. Thus, this Pretrial Report contains the position and proposals of the Government and incorporates only the position of, and information provided by, defendant, Robert Hofschulz.

Id. at 1.

As of January 30—the day before the final pretrial conference—over three months had elapsed since Attorney Brindley had taken over as counsel for Lisa Hofschulz. As of mid-afternoon that day, there was not a single filing on the docket from Attorney Brindley other than his October 2019 filings relating to substituting in as counsel. Late in the afternoon of January 30, the court held a hearing in United States v. Whitton, Case No. 19-cr-224, an arson case scheduled for trial before the undersigned on February 24, 2020. At that hearing, the court advised the parties that it had a conflict with the February 24, 2020 trial in the Whitton case because the Hofschulz case was scheduled to start the week before and to continue into the week of the 24th. Whitton, 19-cr-224 at Dkt. No. 24, p. 1. The court told the parties in Whitton that it had consulted with the other district court judges in Milwaukee, and that neither of them could step in to try the Whitton case on February 24. It told the parties that if they were willing to agree to an adjournment (and, in the defendant's case, waiver of the Speedy Trial Act), it could try the case on a later date. Otherwise, the court explained, it would need to find a judge from another

16

court to conduct the February 24 trial. Id. After learning that defense counsel was not in a position to waive his client's Speedy Trial rights, and after some discussion with the parties about the logistics of having a judge from another court step in to try a case in this district, the court agreed (at the government's suggestion) that it would ask Judge Griesbach if he was available to try the case on the 24th, and if not, the court would contact judges from other districts. Id. at 1-2.[5]

The court stated above that as of mid-afternoon on January 30, there were no filings on the Hofschulz docket from Brindley. That was true until 5:17 p.m. on Thursday evening, January 30, 2020, after hours the night before the final pretrial conference. The court was in the office, preparing for the next day's hearings, when Attorney Brindley filed a motion to continue. United States v. Hofschulz, Case No. 19-cr-145, Dkt. No. 72.

The motion began by reminding the court that when Attorney Brindley first had asked to substitute as counsel, he had been scheduled to go to trial in U.S. v. Ferguson in the Northern District of Illinois on February 10, 2020; he indicated that the Ferguson trial "was continued as undersigned expected it could be." Id. at 1. He explained, however, that when he came on board for this case in October 2019, he also was scheduled for a November 12, 2019 trial in United States v. Burris, Case No. 17-cr-95 (E.D. Mo.) and a January 21, 2020 trial in United States v. Purpera, Case No. 18-cr-19 (W.D. Va.). Id. He asserted

---

[5] The court did contact Judge Griesbach. He was gracious enough to agreed to try the Whitton case, and the parties are scheduled to begin trial before him on February 24, 2020.

that the Purpera trial was "expected to be four or five trial days," which, he asserted, "left ample time to be prepared for the trial in the instant case on February 18, 2020." Id. Attorney Brindley stated, however, that since October 2019, "a number of matters wholly outside [his] control ha[d] combined to change the situation considerably." Id. at 1-2.

First, he alleged that a week before the November Burris trial in the Eastern District of Missouri, the government had disclosed "a substantial new cooperating witness that significantly changed the landscape of the case." Id. at 2. Attorney Brindley said he'd moved to adjourn that trial as a result, and that the court in St. Louis had granted that request, adjourning the trial to January 13, 2020. Id. Attorney Brindley characterized that adjournment as creating "a possible conflict" between the trial in Burris and the trial he had scheduled for January 21, 2020 in Purpera but asserted that "that was something to be worked out between counsel and those two judges." Id. Still, he asserted, "with the *Purpera* trial ending around January 28, 2020, there was ample time to prepare for this case on February 18, 2020." Id.

Next, he stated that another motion to continue the Burris trial "was ultimately filed"—due to Brindley's use of the passive voice, the court could not tell by whom—"due to a surgical procedure that had to be undergone by counsel for the co-defendant in the *Burris* case." Id. Attorney Brindley said that the St. Louis judge adjourned the Burris trial to January 21, 2020, creating a "direct conflict" with the Purpera trial scheduled in the federal court in West Virginia. Id. Brindley asserted that even though it was the Burris co-defendant

who needed the surgery that required the adjournment, the co-defendant "would not waive his speedy trial rights beyond February 3, 2020." Id. Brindley says *his* client waived the speedy trial rights and Brindley asked for an adjournment to a date in March. Id.

Tellingly, Brindley reported that the judge in St. Louis and the judge in Virginia "entered into consultation about the issue," which resulted in the St. Louis judge adjourning the Burris trial to February 3, 2020. Id. at 3. Brindley insisted that all of this was outside of his control and unforeseeable. Id. He stated that there was nothing he could do about the February 3, 2020 trial date in Burris. Id.

Next, Brindley explained that given these schedule changes, "it was essential" for him to prepare for the trial in this case and the Purpera trial "simultaneously during the week of January 6, 2020." Id. Brindley stated, however, that his wife suffers from depression and anxiety, and that she had been working with a certified emotional support dog for the past fourteen years. Id. The dog, Rocko, was "a beloved member of [Attorney Brindley's] household and an essential part of his wife's treatment and well-being."[6] Id. Brindley

---

[6] It appears that Attorney Brindley may have sought a continuance in at least one other case based on Rocko's health. In United States v. Robert Reno, Case No. 16-cr-380 (E.D. Mo.), Attorney Brindley filed a motion to substitute as counsel some twenty months into the case. Id. at Dkt. Nos. 332, 334-335. At the same time, he filed a motion to adjourn an evidentiary hearing scheduled to take place three days later. Id. at Dkt. No. 336. The magistrate judge granted that adjournment and re-scheduled the evidentiary hearing to May 31, 2018. Id. at 340. A week before the adjourned hearing date, Brindley moved to continue it, asserting that he'd been in a federal trial in the Northern District of Illinois which, while estimated to last three days, had lasted more than a week, preventing him for preparing for the evidentiary hearing. Id. at Dkt. No. 345.

reported that on January 6, 2020, after he completed a conference call in the Purpera case, Rocko collapsed and had to be taken to the emergency animal hospital in Chicago. Id. Brindley and his wife learned that a large cyst on Rocko's kidney had burst, causing internal bleeding and requiring immediate emergency surgery. Id. at 3-4. Brindley said that the surgery required a "special surgical team," and that it took the remainder of the day and part of the evening of January 6. Id. at 4. Rocko remained in the hospital for the rest of the week; Brindley and his wife were at the hospital with him more than four hours a day, and Brindley represented that he spent additional time "supporting his wife, who was psychologically traumatized by the entire experience;" he indicated that "[c]onsultations" with his wife's therapist "were ongoing throughout the week" as the couple "dealt with the issue as best [they could]." Id.

Despite appearances of a "remarkable improvement" and possible release from the hospital on January 10, 2020, Rocko suffered several strokes and a blood clot to his lungs, and on January 12, 2020, Brindley and his wife made the painful decision to euthanize Rocko. Id. at 4-5. Brindley described this

---

The magistrate judge moved the evidentiary hearing to June 20. Id.at Dkt. No. 346. On June 19—the day before the hearing—Brindley filed another motion to adjourn. Id. at Dkt. No. 351. He told the court that on June 16, he'd "learned of the need for an invasive liver procedure that is to be performed on [Brindley's] dog." Id. at Dkt. No. 351, p. 1. Brindley asserted that the procedure required two veterinarians and had to be conducted on June 20; he claimed he'd tried to schedule the procedure for the 19th and that it "was not possible." Id. Brindley said he needed to be available to make decisions, to meet with the vets, to pick up the dog and possibly to provide follow-up care. Id. at pages 1-2. Brindley did not indicate the name of the dog, or whether it was his significant other's service dog. The court granted the motion. Id. at Dkt. No. 352.

experience as "emotionally devastating" to both of them, but especially to his wife; Brindley reported that his wife had been required to go to the emergency room at Northwestern Hospital due to chest pains as a result of the stress. Id. at 5. Brindley reported that as a result of this unexpected, traumatic series of events, he lost a week of preparation time, which mean that "the possibility to somehow conduct three back-back federal jury trials no longer existed." Id. Brindley reported that he'd had to return to Virginia immediately after Rocko's loss to meet with his client in the Purpera case, who was incarcerated. Id. In the ensuing days, Brindley told the court, he'd had to go back and forth between Virginia and Chicago to tend to his wife's health and to prepare for the Purpera case, which made it impossible for him to prepare for the February 3, 2020 trial in Burris. Id.

Brindley reported that he'd gone to Virginia to try Purpera on January 19, 2020; his wife's mother had been required to come from Utah to Chicago to stay with his wife during that trial. Id. at 5-6. He described the work days during the Purpera trial as "grueling," requiring him and his trial partner to work fourteen- to seventeen-hour days, and the trial lasted seven days, not the four or five he'd anticipated. Id. at 6. Brindley indicated that he did not get back into the office until January 30—the day he filed the motion to continue the trial in this case. Id. He stated that he was "emotionally and physically exhausted from the events of January 6 to January 30, 2020," and that the prospect of trying Burris in four days was "overwhelming." Id. Brindley reported that his wife's situation remained dire; she had no family in the

Chicago area and her sister would have to fly in from Texas to be with her while Brindley was in St. Louis for the Burris trial. Id. He indicated that he had no more family members to help his wife during the period set aside for the trial in this case, and that because his wife's therapist had indicated that this was a critical period, he could not be away for a third trial in a row. Id. Brindley asserted that it was "impossible to answer ready for trial on February 18, 2020." Id. He asked for a continuance to March 30, 2020 or later. Id. at 7. Counsel asserted that it had always been his intention to try this case as scheduled, and that he was "humbled" at having to request the adjournment. Id.

The court held the final pretrial conference as scheduled the next day— January 31, 2020. Dkt. Nos. 73-74, 78. Attorney Brindley appeared in person at that conference, along with his client. On the table before him, Attorney Brindley had a single, yellow legal pad. He had a briefcase on the floor next to him. As far as the court could tell, he had no other documents—no binders, no folders, no papers. The pretrial conference lasted over an hour and a half, in part because Attorney Brindley stated, and re-stated, the arguments he'd made in the previous evening's motion. Id.

The government objected to the adjournment. Dkt. No. 78 at 1. The prosecution pointed out that Brindley had not notified the court or the government about any of the circumstances he'd described in the motion until the night before. The government also told the court that it had found numerous other cases in which Brindley had sought adjournments on the eve

of trial. The government told the court that while Brindley had described some of the events in <u>Burris</u> and <u>Purpera</u> as being "out of his control," the dockets reflected otherwise. While expressing sympathy for Brindley's wife's health issues, the prosecutor told the court that Brindley had sought a continuance of a trial before Judge Griesbach, in this district, on that same basis. The government also argued that while Brindley undoubtedly had personal issues, everyone had personal issues. <u>Id.</u> Brindley disagreed with, and took umbrage at, some of the government's characterizations, and insisted that if the court forced him to go to trial on February 18, he would have to stand up and state that he was not prepared to proceed. <u>Id.</u>

The court expressed its sympathy to Attorney Brindley for the loss of a beloved pet and service dog, and for the trauma it had caused him and his wife. <u>Id.</u> The court observed, however, that Brindley appeared to have chosen to take on several cases that were scheduled for trial, and that while that was his prerogative, it also meant that he needed to figure out how to juggle those trials. <u>Id.</u> at 1-2. The government had suggested that Brindley's law partner might take some of the trials; while Brindley had responded that this was not how he did things, the court observed that that, too, was a choice. <u>Id.</u> at 2. The court noted its own history as a criminal defense attorney and opined that one of the things a defense attorney had to do was decide how to prioritize work and fit trials into one's schedule. <u>Id.</u> The court also recounted the history of the case pre-dating Brindley's appearance as counsel, and the concerns that had

caused it to state that the February 18, 2020 trial date was a firm one. Id. The court denied the motion to adjourn the trial. Id.

During the housekeeping portion of the final pretrial conference, Brindley told the court that he could file proposed *voir dire* and jury instructions by the end of the day on February 3. Id. When the court turned to the government's motions *in limine*, Brindley stated that he was not prepared to discuss those and asked the court to hold a hearing the Friday before trial (February 14, 2020) to hear argument and rule. Id. The court agreed to that proposal and scheduled a hearing for February 14 at 3:30 p.m. Id. at 2-3. When Brindley mentioned identifying an expert witness, the court reminded him that the deadline for identifying experts had passed on December 20, 2019. Id. Brindley reiterated that he'd not been able to comply with that deadline for the reasons discussed in his motion.[7] The government objected to the court allowing Brindley to file anything after the deadlines the court previously had set; the court withheld ruling on any experts Brindley might identify, and deferred ruling on jury instructions. Id.

True to his word, on February 3, 2020, Brindley filed three proposed *voir dire* questions[8] and five proposed jury instructions. Dkt. No. 75. The

---

[7] The court notes that the December 20, 2019 expert witness disclosure deadline was weeks before the Burris or Purpera trials and over two weeks before Rocko's collapse and hospitalization.

[8] The three questions Brindley proposed are questions the court asks routinely in any criminal case—whether any of the potential jurors have ever worked in law enforcement, whether any of their close friends or family members have done so and whether any potential jurors have feelings about law enforcement

government objected to the proposed jury instructions, dkt. no. 76, and although Brindley was supposed to be in trial in St. Louis, he filed a reply on February 9, 2020, dkt. no. 77. The court assumed, therefore, that the case was on track to begin Tuesday, February 18 as scheduled. The court's jury team had arranged for a sufficient *venire* to accommodate the parties' request for four alternate jurors, the court had arranged for a court reporter and the government had visited the courtroom more than once during breaks between hearings to allow witnesses to become familiar with the courtroom[9]. On February 12, 2020, as is the court's practice, it docketed a draft version of its proposed opening comments, *voir dire* questions and preliminary instructions, so that the parties could view them and, if necessary, suggest changes or corrections. Dkt. No. 79. The court had moved all civil hearings, sentencings, revocation hearings, change-of-plea hearings and other miscellaneous hearings to clear the requisite number of days for the trial, and as noted, Judge Griesbach was scheduled to preside over the Whitton trial.

The court's assumption that all the parties—including Lisa Hofschulz and Attorney Brindley—intended to start the trial on February 18, 2020 was ill-advised. At 4:45 p.m. on February 13, 2020—the day before the February 14

_____

that would make it difficult for them to give law enforcement testimony the same weight they would give the testimony of other witnesses. Dkt. No. 75 at 1.

[9] The court was not privy to these visits but was aware of them because the court's staff alerted the court to the fact that there were people in the courtroom between hearings.

hearing on the motions *in limine* which Attorney Brindley had requested—Attorney Brindley filed another motion to adjourn the trial. Dkt. No. 80.

The first two and a half pages of this fifteen-page motion regurgitated the assertions from the first motion to adjourn. Id. 1-3. Brindley then provided a detailed recount of each day of his four days of trial preparation for <u>Burris</u>—how he'd received 200 hundred pages of new discovery on January 31, traveled to Hofschulz's office to view the facilities that same day, returned to his office to catalog and review the 22,000 pages of discovery in preparing the trial file. Id. at 3. He described how he and his trial partner spent ten hours on February 1 figuring out which wire tap transcripts might be used as exhibits, and how he spent the day on February 2 reviewing jury instructions and *voir dire* for this case and reviewing "materials regarding the government's first series of witnesses" in <u>Burris</u> and preparing for "significant motion *in limine* arguments." Id. at 4. He then described his trial days on February 3 and 4, days that began at 4:15 and 5:45 a.m. respectively and lasted into the wee hours of the following mornings. Id. at 4-5. While the St. Louis court suspended trial on February 5 due to anticipated bad weather, Brindley reported that his assistant, Maria Almazan, notified him on the evening of the 4th that his computer network was down, so his files for this case were inaccessible on the 4th and 5th. Id. at 5-6. He described the trial days on February 6 and 7 and returning to Chicago on the 7th to be with his wife, whose condition had not improved and whose sister had returned to Texas while he was gone. Id. at 6. He walked the court through his day on February 8—frustrated by notes lost

during the computer failure—and his inability to fly back to St. Louis early on the 9th as planned, due to bad weather. Id. at 6-7. He recounted the events of the 10th—the fact that the government's case was to conclude by lunch but took the entire day, the jury instruction conference that lsted past 5:00 and the preparation of closing argument until close to 3:00 a.m. on the 11th. Id. at 7. He described the conclusion of closing arguments late on February 11, the fact that the jury was not able to reach a verdict that day and the fact that he did not arrive back in Chicago until the evening of February 12. Id. at 7-8.

Brindley explained that to effectively prepare for a trial such as this one, he would have needed to meet with Lisa Hofschulz for four to six hours a day for a week; he asserted that a week was "essential." Id. at 7-8. He told the court that he'd planned to use the week of February 9-16 for this preparation, but that he had lost the bulk of that week to the Burris trial. Id. at 8. He indicated that on February 10, he had planned to provide Lisa Hofschulz with "specific materials" to review, in order to "jumpstart" meetings to begin as soon as he got the verdict in Burris. Id. But, he stated, on February 10, Lisa Hofschulz "fell and suffered a significant head and face injury;" he indicated that he'd attached photos showing the injury. Id. Brindley represented that Hofschulz was in the hospital from the 10th through the 11th, and that she was unable to review the materials because of a "significant head trauma." Id.

Brindley told the court that by that time, he was "emotionally and physically exhausted" from trying two complex federal jury trials back to back. Id. He said that the jury's "unfair and apparently thoughtless handling of" the

Purpera case (he knew Dr. Purpera socially and professionally) and his concern for his wife "plagued his mind as he tried the *Burris* case," and he'd been working fourteen to sixteen-hour days for a month. Id. He asserted that it was not possible for him to try this case, when he was already at "this degree of exhaustion." Id. at 9. He conceded that he was not "even remotely prepared to try this case." Id. Brindley also characterized Lisa Hofschulz as having suffered a "facially disfiguring head injury requiring hospitalization days before a trial." Id. The remainder of the motion repeated, in different ways, Brindley's assertions of exhaustion and stress and the impossibility of his trying the case. He also stated that he'd attached a statement from his assistant, Ms. Almazan, attesting to his stress and exhaustion, and the effect it was having on his staff. Id. at 12. He even stated his "combined issues reached such a crescendo" during the Burris trial that Ms. Almazan had insisted that he reach out to his therapist to try to "obtain some sort of counsel to try to control the cavalcade of emotions that this situation has created." Id. He indicated that that appointment had to be canceled due to the length of the Burris trial, and that the therapist could not see him "until next week when this trial is set to be ongoing." Id.

Brindley concluded by stating that he would pay costs or fees associated with moving the trial, and that if the court would give him a three-week break, "nearly every other trial on [his] schedule is potentially movable in favor of this case." Id. at 14.

Brindley attached to this motion two photos of Lisa Hofschulz. Dkt. No. 80-1 at 1-2. Both appeared to be selfies, taken in a house (as opposed to a hospital or medical facility). Both appeared to show deep bruising around her left eye, scrapes above her left eyebrow and at the left corner of her left eye and bruising and possible abrasions on the left side of her mouth and chin. Id. Brindley also attached an undated, unsigned statement purporting to be from his executive legal assistant Maria Almazan, describing her observations of Brindley's stress relating to the events he'd described.[10] Id. at 3-4.

The court held the February 14 hearing as scheduled. Dkt. Nos. 82, 87. Again, from the court's observation, Attorney Brindley appeared with nothing more than his briefcase (which may, the court concedes, have contained papers or folders relating to the trial) and a yellow legal pad. The court advised the parties that it was not going to grant Brindley's second motion for an adjournment. Dkt. No. 82 at 1. It reiterated that it was Attorney Brindley's choice to represent the defendants in the cases he'd described and opined that an experienced lawyer such as himself should have known that trials don't always go as planned. Id. The court acknowledged and sympathized with Brindley's protestations of exhaustion but noted that he had three days before this trial to rest and urged him to do so. Id. As to Lisa Hofschulz's fall, the court observed that she was present in court, and that Brindley had presented no medical records indicating that appearing for trial would endanger her

---

[10] At 1:01 p.m. on February 14—two and a half hours before the hearing on the motions *in limine*—Brindley's office filed a signed version of the statement.

health. Id. The court stated that it had been straight with everyone since scheduling the February 18 trial date in characterizing that date as firm. Id.

Brindley informed the court that only a couple of hours before this hearing, he had learned that Lisa Hofschulz had fallen on February 10 and had lost consciousness. Id. at 2. He said she'd been taken to the hospital and found unresponsive, and that hospital staff had been forced to intubate her because she wasn't breathing on her own. Id. He told the court that while at the hospital, Hofschulz had been diagnosed with an aortic aneurysm and that she needed to see a cardiologist the next week—the week of trial. Id. He offered to provide the court with medical records but stated that Ms. Hofschulz would have to get them from the hospital. The court asked why counsel had not provided a discharge summary at the very least; Brindley responded that he'd learned about all this only hours before. Id. The court stated that it would allow Ms. Hofschulz to leave the hearing and get the medical records; Brindley and Mr. Hofschulz's represented that their clients waived their right to be present, and the defendants left the courtroom. Id.

The prosecutor told the court that she had spoken with an AUSA in Louisiana, who'd informed her that Attorney Brindley had filed a motion to adjourn a March 9 trial in that district on the ground that he was scheduled to try this case, but that he had not informed the Louisiana court that he'd asked to adjourn *this* trial. Counsel asserted that Brindley had a pattern of filing last-minute requests for adjournment as a trial tactic. She also argued that Brindley had provided no medical proof that Ms. Hofschulz was not competent

to stand trial. She told the court that the government's witnesses were ready to go on Tuesday, that some had traveled or would travel a long way to appear and that preparation had been traumatic for some. Id.

Brindley asserted that forcing Ms. Hofschulz to go to trial on Tuesday would pose a health risk. He asked the court to adjourn the trial until Wednesday so that he could provide the court with the medical records and consult with a cardiologist. Id. The court declined to adjourn the trial in the absence of evidence from a doctor showing that it would pose a serious risk to Ms. Hofschulz's health if the trial were to take place on February 18. Id. The court ruled on the motions *in limine* and took care of other housekeeping matters, and concluded by telling the parties it would see them Tuesday morning. Id. at 2-3.

February 17 was President's Day, and the court was closed. The court was in the office preparing for the trial on the 18th and working on other matters; given that parties often file last-minute documents in the hours before trial, the court checked the docket for this case periodically. At 2:39 p.m., Brindley filed a motion for a competency evaluation for Lisa Hofschulz. Dkt. No. 83. This motion stated that on February 10, 2020, "while awaiting the return of [Attorney Brindley] from St. Louis, Missouri in order to prepare for her trial with counsel," Hofschulz had collapsed, lost consciousness, fallen to the pavement, struck her head and "was totally unresponsive." Id. at 1. Brindley said she was transported to Northwestern Hospital by ambulance, where she was intubated "due to concerns she could not effectively breathe on her own

and was admitted into the Intensive Care Unit." Id. He stated that he'd attached the discharge papers. Id. Brindley represented that while Hofschulz was at the hospital, "a trauma team conducted testing that revealed an aortic aneurysm." Id. at 2. He claimed that a *second* trauma team had found "a previously unidentified heart murmur, which is reflected in the discharge papers." Id. Brindley stated that the discharge papers showed there was no diagnosis yet on file, and that test results would not be updated in the hospital records for two weeks. He wrote, "[u]nfortunately for Ms. Hofschulz and this Court, the aortic aneurysm identification is one of the results that the records to not yet reflect," and that "[t]he hospital indicates that the trauma team's test results have not yet been updated into the system and are not reflected in the discharge papers." Id.

Brindley reported that both Lisa and Robert Hofschulz had said that the trauma team had indicated that "immediate care from a cardiologist must occur," and that the cardiology appointment "is being scheduled on February 17, 2020." Id. Brindley asserted that the court was "confronted with a criminal defendant who has suffered a dangerous medical condition that involved a head injury, required intubation, has no diagnosis, and could recur at any time." Id. He claimed that Ms. Hofschulz could not focus on or read the documents he needed her to review the week of February 10, that she was recovering and couldn't meet with him February 13, and that he met with her "for the first time" on February 14—the day of the hearing on the motions *in limine*. Id. at 2-3. He said reported that on that date, he was "concerned" that

Hofschulz's "mental cognition seemed greatly diminished"—that she couldn't focus on questions, struggled for words and became very tired during a two-hour meeting. Id. at 3. He said she couldn't review her medical charts and told Brindley that she needed sleep every two to three hours. Id. Brindley characterized Hofschulz as having an "impairment" that "substantially" affected her ability to review records to prepare for her testimony. Id.

Brindley related that he'd met with Hofschulz again on February 16, but that she wasn't any better—her "reaction to questions remains significantly slowed from what it normally is when she interacts with counsel." Id. He said she tired easily and could not focus on records or find words, and that the "quickness of her wits is obviously reduced at this time." Id. at 3-4. He also asserted that Hofschulz complained of headaches. Id. at 4. Brindley asserted that his assistant, Ms. Almazan, had been present at the February 1 meeting and noticed the same issues he had. Id. The remainder of the motion asked the court to schedule a competency evaluation under 18 U.S.C. §4241. Id. at 4-6.

Attached to this motion were two documents. The first is a single-page document titled "After Visit Summary." Dkt. No. 83-1. It appears to be from Northwestern Medicine, reflecting a visit from Lisa Hofschulz to Northwestern Memorial Hospital on February 10-11, 2020. Under the section titled "Patient Instructions" is what reads like a customer service letter. It begins, "Ms. Hofschulz, It was a pleasure taking care of you at Northwestern Memorial Hospital." Id. It asserts that Hofschulz was admitted after a fall, required intubation "in order to protect your airway and to ensure you continue to

breath [sic] appropriately." Id. The note goes on to say that Hofschulz had CT scans of her head, neck, chest, abdomen and pelvis which showed no injuries or broken bones. It stated that on the day of discharge, Hofschulz "was found to have a heart murmur," "which is not dangerous, but needs follow up with your primary doctor." The note recommended an echocardiogram and that Hofschulz follow up with her primary care doctor in the following week. Id. It also indicated that Hofschulz should continue her medications as prescribed. Id.

The attending physician was listed as John M. Coleman, III, with a specialty of sleep medicine. Under "You Were Seen For" and "Your primary diagnosis was," the words "Not on File" appear. Under the heading "Test Results Not Yet Available," the note reads, "Some tests can take 2 or more weeks for results to be finalized." Id. At the very bottom of the form, under the word "Order," the words "Culture: VRE Screen" appear. Id.

This single document makes no mention of a trauma team. It makes no mention of an aortic aneurysm. It makes no mention of a cardiologist.

The second document is a single-page statement purporting to be from Maria Almazan, reporting on her perceptions of Ms. Hofschulz's cognitive status during the February 16, 2020 meeting. Dkt. No. 83-2. This statement is signed, but not dated or notarized.

As reflected in the bond study prepared in July 2018, Lisa Hofschulz lives in Naples, Florida; she has lived there on and off since 2004, and most recently has lived there since 2016. Dkt. No. 3 at 1. The motion for a

competency evaluation was the first document to suggest that the February 10, 2020 fall may have taken place in *Chicago*, possibly near Attorney Brindley's office, which is located at 53 West Jackson Boulevard, just across the street from the Chicago federal courthouse. <u>See, e.g.</u>, Dkt. No. 60 at 1. He stated that the fall had happened while Ms. Hofschulz was awaiting his return from St. Louis. Northwestern Memorial Hospital is at 251 East Huron Street in Chicago, about a mile and a half northeast of Brindley's office. https://www.nm.org/locations/northwestern-memorial-hospital-emergency-department. Attorney Brindley had mentioned in his first motion to adjourn that his wife had been taken to Northwestern Hospital due to chest pains resulting from the stress of Rocko's illness and subsequent passing.

The court left the office at around 7:30 p.m. on February 17. Upon arriving in the office the next morning—February 18, 2020, the date scheduled for trial—the court learned that Brindley had filed additional documents the night before, after the court had gone home. At 8:40 p.m. on February 17, he'd filed a motion asking the court to reconsider its denial of his motion to continue, "or, in the alternative, to withdraw counsel." Dkt. No. 85 at 1. This fourteen-page motion recounted some of the above facts, recited Wisconsin rules of professional conduct in support of Brindley's claim that he could not uphold his ethical responsibilities to his client if he had to go to trial on February 18, and shared with the court glowing reviews he claimed he'd received from other judges in other cases. At page 11 of the motion, Brindley stated:

> If the Court refuses to grant a continuance and refuses to withdraw counsel despite the demand of the ethical rules, then counsel will be ethically forced to proceed as follows: at every stage of the trial (opening statement, cross-examination, presenting witnesses, etc.), the undersigned will be compelled to state for the record that he is unprepared to conduct the stage of the trial in question for reasons previously presented, to state for the record the things he would have done if he had the ability to prepare the case with the client, and to state for the record that his failure to do these things is because of his inability and unpreparedness and not because of any strategic decision. That will obviously constitute ineffective assistance of counsel, which violates the Sixth Amendment. Yet, that is all that counsel can ethically do under circumstances where he has been rendered unable to prepare for trial with the client. That is what the ethical rules dictate.

Id. at 11. He concluded by asking the court to adjourn the February 18 trial date "or, in the alternative, to withdraw him as counsel in this because he [sic] the denial of continuance make [sic] him ethically bound to withdraw." Id. at 14. Brindley attached to this motion the invoice for Rocko's veterinary care (over $14,000), dkt. no. 85-1, and a page of a court transcript—undated, with no case number and bearing the warning "unedited realtime translation," in which the unidentified court tells Brindley "that his closing was the best closing I have ever seen in a criminal case," dkt. no. 85-2 at lines 2-4. (In the motion, Brindley represented that the page was taken from a transcript in United States v. Kahn, 17-cr-29 (D. Wyoming, Jan. 12, 2017), and that Judge Alan B. Johnson made the statement.[11] Dkt. No. 85 at 8. Brindley also

---

[11] Attorney Brindley did not include in his motion the fact that on March 6, 2019, Judge Johnson scheduled the trial for April 25, 2019. United States v. Kahn, 17-cr-29 (D. Wyoming) at Dkt. No. 564. He did not mention that on April 18, 2019—six days before that trial date—his client filed an *ex parte*, emergency motion to continue the trial, id. at dkt. no. 679, or that Judge Johnson denied that motion the same day, id. at dkt. no. 684.

represented in the motion that Chief Judge Ruben Castillo and Judge Rebecca Pallmeyer of the Northern District of Illinois had made similarly admiring comments about his work. Id. at 8-9.

At 9:14 p.m. on February 17, Brindley filed a single-page document purporting to be a letter from a Dr. James N. Lamphe, Ph.D., indicating that he'd evaluated Brindley in his office on February 17 at Brindley's request "for crisis evaluation," and that in his professional opinion, Brindley needed a "mental and physical break from his work and from general life demands." Id.

The court took the bench at 8:30 a.m. on February 18, 2020; all parties and counsel were present. While Mr. Hofschulz's counsel had on counsel table before him a large expanding folder packed with manila folders and papers, Attorney Brindley again appeared armed only with his briefcase and a yellow legal pad. The court advised the parties that it had reviewed the most recent filings. It commented on the fact that the purported discharge summary for Ms. Hofschulz did not mention the aortic aneurysm Brindley claimed that a trauma team had discovered. It also noted that in support of his motion to reconsider or to be allowed to withdraw, Brindley had asserted that this court's crowded docket did not justify refusing Ms. Hofschulz the counsel of her choice. The court informed the parties that while its crowded docket and its struggle to schedule hearings and trials played a part in its denials of Brindley's motions to adjourn, the driving reason that the court had denied those motions was its suspicion (dating back to events that occurred prior to Brindley's appearance) that Ms. Hofschulz had been gaming the system, using motions for

37

adjournments as trial tactics. The court wondered aloud what Ms. Hofschulz hoped to gain by these tactics, noting that the government wasn't going to just forget about this case and wander off.

The government again opposed the motion to adjourn, advising the court that it was prepared to proceed this morning. The prosecutor provided the court with the government's theory about why Ms. Hofschulz might want to adjourn the trial as long as possible—some of the government's witnesses were current or former addicts and some were reluctant to testify or traumatized by the prospect. Counsel speculated that Ms. Hofschulz might believe that if the court adjourned the case enough, witnesses would stop cooperating or refuse to testify, weakening the government's case against her. The prosecutor reiterated some of the arguments the government had made regarding previous motions and agreed with the court's concerns about gamesmanship. It urged the court to deny the motion, and to start the trial.

When the court turned to Brindley, he spoke for some time, emphasizing what appeared to the court to be an eleventh-hour epiphany regarding an attorney's ethical obligations under the Wisconsin Rules of Professional Conduct to be fully prepared to represent a client at trial. He told the court that he'd consulted with colleagues about Wisconsin's ethical requirements, and had concluded based on those consultations and his knowledge of the Illinois ethical rules (which he characterized as "basically the same" as the Wisconsin rules) that if the court would not adjourn the trial, he had an ethical obligation to withdraw.

The court then turned to counsel for Robert Hofschulz, who has represented his client since the original indictment, appeared at every hearing, filed motions on his client's behalf and participated in the preparation of the joint pretrial report and never sought an adjournment of the trial. Attorney Smith noted that in previous hearings on Attorney Brindley's motions to adjourn, he had not put his oar in the water other than to note that his client's fate was inextricably intertwined with that of Ms. Hofschulz, and that her ability to present a full-throated defense impacted his client. Attorney Smith told the court (as he had at the last hearing) that he was aware that Ms. Hofschulz had fallen, lost consciousness and gone to the hospital. Setting that issue aside, he told the court that he did not really know Attorney Brindley and had had almost no contact with him despite the two being co-counsel on a complex case that had been headed to trial for some time. He expressed his concern about this fact and told the court (with some apparent discomfort) that from what he could tell, Attorney Brindley *was* completely unprepared to proceed to trial today—not just less prepared than he would like to be, but *completely* unprepared. Attorney Smith told the court that although he was prepared to proceed today, he had little choice but to join Attorney Brindley's motion for an adjournment given this circumstance.

After a brief recess, the court advised the parties—Ms. Hofschulz, particularly—that if the trial was going to proceed with Attorney Brindley as counsel, it would proceed today. If Mr. Brindley was not able to proceed to trial today, the court would allow Brindley to withdraw. The court gave the parties

time to discuss these options. When court resumed, Brindley stated that Ms. Hofschulz wanted him to continue as her lawyer, but that if the court was refusing to adjourn the trial, he had no ethical choice but to withdraw.

The court stated that it would grant the motion to withdraw. It reminded Brindley that he'd said he would pay any costs of adjourning the trial and indicated that it would be requiring him to pay the cost of bringing in the *venire* today. The court stated that it would not set a new trial date until Ms. Hofschulz had retained successor counsel, but it scheduled a status conference for February 27, 2020 to make sure that she obtained counsel or was in the process of doing so. Attorney Brindley then informed the court that he would be filing a petition for a writ of mandamus with the Seventh Circuit, asking it to order that he be allowed to represent Ms. Hofschulz at any adjourned trial because in his view, his inability to discharge his ethical obligations to her was "temporary."

The government noted that the court had not ruled on the motion for a competency evaluation, and asked the court to grant that motion and to remand Ms. Hofschulz to the custody of the attorney general for that evaluation, to make sure that the competency issue did not form the basis for yet another adjournment request down the road. The court allowed Attorney Brindley to respond; he insisted that a defendant did not have to be remanded to the custody of the attorney general for a competency evaluation. The court stated that it would take that issue under advisement.

## II.    Second Motion to Continue (Dkt. No. 80)

At the final pretrial conference on February 14, the court orally denied Attorney Brindley's second motion to continue the trial (Dkt. No. 80). Dkt. No. 87. The court neglected to memorialize that ruling in the minute order resulting from that hearing. For the reasons the court stated above and on the record at that hearing, the court denies the second motion to continue the trial date.

## III.    Motion for Competency Evaluation (Dkt. No. 83)

Section 4241(a) of Title 18 allows defense counsel to file a motion for a hearing to determine the mental competency of a defendant. The statute provides that "[t]he court shall grant the motion . . . if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering [her] mentally incompetent to the extent that [she] is unable to understand the nature and consequences of the proceedings against [her] or to assist properly in [her] defense." A district court is not required to order a competency evaluation, or to hold a competency hearing, "unless there is a bona fide doubt that arises as to a defendant's competency before trial." United States v. Jonassen, 759 F.3d 653, 659 (7th Cir. 2014) (quoting United States v. Woodard, 744 F.3d 488, 493 (7th Cir. 2014)). See also, e.g., United States v. Collins, 949 F.2d 921, 924 (7th Cir. 1991) ("Clearly, only if Judge Hart had reasonable cause to believe that Collins was not mentally competent to understand that he was being prosecuted for bank robbery, which could result in a conviction and prison sentence, and that Collins was unable to consult

with and assist his lawyer, should [Judge Hart] have held a hearing *sua sponte.*").

The statute provides that prior to any hearing, the court "may order that a psychiatric or psychological examination of the defendant be conducted," and that a report of the results of that examination be filed with the court. 18 U.S.C. §4241(b). The court may use the results of such an examination to determine whether the competency hearing is warranted; courts consider factors such as "any evidence of irrational behavior, the defendant's demeanor in court, and any medical opinions on the defendant's competency to stand trial" in determining whether there is reasonable cause to hold a hearing. McManus v. Neal, 779 F.3d 634, 656 (7th Cir. 2015) (quoting Sturgeon v. Chandler, 552 F.3d 604, 612 (7th Cir. 2009)); see also, Collins, 949 F.2d at 924 ("there must be some manifestation, some conduct, on the defendant's part to trigger the reasonable doubt of his competency").

The Seventh Circuit has held that "[a] defense motion for a competency hearing is not sufficient to create 'reasonable cause' for the judge to believe the defendant is incompetent." Collins, 949 F.2d at 925. In Drope v. Missouri, 420 U.S. 162 (1975), the Supreme Court explained that

> The sentencing judge observed that 'motions for psychiatric examinations have often been made merely for the purpose of delay, and 'estimated that almost seventy-five percent of those sent for psychiatric examinations are returned mentally competent.' App. 202, Although we do not, of course, suggest that courts must accept without question a lawyer's representations concerning the competence of his client, see United States ex rel. Rizzi v. Follette, 367 F.2d 559, 561 (CA2 1966), an expressed doubt in that regard by one with 'the closest contact with the defendant,' Pate v.

Robinson, 383 U.S. 375, 391 . . . (1966) (Harlan, J., dissenting), is unquestionably a favor which should be considered.

Id. at 177 n.13.

Acknowledging this holding, the Tenth Circuit rejected a defendant's argument that the trial court erred in failing to consider or give proper weight to his lawyer's proffers about the defendant's ability to assist in his own defense. In United States v. Osborn, 664 F.. App'x 708, 713 (10th Cir. 2016), the court explained that

> [t]he record reflects that the district court didn't ignore defense counsel's proffers. Instead, it noted those proffers but found it likely that the persistent nature of Osborn's mental illness and delusions would interfere with Osborn's ability to assist counsel in formulating a defense strategy or deciding whether to testify in her own defense. Moreover, while the district court was required to consider input from defense counsel, it wasn't required to accept counsel's recommendations. *See Drope*, 420 U.S. at 177 n.13 . . . (explaining that although trial court should consider counsel's representations regarding defendant's competency, it need not accept them); *cf.* [*United States v.*] *Mackovich,* 209 F.3d [1227,] 1233 [10th Cir. 2000] ("[C]oncerns of counsel alone are insufficient to establish doubt of a defendant's competency.")

Id.

Brindley's 11th-hour motion asked the court "to order a competency evaluation *and competency hearing* for the defendant prior to the onset of trial in this matter." Dkt. No. 83 at 1 (emphasis added). He based this request on his repeated assertions—unsupported by the one alleged medical document he provided—that Hofschulz "struck her head," id. at 1, and had suffered a "serious head injury," id. at 2, 6, along with his personal opinions (and, allegedly, those of his legal assistant) that after the trip to the hospital,

Hofschulz appeared to be slower in answering questions, unable to focus, easily fatigued and at a loss for words.

In response to the government's request that it remand Hofschulz to the custody of the Attorney General, the court responded that it did not believe that it had "reasonable cause" to grant Brindley's motion. It still does not. As of February 18—eight days after the alleged fall—Brindley had not provided the court with any medical evidence indicating that Hofschulz suffered a serious head injury. While he provided the court with photos of Hofschulz with bruises and abrasions on her face, those photos shed no light on how Hofschulz got the bruises and abrasions. The court has questions about the authenticity of the "After Visit Summary" Brindley provided the court, but even that document does not indicate that Hofschulz suffered any injury as a result of a fall; if it is authentic, it reflects only the attending physician's understanding that the reason Hofschulz had come to the hospital was because of a fall.

Brindley's suggestion that Hofschulz was cognitively impaired as a result of the fall also represented a change from his earlier argument that the reason the court needed to adjourn the trial was because Hofschulz needed to see a cardiologist as a result of the alleged trauma team's discovery of an alleged aortic aneurysm. Brindley never has provided medical evidence supporting the allegation that a trauma team discovered an aortic aneurysm, despite the court allowing Hofschulz to leave the February 14 hearing to try to obtain such evidence. Brindley did not mention the alleged aneurysm in the motion for a competency evaluation and hearing.

Although Brindley asserts in the motion that he had difficulty working with Hofschulz when he "first" met with her on February 14, he did not suggest at the February 14 hearing that the court query his client, although Hofschulz appeared—appropriately dressed, and awake—at that hearing. Nor did he make that suggestion on the morning of February 18, when his client appeared—appropriately dressed, and awake—for what the court and the government had assumed was going to be a trial. In fact, after filing the motion for a competency evaluation and hearing mid-afternoon on February 17, Brindley appears to have abandoned that particular tactic for adjournment, focusing his attention on his own exhaustion and lack of preparedness and his new-found familiarity with Wisconsin's ethical rules.

As is apparent, the court suspects that Brindley filed the motion for a competency evaluation and hearing for the purpose of forcing an adjournment of the trial. That suspicion finds some support in the docket for United States v. Israel Castaneda-Serrano, Case No. 17-cr-113 (N.D. Ill.). Attorney Brindley is counsel for the defendant in that narcotics case, pending before Judge Sara L. Ellis. On October 9, 2019, Brindley filed a motion to adjourn the October 21, 2019 trial scheduled in that case on the basis that his client was "suffering from some sort of memory impairment, which limits his ability to answer certain questions, prepare for trial, and participate in his defense." Id. at Dkt. No. 307, p. 1. Brindley attached to that motion a purported referral to a neurologist and letter from a doctor reflecting an October 23, 2019 appointment. Id. at Dkt. Nos. 307-1, 307-2. Over the government's objection,

Judge Ellis adjourned the jury trial to December 3, 2019, and ordered Brindley to provide the court and the prosecution "the neurologist report, physician notes, and all additional testing or appointments, if any, must be scheduled," as well as the reports of any subsequent testing; she also ordered the defendant to report to pretrial services the fact that he had an MRI scheduled for October 16, 2019. Id. at Dkt. No. 309.

On November 7, 2019, Brindley filed a motion to adjourn the December 2019 trial date before Judge Ellis, indicating that his client had undergone the neurological exam and that Brindley had attached the results, showing that the defendant was suffering from a spinal condition "as well as from the results of a concussion without loss of consciousness." Id. at Dkt. No. 314, page 1. (Attorney Brindley also mentioned that he'd been delayed in filing the motion by the fact that he'd been in trial in Cook County in a case called People v. Beard. Id. at p. 2.) The government didn't oppose this motion, and Judge Ellis adjourned the trial to March 2, 2020, requiring Brindley to provide the court with a detailed assessment of the defendant's diagnosis, including MRI results, by December 20, 2019 (coincidentally, the same date Brindley's expert witness disclosure was due in this case). Id. at Dkt. No. 315. At a status conference on January 22, 2019, the defendant appeared and reported that the "fall occurred at work." Id. at dkt. No. 319. Judge Ellis ordered Brindley to appear at a status conference on January 29, 2020 and to bring "all documentation regarding workers' compensation claim and how injury occurred." Id. at Dkt. No. 319. On January 27, however, Brindley filed a motion asking Judge Ellis to adjourn

that January 29 status conference because he'd begun the <u>Purpera</u> trial on January 21; he asked Judge Ellis to adjourn the hearing to a date "after January 29, 2020, when the undersigned can attend this status hearing." <u>Id.</u> at Dkt. No. 321.

Judge Ellis conducted the January 29 hearing; the defendant appeared without Brindley. <u>Id.</u> at Dkt. No. 323. Judge Ellis denied Brindley's motion to continue the status conference because he hadn't provided a date when he could appear; she scheduled a status conference for February 5. <u>Id.</u> The defendant told the court that he'd provided "all documentation pertaining to his fall to his attorney," but the government reported it had received nothing. <u>Id.</u> Judge Ellis ordered that if Brindley did not provide all the documentation in his possession "relating to Defendant's fall" to the government before the next status hearing, the court would sanction him—Brindley, not his client— $5,000. <u>Id.</u> Judge Ellis removed the March 2, 2020 trial date from the calendar. <u>Id.</u>

Not surprisingly, on February 4—the day before the status conference scheduled by Judge Ellis—Brindley filed a motion to adjourn that status conference. <u>Id.</u> at Dkt. No. 324. He explained that he was scheduled to start the <u>Burris</u> trial on February 3 (providing some of the details he told this court about his co-counsel's surgery). <u>Id.</u> at 1. He also told Judge Ellis that "if Mr. Burris's trial ends before its two-week estimation Mr. Brindley is still scheduled to conduct a pretrial conference in February 14, 2020" in <u>Hofschulz</u>, and that he was scheduled to start the seven-day <u>Hofschulz</u> trial on February 18. <u>Id.</u> at

2. Brindley advised Judge Ellis that immediately after the conclusion of the Hofschulz trial, he would be "out of the country," then would be starting a trial in United States v. Lamartiniere, Case No. 18-cr-97, in the Central District of Louisiana on March 9, 2020 [12] Id. at page 2. He told Judge Ellis he would be available for a status hearing "on March 26, 27, or 30." Id.

Brindley also told Judge Ellis that she had "demonstrated apparent confusion" regarding the documentation she'd ordered him to provide. Id. He said that his client had "suffered two falls: one related to work. And another at home when the ankle monitor came off after Mr. Castaneda fell at home." Id. Brindley claimed he had "no other medical records beyond those that have already been disclosed," and indicated that his assistant had provided a signed statement attesting to that fact. Id. at page 3. The attached statement, which was *not* signed, purported to be from Maria E. Almazan. Id. at Dkt. No. 324-1.

Judge Ellis received the motion to adjourn the February 5 status conference on February 5. Id. at Dkt. No. 326. Concluding that Brindley had not complied with her orders to produce records to the government and the court, Judge Ellis sanctioned Brindley $5,000. Id. She also stated that because she had no medical evidence that the defendant had any cognitive impairment despite the "many months" she had allowed the defendant to seek treatment, Judge Ellis stated that she would not extend the trial date any further, and

---

[12] Attorney Brindley is counsel of record in United States v. Randy J. Lamartiniere, Case No. 18-cr-87 in the Middle District of Louisiana.

would "set a trial date for the next available date for the Court and the parties."
Id.

In the space of four months, Attorney Brindley has sought adjournment of two trials in two districts based on his assertions that his clients were cognitively impaired as a result of falls. In neither case has he provided the court with medical records supporting those allegations. This gives the court even more reason to suspect that Attorney Brindley filed the motion for a competency evaluation and hearing for the purpose of forcing this court to adjourn the trial date it had refused to adjourn twice before.

Based on Brindley's motion, the government asked the court to remand Ms. Hofschulz to the custody of the Attorney General for the requested competency evaluation, admitting that it was doing so to avoid a future request to adjourn a future trial based on alleged cognitive impairment. The statute does not require the court to remand the defendant to the Attorney General's custody for the competency *evaluation.* Rather, it allows the court, at its discretion, to decide whether order the defendant to submit to an evaluation, and it allows the court to use the results of any such evaluation to determine whether to schedule a competency hearing. What the statute *does* require is that if the court holds a hearing, and determines by a preponderance of the evidence that the defendant suffers from a mental disease or defect that renders her incompetent to the extent that she can't assist properly in her defense, "the court **shall** commit the defendant to the custody of the Attorney General." 18 U.S.C. §4241(d) (emphasis added).

If Attorney Brindley filed the motion as a tactic for forcing adjournment, it was a risky one. The court could have scheduled a hearing without an evaluation, and if it found Ms. Hofschulz unable to assist in her defense, would have had no choice but to remand her to the custody of the Attorney General. The court could have ordered a competency evaluation; if the results had revealed that Ms. Hofschulz was unable to assist in her defense, the same result would have followed.

As the court discusses further below, the court has allowed Attorney Brindley to withdraw. It assumes that Ms. Hofschulz will proceed with different counsel, unless the Seventh Circuit orders otherwise. The court will defer ruling on the motion for a competency evaluation and hearing until successor counsel comes on board and can evaluate the history of this case, the timing of the motion and the basis for the motion. If successor counsel presents the court with reasonable cause to believe that a hearing is necessary, the court will schedule one, but it will follow the requirements of the statute if that hearing results in a finding of incompetence.

## IV. Motion to Reconsider Request to Continue or, in the Alternative, to Withdraw Counsel (Dkt. No. 85)

Brindley's February 17 motion asked the court to reconsider its orders refusing to adjourn the February 18 trial date or, if it would not do so, to allow him to withdraw. When the court informed Ms. Hofschulz that proceeding with Mr. Brindley would mean going to trial on February 18, Brindley responded that the court was giving him no choice but to withdraw. The court allowed him to do so, then stated that it would adjourn the trial. Brindley almost

50

immediately gave the court a "heads up" that he'd be seeking a writ of mandamus from the Seventh Circuit, ordering that he be allowed to continue as Ms. Hofschulz's counsel at any adjourned trial, because he was Ms. Hofschulz's counsel of choice and in his view, his ethical disability was a temporary result of the court's refusal to adjourn the trial.

The Supreme Court has explained that "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159 (1988) (citing Morris v. Slappy, 461 U.S. 1, 13-14 (1983) and Jones v. Barnes, 463 U.S. 745 (1983)). Nonetheless, an element of the Sixth Amendment right to counsel for someone who doesn't require appointed counsel is "to choose who will represent him." United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006) (citing Wheat, 486 U.S. at 159). The Sixth Amendment requires not only a fair trial, but "that the accused be defended by the counsel he believes to be best." Id. at 146. A court deprives a defendant of her Sixth Amendment right to counsel if it errs in disqualifying that defendant's counsel of choice. Id.

In denying Brindley's motion to reconsider its refusal to adjourn the trial based on his protestations that he was unprepared for trial, the court refused (as it had twice before) to adjourn the trial for the purpose of preserving Ms. Hofschulz's right to proceed with counsel of her choice. The Seventh Circuit

has held that a trial court "has broad discretion in addressing a continuance motion based on the [defendant's right to counsel of choice]." United States v. Sinclair, 770 F.3d 1148, 1150 (7th Cir. 2014). The appellate court explained that a trial court is "entitled to weigh the defendant's claim against the need to ensure the fair and efficient administration of justice." Id. The court has "wide latitude in balancing the right to counsel of choice against the needs of fairness and . . . the demands of its calendar." Id. at 1154 (quoting Gonzalez-Lopez, 548 U.S. at 152, and citing United States v. Sellers, 645 F.3d 830, 834 (7th Cir. 2011)).

> Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsel against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel [of choice].

Id. (quoting Morris, 461 U.S. at 11).

The Sinclair court emphasized that a trial court's "discretion" didn't mean that the court could deny a continuance based on a whim, and repeated the familiar language that a trial judge cannot deny a valid motion for an adjournment based on "a myopic insistence upon expeditiousness." Id. (quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964)). But the court stated that it would not second-guess a trial judge's balancing of factors involved in deciding whether to grant an adjournment to accommodate the defendant's choice of counsel, holding that "[o]nly an 'unreason[ed] and arbitrary'" denial of a

continuance violates the defendant's Sixth Amendment right to counsel of his

choice. Id. (quoting Morris, 461 U.S. at 11).

The Seventh Circuit discussed the issue of timing in determining whether

a trial judge's denial of a continuance violated a defendant's Sixth Amendment

right to counsel of his choice:

> One particularly salient circumstance here involves the timing of
> [the defendant's] continuance motion. The judge expressed serious
> concern about the last-minute nature of the request, and rightly so.
> As a case gets closer to trial, granting a continuance becomes more
> disruptive to the court's calendar and to others involved in the case.
> On the eve of trial, as compared to earlier in the litigation, the
> interests of the government, the witnesses, the jurors, and the court
> will be particularly strong. *See United States v. Gaya*, 647 F.3d 634,
> 636 (7th Cir. 2011). Needless to say, trial preparation takes
> substantial time and effort—by the prosecutor and defense attorney,
> to be sure, but also by the court—and revving up for trial a second
> time necessarily involves duplication of effort and attendant public
> expense. Other parties—primarily the witnesses and jurors, but
> court personnel as well—will have made preparations and arranged
> their schedules in expectation of trial. Finally, last-minute
> continuances cause more serious disruption to court calendars; it's
> too late for the court to slot in another trial, and the interests of
> litigants in other cases may be adversely affected. In short, late-
> breaking continuances can be especially costly. On the eve of trial,
> the interests weighing against granting a continuance take on
> greater significance.

Id. at 1154-55.

On the other hand, the court explained, the trial court cannot simply cite

general calendar disruption as the basis for a denial of a continuance based on

the defendant's right to counsel of choice. Id. at 1155. There remains a

presumption that the defendant is entitled to the counsel of her choice; the

court must start with that presumption. Id. at 1154-55. But "the defendant

bears some responsibility to act diligently to minimize or avoid" the costs of an adjournment "if possible." Id. at 1155.

This court has been cognizant of Ms. Hofschulz's choice of attorney since the case began. She chose Attorney Nistler. He brought in Attorney Chapman—a self-proclaimed expert in cases like this one—but Chapman withdrew because of an irrevocable break-down in his relationship with Ms. Hofschulz. Chapman explained in his motion that Ms. Hofschulz wanted to proceed with Attorney Nistler, so the court allowed Chapman to withdraw. Attorney Cirincione joined the team; the court did not recuse itself, because it had been over two years since Cirincione's clerkship had ended and because it assumed Hofschulz (and Nistler) wanted Cirincione on the trial team. The court adjourned the trial at the request of that trial team, over the government's understandable and valid objection, fifteen months after indictment and some nineteen days prior to trial—arguably, on the "eve" of trial. It adjourned the trial for five months and made clear that the adjourned trial date was firm. Days later, when Hofschulz indicated that she wanted to jettison her counsel of choice—Nistler and Cirincione—and replace them with Attorney Brindley, the court made clear that the February 18 trial date was firm, and gave Hofschulz and Brindley the opportunity to make sure that Brindley would be available to try the case on that date. Brindley assured the court that he would be available, then fell off the grid for almost three months.

Brindley filed his first motion to adjourn the trial at 5:17 p.m. the day before the final pretrial conference—undisputedly on the eve of trial. He did not

give the government a "heads-up" that his busy trial schedule and events in his personal life had made it impossible for him to be ready for the February 18 trial. Instead, he filed the motion *after hours* the night before the hearing scheduled for 8:30 a.m. the following morning. Whether intended or not, the effect of Brindley's filing the motion then meant that the court did not have the opportunity to look at the dockets for the cases he'd cited. Had Brindley filed the motion even twenty-four hours before the final pretrial conference, the court might have discovered Judge Dillon's August 12, 2019 order in <u>United States v. Purpera</u>, Case No. 19-cr-16, 2019 WL 3797370 (W.D. Va. Aug. 12, 2019), ruling on Attorney Brindley's oral motion at an August 6, 2019 status conference (requested by the government because Brindley had telegraphed his intent to file such a motion) to adjourn the trial scheduled in that case. The court might have seen the following paragraph in that order:

> In his motion, Purpera asserts that his counsel lacks sufficient time to prepare for trial because of unforeseen changes in his schedule. With regard to counsel's schedule, he notes that his lead attorney, Mr. Brindley (from Chicago), had to move his wedding from December 2019 to August 2019 because he learned in June 2019 of an ill family member. Also, on June 29, 2019, Mr. Brindley had to ask that a trial scheduled to begin in Indiana be continued for unknown emergency reasons, and that case was then set for a three-day jury trial to begin September 3, 2019, per that court's docket. Mr. Brindley mistakenly represented that the trial was set for four days to begin on September 2, 2019. The motion also asserts that it will be necessary to meet in person with Purpera in Virginia on a daily basis for approximately one to two weeks prior to trial. Because of the wedding and the Indiana case, Mr. Brindley asserts that it is now impossible to do so. Notably, the motion to continue was filed well over one month after defense counsel was aware of both asserted reasons for the need for a continuance. Mr. Brindley did not make any effort to notify the court or contact counsel for the United States with regard to a continuance. Indeed, it was not until

Mr. Brindley responded to the United States' email that anyone knew of any intended request for a continuance.

Id. at *1. The court might have seen Judge Dillon's discussion of the fact that

[w]hile this may be the only time that Purpera has sought a continuance with regard to the charges in the third indictment, it is the fourth continuance of the trial with regard to the charges in the second indictment (although all were without objection), and there were six motions to continue the sentencing hearing with regard to convictions on some of the charges contained in the first indictment. In two of those orders, the court noted its frustration with frequent requests for a continuance, counsel's inflexibility and scheduling unavailability, and counsel's delay in requesting continuances.

Id. at *2. Because Judge Dillon concluded that Brindley still had over a month to prepare and could prepare his client via telephone, she denied the motion to adjourn. Id.

Given more time, the court also might have seen the order Judge Dillon issued two weeks later, on August 26, 2019, granting Attorney Brindley's motion to reconsider her denial of the adjournment. United States v. Purpera, Case No. 19-cr-16, 2019 WL 4016210, at *2 (W.D. Va. Aug. 26, 2019). Judge Dillon concluded that although Brindley had had over six months to prepare for the Purpera trial, "he has not set aside the requisite time to prepare his client." Id. While noting that the Fourth Circuit had dismissed a defense argument that a "rush to trial" had left them unprepared, Judge Dillon granted the continuance to allow Brindley to prepare his client for trial. Id. She acknowledged that the continuance "delays administration of justice and frustrates the government's trial preparation," but concluded that "defense counsel's apparent inability to find time for his client, despite the court's previous ruling, casts doubt on the adequacy of Purpera's representation and

threatens Purpera's Sixth Amendment right to effective assistance." Id. She anticipated that if she were to go forward with the scheduled trial date, "defense counsel would appear and undoubtedly represent that they were unprepared to proceed." Id. As Brindley's motion to this court stated, Judge Dillon subsequently adjourned the Purpera trial to January 21, 2020. Dkt. No. 72 at 1.[13]

Even without having seen Judge Dillon's orders, this court denied Brindley's motion. Brindley had been Ms. Hofschulz's lawyer for some months and had assured the court at the outset that he could be ready for the February 18 trial date. He had filed this motion on the eve of trial, without warning and less than twenty-four hours before the final pretrial conference. The court had arranged its schedule to accommodate the February 18 trial— just that afternoon, it had asked Judge Griesbach to preside over another trial scheduled for the second week of the Hofschulz trial. The government was deep in preparation, jurors had been contacted. Over two weeks remained until the trial date.

During the January 31, 2020 final pretrial conference, Attorney Brindley told the court (as he has several times) that given time to prepare the way he wants to prepare, he is a very effective trial lawyer. He mentioned that he had

---

[13] The court did not review in depth the docket of the other case Brindley was juggling during this time, United States v. Burris, in the Eastern District of Missouri. A glance at that docket, however, indicates that he filed more than *twenty* motions to continue various proceedings, sometimes more than once, including three separate motions to continue the trial. Burris, Case No. 17-cr-95 (E.D. Mo.).

had a case before Judge Griesbach and encouraged the court to verify his skills with Judge Griesbach. The government responded that in the case before Judge Griesbach, Attorney Brindley had sought an adjournment based on his wife's health—just as he was doing in this case. The court did not address that contention or investigate it further; it accepted Attorney Brindley's assertions regarding his wife's health, but nonetheless concluded that he could proceed with this trial on February 18. Attorney Brindley filed his second motion to adjourn the trial at 4:45 p.m. on February 13, the day before the hearing on the motions *in limine*. The court had a little more time to look into this second motion—though it had hearings scheduled for 9:30 and 11:00 a.m. on February 14th, it learned of the motion on the evening of February 13 and was able to spend some time that evening and the next day preparing. But the court's preparation did not include looking at the docket for the case Brindley had referenced with Judge Griesbach. If it had, the court would have learned that Brindley represented Charles R. Szyman in <u>United States v. Szyman</u>, 16-cr-95 (E.D. Wis.).

Judge Griesbach originally had scheduled the trial in the <u>Szyman</u> case for May 1, 2017, with a back-up trial date of June 26, 2017, <u>id.</u> at dkt. no. 18, but he rescheduled from the May 1 date to the back-up date when Brindley's co-counsel, Michael Thompson, told him that he and Brindley had a case scheduled to begin in the Northern District of Illinois on May 1, <u>id.</u> at dkt. no. 19. At the government's request, at a hearing that Attorney Brindley attended, Judge Grisbach adjourned the trial to October 16, 2017. <u>Id.</u> at Dkt. No. 24.

Judge Griesbach conducted the final pretrial conference on October 4 and gave the parties a deadline of October 11 to submit proposed jury instructions and *voir dire*. Id. at Dkt. No. 28. October 11 came and went; the government filed its proposed jury instructions and *voir dire*, id. at dkt. nos. 29, 30, but Brindley did not file anything.

On October 12, 2017—four days before the jury trial was scheduled to start—there was a sealed docket entry, described as a "telephone conference . . . regarding possible adjournment." Id. at Dkt. No. 33. The government responded the same day, id. at dkt. no. 35, and the following day, Judge Griesbach issued an order granting the sealed motion to adjourn the trial and rescheduling the trial to November 13, 2017, id. at dkt. no. 35. While the court cannot confirm from the sealed entries on the docket the government's contention that Attorney Brindley sought a continuance based on his wife's[14] health, the court can't help but notice that Judge Griesbach adjourned the trial based on an eve-of-trial request that came after the deadline for filing jury instructions and *voir dire* had passed without Attorney Brindley filing those documents.

During the final pretrial conference before this court, the prosecutor explained that she had spoken with a federal prosecutor in Louisiana who'd

---

[14] Judge Dillon indicated in Purpera that one of the bases for Attorney Brindley's request for an adjournment of that case was his need to move his wedding from December 2019 to August 2019; the court supposes that in the fall of 2017, Mr. Brindley's now-wife may have been his significant other. At the February 18 hearing, he referred to her as his "fiancée," then corrected himself to refer to her as his wife.

told her that Attorney Brindley had filed a motion to adjourn a March 9, 2020 trial date there based on the trial in this case. Brindley had told Judge Ellis that he had a trial starting March 9, 2020 in the "Central" District of Louisiana in a case called Lamartiniere. A PACER search shows that Attorney Brindley is counsel for Randy J. Lamartiniere in United States v. Lamartiniere, 18-cr-87 (M.D. La.). The indictment in that case charges Dr. Lamartiniere with offenses similar to those alleged against the defendants in this case. Id. at Dkt. No. 1. Dr. Lamartiniere appears to have sought out Attorney Brindley in the summer of 2018, id. at dkt. nos. 18-19, just prior to the trial scheduled for August 20, 2018. The adjourned trial was scheduled for July 15-26, 2019. Id. at Dkt. No. 32. On June 13, 2019, Attorney Brindley filed a motion to continue that trial date, asserting that the defendant was hospitalized for an infection resulting in a liver abscess, was on a ventilator and was heavily sedated, and would need treatment and possibly surgery. Id. at Dkt. No. 35. The motion represented that the government did not oppose an adjournment, and the court granted the motion without a hearing. Id. at Dkt. No. 36. The court rescheduled the trial to October 21 through November 1, 2019. Id. at Dkt. No. 37.

On September 16, 2019, Brindley filed another unopposed motion to adjourn the trial, this time citing the rescheduling of the Burris trial in St. Louis to November 12. Id. at Dkt. No. 39. He also indicated that his client was still recovering from health problems that had left him hospitalized and in a coma. Id. at 1-2. Brindley asked the Louisiana judge to adjourn the Lamartiniere trial "to an available date in March of 2020 or sometime

thereabouts that is convenient for the Court's schedule." Id. at page 2. The court granted the motion and adjourned the trial to March 9, 2020. Id. at Dkt. No. 40. He required the parties to file proposed *voir dire* questions, jury instructions and motions *in limine* by February 24, 2020. Id. at page 2. At a telephone status conference on December 11, 2019, the court moved the deadline for filing motions *in limine* to January 15, 2020 and set a deadline of January 29, 2020 for disclosure of experts. Id. at Dkt. No. 42.

On February 12, 2020, the prosecutor in Lamartiniere filed an unopposed motion for a status conference. Id. at Dkt. No. 47. The prosecutor told the court that the previous day—February 11, 2020—Attorney Brindley had informed him that Attorney Brindley was in the second week of a two-week trial, and had another scheduled to begin "on 19 February, 2020." Id. at page 1. The prosecutor said that there were other reasons both parties thought a status conference might be appropriate. Id. The court granted the motion, and scheduled a telephone conference for February 14, 2020—the date this court had scheduled for the hearing on the motions *in limine*—at 8:00 a.m. Id. at Dkt. No. 48. At the February 14 status conference, the court adjourned the trial to March 30, 2020 at 9:00 a.m. Id. at Dkt. No. 49.

By February 18, this court had told Attorney Brindley and Ms. Hofschulz on two occasions that it was not going to adjourn the trial. Yet Attorney Brindley again filed an after-hours request for reconsideration, this time less than twelve hours before the trial was to begin, and specifically asserted as one of the bases for the request Ms. Hofschulz's constitutional right to her counsel

of choice. When considering whether to grant an adjournment on that basis, the court considered the fact that Ms. Hofzhulz had had three other "attorneys of choice" before Mr. Brindley. It considered the fact that it had given Ms. Hofschulz and Mr. Brindley the opportunity to make certain that Mr. Brindley would be available for the February 18 trial before granting the motion to substitute. It considered the fact that once Mr. Brindley came on board as Ms. Hofschulz's most recent counsel of choice, the court hadn't heard from him for almost three months. It considered the fact that he had missed the expert witness deadline, the deadline for filing motions *in limine* and the deadline for filing the pretrial report and other documents, and that he had not responded to the government's attempts to contact him. It considered the shifting nature of Brindley's bases for requesting adjournment—his busy trial schedule, alleged unforeseen changes in that trial schedule, Rocko's sudden illness and passing, his wife's health crisis and need for assistance, Ms. Hofschulz's alleged fall. It considered the last-minute filing of the motion for a competency evaluation and hearing and the belt-and-suspenders filing, on the same day, of the motion to reconsider. It considered the fact that it had some fifty jurors waiting in the jury assembly room, that the government stood ready with witnesses in the wings, that it had imposed upon a busy colleague to try another case to keep available the time to try this case. Finally, it considered its perception that while Attorney Brindley had appeared physically on February 18, he had no intention of proceeding with the trial that day.

For all those reasons, the court declined to adjourn the case for the purpose of allowing Attorney Brindley to do what he should have done weeks earlier—prepare to defend Ms. Hofschulz.[15]

Given that, Attorney Brindley indicated that he had no ethical choice but to withdraw. The court agreed and granted his motion. The court did so knowing that the withdrawal would necessitate adjournment, throwing this court's schedule and, more critically, the government's extensive preparations into disarray. It did so knowing that the government would be forced to prepare a *third* time for a trial involving witnesses with various reasons for not wanting to relive (or re-relive) their experiences with the defendants, and at significant cost. The court did so knowing that it would take Ms. Hofschulz time to find successor counsel. But it could not, in good conscience, given the facts and

---

[15] In preparing this order, the court has learned of at least one reason that Attorney Brindley, as opposed to his client, may have needed to adjourn the February 18, 2020 trial. On December 30, 2019, Judge Janet Neff of the Western District of Michigan ordered that by January 6, 2020, the parties must file a joint motion about how many days remained on the speedy trial clock, providing their positions on an ends-of-justice continuance and requiring each defendant to provide a signed consent to adjournment or statement. United States v. Colbert, *et al.*, Case No. 18-cr-140 (W.D. Mich.) at Dkt. No. 429. Brindley represents defendant Calvin Charles Colvin, Jr. in that case. On January 9, 2020, Judge Neff issued an order to show cause requiring that by January 16, 2020, Brindley's client must either file a separate, signed consent to adjournment or a statement regarding an ends-of-justice continuance, or show cause why he'd failed to comply with the court's orders. Id. at Dkt. No. 435. On February 6, Judge Neff issued an order requiring the defendant and Attorney Brindley (as well as his partner Michael Thompson) to appear in person at the federal building in Grand Rapids, Michigan on *February 20, 2020 at 2:30 p.m.* to show cause why they should not be held in contempt. Id. at Dkt. No. 438. Had the trial in this case proceeded on February 18, Attorney Brindley would have been in Room 222 of the federal courthouse in Milwaukee on the afternoon of February 20, and *not* before Judge Neff in Grand Rapids.

history recounted above, adjourn the trial for the purpose of allowing Attorney Brindley to prepare in the way he saw fit to represent Ms. Hofschulz.

The court is mindful that as a result of its ruling, absent an order from the Seventh Circuit, Mr. Brindley is disqualified from representing Ms. Hofschulz at the trial in this case, and the court has denied Ms. Hofschulz the ability to proceed with her current counsel of choice. The court did not make that decision lightly. The court suspects that Attorney Brindley has abused the system and, despite his recent concern with his ethical obligations to his client, has been less than candid with this court and possibly others. The history of litigation in Purpera, Castaneda-Serrano and Lamartiniere shows that Attorney Brindley manages his case load by "working the float." When Brindley filed the motion to substitute as counsel for Ms. Hofschulz on September 27, 2019, he had a trial scheduled for October 21, 2019 before Judge Ellis in Chicago (Castaneda-Serrano), a November 12, 2019 trial scheduled before Judge Sippel in St. Louis (Burris), a January 21, 2020 trial scheduled in front of Judge Dillon in Virginia (Purpera), a February 10, 2020 trial scheduled before Judge Kennelly in Chicago (United States v. Ferguson, Case No. 18-cr-734 (N.D. Ill.)) and a March 9, 2020 trial before Judge deGravelles in Baton Rouge (Lamartiniere), in addition to whatever state trials he mentioned in various filings. He was scheduled to participate in one federal trial per month in October, November, January, February and March before he sought to substitute into this case. His filings in the cases demonstrate that he planned to manage this schedule by seeking adjournments—indeed, he assured this

court that he could be ready for the Hofschulz trial on February 18 because he anticipated that he could get an adjournment of the Ferguson trial scheduled for February 10 before Judge Kennelly. His numerous motions to adjourn show an attorney trying to manipulate trial dates like puzzle pieces—sometimes in apparent disregard for the schedules of his opposing counsel, his co-counsel and the courts.[16] He variously asked this court to move the Hofschulz trial to March 30 or later, or to March, or to adjourn it for "three weeks," when he'd asked other judges in other cases to do the same, or had represented that he wasn't available in March.

In at least three cases—Lamartiniere, Castaneda-Serrano and this one—he requested adjournments based on allegations that his clients had suffered medical issues. There is no evidence that the prosecutor or the judge in Baton Rouge asked him for proof of his client's medical condition, but Judge Ellis did, and she never received it. This court asked for proof and received only the After Visit Summary. The court has expressed skepticism about the authenticity of that document; even if it is authentic, it does not support Brindley's assertions.

In two of the cases, the defendant's alleged medical issues included cognitive disabilities suffered as the result of an alleged fall. This court still has no evidence that Lisa Hofschulz suffered a fall. One wonders that the alleged

---

[16] There are other examples of Attorney Brindley's case management technique in the federal courts, including United States v. Keenan Rollerson, Case No. 17-cr-101 (S.D. Ind.); United States v. Anastacio Carillo, Case No. 17-cr-104 (W.D. Mich.); United States v. Eric Avendano, Case No. 17-cr-20103 (W.D. Tenn.) (including one request for an adjournment due to a dental procedure that would not allow Brindley to fly); and United States v. Deshonte Antwon Dickson, Case No. 17-cr-36 (D. N. Dakota).

fall took place on the day Attorney Brindley had projected he'd be finished with the <u>Burris</u> trial in St. Louis, that it took place in Chicago, and that Hofschulz was taken to the same hospital where Attorney Brindley indicated his wife had been taken when she suffered chest pains in January. Perhaps there is evidence supporting everything Attorney Brindley has told the court about Ms. Hofschulz's fall. The court doesn't have that evidence—not even an affidavit from whoever was with Ms. Hofschulz when she collapsed, or whoever called emergency services.

In at least two of the cases, Attorney Brindley has filed statements purporting to be from his legal assistant, Ms. Almazan. In both cases, the statements were not signed (although in this case, Attorney Brindley filed a signed copy of one of the statements the day after he filed the unsigned copy). In several of the cases, Attorney Brindley asked for an adjournment from one court based on the trial scheduled in another court, without revealing that he'd asked for adjournment of the trial in the other court.

It is not this court's habit to think the worst of the defendants or of their counsel. Defendants in federal criminal prosecutions often find themselves in the worst, most stressful experiences of their lives, as this court knows from setting next to clients in federal courts and meeting with them in federal pre-trial holding facilities. Criminal defense attorneys have stressful, tough and often thankless jobs. They often do not have full control of their schedules, work during family crises or while ill, shoulder the emotional burdens of their

clients and don't get paid. But the court cannot help but be skeptical given the totality of the circumstances.

And this court is not the first to suggest that Attorney Brindley may not have been candid. In <u>United States v. Johnson</u>, 745 F.3d 227, 230-231 (7th Cir. 2014), Attorney Brindley represented defendant Mason Johnson in his appeal of his conviction on bank robbery charges. <u>Id.</u> at 230-231. The Seventh Circuit explained that Brindley had filed a brief that made it appear as if the trial court had no reason for denying, in a minute order, Johnson's pretrial motion to suppress evidence. <u>Id.</u> at 231. The government's brief revealed that the trial court had made findings and conclusions at the hearing, but neither party had included the transcript in the appellate record. <u>Id.</u> In his brief, Brindley certified that his appendix incorporated all the material required by the circuit rules, a representation the court found false, given the missing transcript. <u>Id.</u>

When the panel asked Brindley at oral argument how the transcript had been omitted and how his false statement had come about, Brindley indicated that predecessor appellate counsel failed to order the transcript, and that by the time he discovered that fact, it was too late to get the hearing transcribed and filed by the deadline the court had set for filing his brief (a final deadline the court had set once Brindley came on board, after three prior motions for extensions of time by predecessor counsel). <u>Id.</u> Brindley had asked for yet another extension of the briefing deadline to obtain the missing transcript, but when the court denied that request, he "elected not to order the transcript." <u>Id.</u>

The Seventh Circuit opined that Brindley had explained why he didn't have the transcript before the deadline to file his brief, but not why Brindley didn't bother to order the transcript at all, or why he falsely certified in his brief that his appendix included all required materials. Id. at 231-32. Noting that Brindley had been held in contempt for lying to a federal judge the previous year, the court opined that Brindley's decision to file a false certification was "a mighty strange decision." Id. at 232 (citing United States v. Britton, 731 F.3d 745 (7th Cir. 2013) [17]. The court fined Brindley $2,000, concluding that

> Brindley may not have set out to develop a reputation as a lawyer whose word cannot be trusted, but he has acquired it. This opinion serves as a public rebuke and as a warning that any further deceit will lead to an order requiring Brindley to show cause why he should not be suspected or disbarred. We also direct Brindley to pay $2,000 as a sanction for his intentional violation of Circuit Rule 30(d).

Id.

While a criminal defendant who does not require appointed counsel has a constitutional right to her counsel of choice, she does not have a right to

---

[17] In Britton, a district judge in the Central District of Illinois held Brindley in contempt for twice failing to attend hearings (once after being ordered to appear in person by the judge to show cause why he hadn't appeared at a previous hearing). Britton, 731 F.3d at 746-47. Some of the facts in that case resemble facts the court recounted in this order—two days before the contempt hearing, Brindley filed a pleading explaining that he'd been involved in trial in another court when the judge had set one of the missed hearings, and that at the time of the missed hearing itself he'd been at the jail preparing a client to testify; he asked to adjourn the contempt hearing because he'd be in trial in state court; the federal judge reviewed the state court docket and learned that Brindley wasn't scheduled for trial on the date of the contempt hearing; etc. At any rate, Brindley testified at the contempt hearing; the federal judge found that he was untruthful, held him in contempt and remanded him to the custody of the marshal for forty-eight hours. Britton, 731 F.3d at 748. The Seventh Circuit vacated the contempt finding because it concluded that the district court had used the wrong procedure. Id. at 749, 751.

insist on representation by counsel who abuses the court's trust and the judicial system. That is why the court denied Attorney Brindley's motion to adjourn the trial to give him time to prepare, and why instead it granted his request to withdraw. That is why the court anticipates that at the February 27, 2020 status conference, Ms. Hofschulz will either have a different attorney of choice, or will be ready to tell the court and the parties what steps she has taken to find a different attorney of choice.

## V.     Imposition of Costs

Attorney Brindley informed the court at the February 14 hearing that he would pay any costs associated with adjourning the trial at the eleventh hour. The court requires Mr. Brindley to submit the sum of $4,465.68 to the Clerk of Court by the end of the day on March 20, 2020. This amount is the total of the $50 payment to each of the fifty-one potential jurors who appeared, their mileage reimbursement and their parking fees (if any). The court attaches to this hearing a copy of the pool attendance record, with the names of the potential jurors redacted.

## VI.     Conclusion

The court **DENIES** Lisa Hofschulz's second motion to continue. Dkt. No. 80.

The court **DEFERS RULING** on Lisa Hofschulz's motion for competency evaluation. Dkt. No. 83.

The court **DENIES** Lisa Hofschulz's motion to reconsider requrest to continue. Dkt. No. 85.

The court **GRANTS** Lisa Hofschulz's alternative motion to allow Attorney Beau Brindley to withdraw. Dkt. No. 85.

The court **ORDERS** that the clerk's office must terminate Attorney Brindley as counsel of record for Lisa Hofschulz.

The court **ORDERS** that Attorney Beau Brindley must remit to the Clerk of Court $4,465.68, made payable to "Clerk, U.S. District Court," in time for the clerk's office to receive it by the end of the day on **March 20, 2020**. The court **ORDERS** that Attorney Brindley should indicate the reason for the payment (jury costs) and the case name and number on any form of payment.

The court **ORDERS** that the parties must appear at a status conference on February 27, 2020 at 10:30 a.m. in Room 222. If Lisa Hofschulz has retained successor counsel by that time, that attorney must appear on her behalf at the hearing. If not, Lisa Hofschulz must appear in person and must be prepared to update the court on the steps she has taken to find successor counsel.

Dated in Milwaukee, Wisconsin this 20th day of February, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**