UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

                                    Case No. 18-cr-145-pp

    v.

LISA HOFSCHULZ,
and ROBERT HOFSCHULZ,

          Defendants.

## ORDER DENYING GOVERNMENT'S MOTION TO EXCLUDE TESTIMONY OF DR. JAMES HALIKAS (DKT. NO. 125)

## I.    Procedural Background

In June 2018, the grand jury indicted the defendants on charges of conspiring to distribute controlled substances outside of a medical practice and not for a legitimate medical purpose and unlawfully distributing controlled substances outside of a medical practice and not for a legitimate medical purpose. Dkt. No. 1. The indictment alleged that Lisa Hofshulz (a licensed nurse practitioner and owner of Clinical Pain Consultants) and Robert Hofschulz provided customers with "excessive" dosages of opioids for cash. Id. At the arraignment and plea hearing, Attorney Brent Nistler appeared as counsel for Ms. Hofschulz. Dkt. No. 6.

The court set a jury trial for October 7, 2019. Dkt. No. 27. Two months later, on November 30, 2018, Attorney Ronald W. Chapman, II, a member of

1

the Michigan bar, filed an appearance on behalf of Ms. Hofschulz. Dkt. No. 19.

Attorney Nistler also remained counsel of record.

In a pretrial order dated January 31, 2019, the court ordered that no later than September 12, 2019, the parties must file a final pretrial report that included "[a] short narrative statement detailing the background and qualifications of any expert witness whom either party expects to testify." Dkt. No. 28 at ¶5.

On February 26, 2019, the grand jury returned a superseding indictment. Dkt. No. 29. Ms. Hofshulz, through Attorney Chapman, filed a motion to suppress evidence. Dkt. No. 33. Magistrate Judge William E. Duffin recommended that the court deny the motion, dkt. no. 37; Attorney Chapman objected on Ms. Hofschulz's behalf, dkt. no. 42. The court overruled the objections and denied the motion to suppress. Dkt. No. 44. Two weeks later, Attorney Chapman moved to withdraw, asserting that he had joined the case at the request of Attorney Nistler and that there had been an "irrevocable breakdown in the attorney-client relationship" and that Ms. Hofschulz wanted to continue only with Attorney Nistler. Dkt. No. 45. The court granted the motion. Dkt. No. 48. At that point, the pretrial report (disclosing the identities of experts) was due in just over a month.

On August 2, 2019, the government asked for additional time to file the pretrial report and an adjournment of the final pretrial conference; one of the prosecutors had become United States Attorney and the other had transferred to another district. Dkt. No. 47. The defendants did not object to this motion,

2

and the court extended the deadline for filing the pretrial report—and disclosing experts—to September 19, 2019. Dkt. No. 49.

On September 18, 2019—the day before the final pretrial report was due—defendant Lisa Hofschulz asked the court to adjourn the final pretrial conference and the trial. Dkt. No. 58. At a hearing that same day, defense counsel reported that Ms. Hofshulz's expert, a Dr. Odell, was not available to testify at the October trial. Dkt. No. 59. Defense counsel—at that time, Attorney Brent Nistler—told the court that he could not provide Ms. Hofschulz with a proper defense without an expert. Id. at 1. The government vehemently objected to an adjournment, arguing that Ms. Hofschulz continued to run her clinic and that the government had agreed not to question Odell about the recent suspension of his license. Id. Defense counsel asked to speak with the court off the record about why Dr. Odell could not testify; the court granted that request, and after the off-the-record discussion, granted Ms. Hofschulz's motion to adjourn the trial. Id. at 2. The court rescheduled the trial for February 18, 2020, to give Ms. Hofschulz the opportunity to find an expert. Id. It ordered that the parties must disclose the identities of experts, along with their reports and supporting documentation, no later than December 20, 2019. Id. at 2.

Nine days later, Attorney Beau Brindley filed a motion to substitute as counsel for Ms. Hofschulz. Dkt. No. 60. When the government filed a response insisting that it did not want a change of counsel to result in an adjournment of the February 18, 2020 trial date, dkt. no. 61, Attorney Brindley responded

3

that given his schedule, it was "impossible" for him to conduct the trial on February 18, 2020, dkt. no. 62. The court issued a written order, indicating that it would not reschedule the February 18, 2020 trial, noting that it had adjourned the trial "solely because of its concern that the defendant would be denied her right to present a defense if it did not do so." Dkt. No. 64 at 6. The court deferred ruling on Attorney Brindley's motion to substitute, so that Ms. Hofschulz could consider whether she wanted to retain him knowing that he was unavailable on February 18, 2020. Id. at 6-7. Attorney Brindley subsequently indicated that he would make the February 18, 2020 date work, dkt. no. 65, and the court allowed him to substitute for Attorney Nistler, dkt. no. 66. Again, the deadline for disclosing experts was December 20, 2020—two months later.

As ordered, the government filed its notice of expert disclosures on December 20, 2020. Dkt. No. 69. The defendants did not file anything. On March 13, 2020—after a series of events the court need not recount here, but which included adjourning the February 18, 2020 trial date on the morning of trial[1]—the court set another deadline, ordering the parties to disclose the

_____

[1] In pleadings regarding the court's conditioning the adjournment of the trial date on Attorney Brindley's withdrawal from the case, Attorney Brindley responded to the court's observation that prior to the aborted February 18, 2020 trial, he did not file an expert witness disclosure. Dkt. No. 102 at 10. Attorney Brindley objected to the court's implication that his failure to identify an expert indicated that he did not intent to proceed to trial, stating that "[t]he problem with this logic is that it presumes that, if given ample time, Mr. Brindley would have felt the need to file motions *in limine* or to utilize an expert witness." Id. Attorney Brindley listed several cases in which he defended clients on charges similar to those Ms. Hofschulz faces and did not utilize

4

identities of their expert witnesses, and the reports of those witnesses, no later than sixty days prior to November 19, 2020—around September 21, 2020. Dkt. No. 99. On September 21, 2020, the government filed a notice disclosing four experts. Dkt. No. 111. The defendants did not file anything.

On October 16, 2020, the government filed its consolidated motions *in limine.* Dkt. No. 114. Among them was a motion asking the court to preclude the defendants from calling expert witnesses at trial. Id. at 15. The motion recounted that late in the evening on September 21, 2020, Ms. Hofschulz's counsel had sent the government an email "purporting to be" her expert witness disclosure, naming a Dr. James Halikas and providing his *curriculum vitae.* Id. at 16. The government argued that the content of the email did not comply with Fed. R. Crim. P. 12(b)(C) regarding disclosure of an expert witness's opinions. Id. at 16-19.

At the October 28, 2020 final pretrial conference (one of several in the case), the court denied the government's motion to preclude the defendants from calling expert witnesses. Dkt. No. 117 at 2. It ordered the defendants to file Halikas's report by November 9, 2020. Id.

At a status conference on November 3, 2020, the court removed the December 7, 2020 trial date from the calendar due to its concerns over the high number of confirmed COVID-19 cases in Wisconsin. Dkt. No. 119. Attorney Brindley indicated that his expert needed more time to prepare his

_____

expert witnesses and argued that "his preference from not using experts in these opiate prescription cases is well-established." Id. at 10-11.

report; the court ordered that by November 30, 2020, Ms. Hofschulz must disclose the identity of her expert or experts and the expert reports. Id. at 2. On November 30, 2020, Attorney Brindley filed a motion for extension of time to file Ms. Hofschulz's expert report, dkt. no. 120, which the court granted, dkt. no. 121. The court gave Ms. Hofschulz a deadline of December 14, 2020 by which to file her expert reports. Id. Lisa Hofschulz did not file anything prior to that deadline. At this point, Attorney Brindley had been representing Ms. Hofschulz for almost fourteen months, had obtained two extensions of the expert disclosure deadline and had failed to seek extensions (or provide the expert report) by three other deadlines.

On January 19, 2021, the government filed a motion to exclude the testimony of Dr. James Halikas under Daubert v. Merrell Dow Pharmaceuticals. Dkt. No. 125. The government explained that on December 17, 2020, one of the prosecutors received an email from Attorney Brindley that stated, "I have finally received Dr. Halikas's report. It was emailed to me yesterday evening. I am attaching it here for your review." Id. at 1. See also, Dkt. No. 125-1 at 1. The government attached to the motion Dr. Halikas's six-page report. Dkt. No. 125-1. It also attached his fifty-four page, September 9, 2008 *curriculum vitae*, dkt. no. 125-3, as well as a September 21, 2020 email to the same AUSA from Attorney Brindley, dkt. no. 125-4. This email (dated two months before the December 20, 2020 deadline for disclosing experts and their reports) stated:

> Attached is the CVO for our potential expert witness regarding addiction medicine and pain management: Dr. James Halikas[.]

6

I believe you are familiar with Dr. Halikas from the investigation in this case.

Simply stated, we expect that Dr. Halikas would opine that, after reviewing all available records for the patients who are listed in the indictment, he does not find that Ms. Hofshulz's prescriptions were either (1) unreasonable; or (2) outside the normal course of professional practice when taking into account concerns regarding addiction and the presentations and symptoms shown by the patients in question.

He has not provided any expert report. If we decide to call him as a witness, then I will supplement this disclosure with any report that he submits.

Id.

Lisa Hofschulz responded to the government's motion on February 4, 2020. Dkt. No. 133. The government filed its reply the next day. Dkt. No. 137.

## II.    The Parties' Arguments

The government argues that Halikas is not qualified to offer an expert. Dkt. No. 125 at 5. It asserts that this case is about "a pain management clinic and a nurse practitioner purporting to practice pain management by prescribing high doses of narcotic medications," while Dr. Halikas "is a psychiatrist who is not board certified in pain management" and who has "no significant experience in pain management and does not regularly prescribe the controlled substances that are it issue here." Id. The government argues that Halikas's report both consists of conclusory assertions and "reads like the text of an editorial about the Controlled Substances Act or a summary of the Defense's closing argument." Id. at 6. The government argues that if the court decides to allow Halikas to testify, it should preclude him from testifying (1)

7

about legal standards, (2) that the prosecution is based on race or "scare tactics" and (3) about F.E.'s cause of death or the police investigation into that death. Id. at 7-12. It also asserts that the court should preclude Halikas from making argument rather than giving opinion testimony. Id. at 12. Finally, the government asks that if the court allows Halikas to testify, it require him to produce within seven days documents detailing his relationship with Ms. Hofshulz and/or the pain clinic she runs, a list of any literature he has authored or speeches he has given relating to the topic of his testimony and the pain management literature he references in his report (or any literature on which he bases his opinions or on which he intends to rely for his testimony). Id. at 13.

Ms. Hofshulz first responds that Halikas "will not be asked" his opinion about legal standards and how they apply to providers, his opinions regarding the motivations of the investigators and prosecutors or his opinions regarding the cause of death of F.E. "and the shortcomings of the investigation into that death." Dkt. No. 133 at 1. The defendant asserts that Dr. Halikas "will be asked to opine on whether the specified patients received medically appropriate treatment, or treatment that was generally acceptable in the medical filed based on his experience, not whether he believes Ms. Hofschulz specifically acted within the bounds of the law." Id. at 1-2. The defendant asserts that Dr. Halikas's "misunderstanding of which matters to include in his expert report" should not have anything to do with whether he is qualified to testify as an "expert in medicine." Id. at 2.

Ms. Hofshulz argues that that Halikas's education, training and experience make him "more than" qualified "to provide expert testimony regarding the prescriptions written in this case." Id. at 6. She argues that while being board-certified "is certainly suggestive of expertise in a field," it is not a prerequisite for expertise. Id. She asserts that Halikas has written more than 1,300 prescriptions for narcotic pain medication in eight years, and asserts that contrary to the government's argument, this shows that Halikas is experienced in pain management treatment. Id. She argues that "[a] physician such as Dr. Halikas, who is immensely familiar with the prescription of these psychiatric medications and has himself spent the last decade issuing narcotic pain medication prescriptions to his patients nearly every single day of every single work week on average, is particularly qualified to offer an expert opinion on the appropriateness of the charged prescriptions in this case and the combinations of drugs that [the government's expert] will be criticizing." Id. at 6-7.

The defendant asserts that the government is free to argue to the jury that Halikas's experience is "limited"—she asserts that that argument goes to weight, not to whether Halikas is qualified to testify. Id. at 7. She asserts that there is no requirement that a physician's primary area of practice must be pain management in order to give opinions "about issued prescriptions and patient treatment in a case charging that a practitioner issued prescriptions for opiate pain medications outside the usual course of professional medical practice and not for a legitimate medical purpose." Id.

The government replies that while it is true that Halikas does not have to be an expert in pain management to testify, he does need to have *some* experience in that area. Dkt. No. 137 at 3-4. It argues that only about two percent of Halikas's prescriptions over the seven-year period Ms. Hofschulz describes were prescriptions for "the relevant narcotic medications"—Methadone, Fentanyl, Oxycodone, Morphine or Oxycontin. Id. at 4. The government asserts, "If just practicing pain management for 1-2% of your time is sufficient to qualify a doctor as an expert in pain management, it is likely that a whole host of medical professionals such as family/general practitioners, surgeons, and ER doctors would similarly qualify." Id. The government asserts that this is not the standard, and cites a case from the Northern District of Illinois, Padilla v. Hunter Douglas Window Coverings, Inc., 14 F. Supp. 3d 1127, 1134 (N.D. Ill. 2014). Id. The government also points out that Halikas is the medical director of the defendants' pain clinic, and argues that "[t]he fact that the Defendants hired a doctor with no relevant pain management experience or expertise to serve as the medical director at their clinic does not suddenly transform him into an expert in pain management or controlled-substance prescribing." Id. at 5.

The government also asserts—again—that the portion of Halikas's report that constitutes an admissible opinion is less than a page, is conclusory and fails to comply with Fed. R. Crim. P. 16. Id. at 5. Finally, it reiterates that if the court is going to allow Halikas to testify, it must require him to produce the

documents requested in the government's motion within three days of the court's order. Id. at 6.

## III. Analysis

### A. Applicable Law

Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), govern the admissibility of expert testimony. The court, as gatekeeper, "is responsible for ensuring that proposed expert testimony 'is not only relevant, but reliable.'" Timm v. Goodyear Dunlop Tires N. Am., Ltd., 932 F.3d 986, 993 (7th Cir. 2019) (quoting Daubert, 509 U.S. at 589). "In assessing reliability, 'the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions.'" Id. (quoting Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000)).

This determination requires to court to engage in a three-step analysis. "It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue." Gopalratnam v. Hewlett-Packard Co., 877 F.3d 771, 779 (7th Cir. 2017) (citing Myers v. Ill. Cent. R.R. Co., 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted). The Seventh Circuit has clarified that "the district court must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." Id.

Case 2:18-cr-00145-PP   Filed 02/22/21   Page 11 of 20   Document 152

(emphasis in original). It is the burden of the party seeking to introduce an expert to show that they meet the Daubert standard. Id., 877 F.3d 771 at 782.

Rule 702 indicates that an expert witness may be qualified as an expert "by knowledge, skill, experience, training or education." An expert need not have particular academic credentials to be qualified; "anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." Tuf Racing Prods, Inc. v. Am. Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000).

To be relevant for purposes of Rule 702, the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Relevant evidence is evidence "that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Daubert, 509 U.S. at 587 (quoting Fed. R. Evid. 401). "Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies *Daubert's* relevancy requirement." Smith v. Ford Motor Co., 215 F.3d 713, 718–19 (7th 2000). If an expert uses hypothetical explanations for causes of an event, those hypotheticals must have "analytically sound bases," rendering them "more than mere 'speculation' by the expert." Id. at 719 (quoting DePaepe v. Gen. Motors Corp., 141 F.3d 715, 720 (7th Cir. 1998)). The question of whether the expert's theory is correct given the circumstances of a particular case is a factual one left for the jury to determine.

The factors the trial court should consider when determining if an expert's opinion is reliable are:

> (1) "whether [the expert's theory or technique] can be (and has been) tested";
> (2) "whether the theory or technique has been subjected to peer review and publication";
> (3) "the known or potential rate of error"; and
> (4) "general acceptance" in the "relevant scientific community."

Daubert, 509 U.S. at 593–94.

B.    Application of the Law to the Facts

1.    *Is Halikas Qualified?*

Halikas earned a bachelor of science from Brooklyn College in 1962 and his medical degree from the Duke University School of Medicine in 1966. Dkt. No. 125-3 at 1. He performed his rotating internship at Barens Hospital, Washington University School of Medicine in St. Louis, Missouri from 1966-67. Id. He did his psychiatric residency at Barnes and Renard Hospitals through the Washington University School of Medicine in St. Louis from 1967-1970. Id. at 1-2. In a fifty-four-page CV, Halikas does not state where he works; as indicated above, the CV is over twelve years old, dated September 9, 2008. Id. at 1.

The CV reflects thirty-two teaching and research appointments between 1963 and 1999. Id. at 2-5. Of those, seven—including the more recent ones (recent meaning between 1993 and 1999)—are focused on drug and alcohol addiction medicine and services. Under the heading "Grant Support," Halikas lists numerous fellowships and grant awards relating to alcohol and drug use, though they are dated between 1969 and 1984. Id. at 5-8. Among his many

13

hospital and clinical appointments, Halikas lists the Jefferson County, Kentucky Alcoholism and Drug Abuse Center for Treatment and Research (January to July 1978) and the Chemical Dependency Treatment Program at the University of Minnesota Hospital and Clinic (September 1984 to October 1989). Id. at 8-10.

Halikas spent time in the Department of Psychiatry and Mental Health Sciences at the Medical College of Wisconsin—between September 1978 and August 1984 he was the director of the Division of Alcoholism and Chemical Dependency and the director of "Medical Education in Alcoholism and Chemical Dependency." Id. at 12. During that same period, he was a member of the executive committee of the Division of Alcoholism and Chemical Dependency at the Milwaukee County Mental Health Complex. Id. at 13. In the Department of Psychiatry at the University of Minnesota Medical School, Halikas was a member of the Chemical Dependency Fellowship Steering Committee from 1983-1993 and was its chairman from 1993 to 1998. Id. at 13-14. He was the director of the Chemical Dependency Treatment Program from 1989-1994. Id. at 14. He was the director of the Addiction Medicine Postgraduate Residency Training Program from 1993-1998. Id. In 1999, he was named a fellow of the American Society of Addiction Medication. Id. at 15.

From 1995 to 2008, Halikas was a member of the American Society of Addiction Medicine, the Association for Medical Education and Research in Substance Abuse and the Research Society on Alcoholism. Id. at 16-17. From 1978 to 1984, he was a member of the Wisconsin Association on Alcohol and

Other Drug Abuse. Id. at 17. From 1987 to 2008, he was a member of the American Academy of Addiction Psychiatry. Id. at 18. He was the "founding vice-president" of the Drug and Substance Abuse Council of Metropolitan St. Louis in 1970 and held positions with that organization through 1972. Id. at 18-19. In 1971, he was on the steering committee for Drug Abuse Education of Policy Makes of Washington University and the Florissant Valley Community College's steering committee for drug abuse. Id. at 19. For twenty-six weeks in 1982, he was on a weekly television series in St. Louis about the teen point of view on drugs. Id. From the late 1970s through the early 1990s he was involved in numerous drug and alcohol task forces and education committees. Id. at 19-23. He has served on advisory councils for courts, crisis intervention units, government entities and law enforcement on drug abuse. Id. at 23-26. He served on the editorial boards of two journals relating to addiction and was an *ad hoc* reviewer for four others. Id. at 26-27. Among the hundreds of publications listed in the CV are publications on drug abuse and addiction. Id. at 27-39. He has given presentations on these topics on many occasions. Id. at 39-49.

In his report, Halikas states that he has done research on heroin addicts, cocaine addicts, teenagers with addictions, "skid row alcoholics," chronic marijuana users and patients with psychiatric illness and drug dependence. Dkt. No. 125-1 at 2. He says he is "credited" with three "use patents" in treatment of addictions. Id. He says he has spent additional time working in pain management with both addicted and non-addicted individuals in his

psychiatric practice in Naples, Florida. Dkt. No. 125-1 at 3. He has spent the last three years as the Medical Director for Clinical Pain Consultants, the defendants' medical pain management program. Id.

The government argues that its expert, Dr. Timothy King, "has been qualified as an expert on the subject of controlled substance prescribing on multiple occasions in numerous jurisdictions." Dkt. No. 125 at 2. It says that King will testify about the ways in which defendant Lisa Hofchulz "failed to engage in the practice of medicine when prescribing controlled substances." Id. at 2-3. Dr. King also will testify about "the steps required of all doctors to engage in the practice of medicine, as well as the specific standards applicable in the area of pain management." Id. at 3. The government asserts that Dr. Halikas, on the other hand, is not board certified in pain management and has no expertise in pain management. Id. The government says that "[t]his case is about a pain management clinic and a nurse practitioner purporting to practice pain management by prescribing high doses of narcotic medications," and it says that there is nothing in Halikas's education or experience that shows that he has "any qualifications to testify as to the generally accepted standards of controlled substance prescribing in pain management or the generally accepted standards of patient case in the area of pain management." Id. at 5.

Ms. Hofchulz responds that Dr. Halikas is qualified "to provide expert testimony regarding the prescriptions written in this case." Dkt. No. 133 at 6. This argument is not particularly helpful. The government asserts that its

expert is going to opine on the standards that govern medical professionals who prescribe controlled substances for the purpose of managing pain. The defense responds that Halikas has written lots of prescriptions for psychiatric issues and addiction management. It argues that Halikas has "spent the last decade issuing narcotic pain medication prescriptions to his patients nearly every single day of every single work week on average." Id. at 6-7. And it argues that "[t]here is no requirement that a physician must primarily practice in the area of pain management to give expert opinions about issued prescriptions and patient treatment in a case charging that a practitioner issued prescriptions for opiate pain medications outside the usual course of professional medical practice and not for a legitimate medical purpose." Id. at 7.

While the defense description of the topic on which it proposes Halikas will opine is less precise than the government's, and while one might question whether a person who has experience—even expertise—in prescribing psychiatric medications and in the study of the psychiatric underpinnings of addiction has knowledge that equates to an expertise in the standards applicable to proper prescription of medications for the management of pain, the court finds that Halikas does have education, training and experience in prescribing drugs and in understanding how certain drugs can be addictive in certain individuals. That kind of experience is relevant to some of the issues in this case—whether Ms. Hofchulz prescribed to people whom she knew or suspected to be addicts, whether the medications she handed out were likely to

17

cause addiction. The court concludes that Halikas is qualified to opine on these issues. He likely is not qualified to opine on every issue that will arise at trial, and the government will be able to cross-examine and to probe him on that fact.

2.    *Is Halikas's Methodology Reliable?*

Only three paragraphs of Halika's expert report—roughly one page of a six-page document—pertain to the actual prescription and treatment process. Those paragraphs state:

> For each case, Lisa Hofschulz prescribed appropriate controlled substances in accordance with the recognized standard of medical practice in the field of pain management. For each patient, prescriptions were written and dispensed for a legitimate medical purpose, and within the accepted course of medical practice. Patients were seen monthly and only by appointment. All diagnoses were based on objectively confirmed radiologic and physical examination findings by other physicians. All diagnoses were objectively confirmed. The PDMP and Urine Drug Screens were utilized regularly.

> Opiates were prescribed at appropriate therapeutic levels. The correctness of these dosages was demonstrated by the frequently obtained pain scales which showed that each patient had achieved a good quality of life, which is the true goal of pain management treatment.

> Mental health comorbidities were appropriately addressed. Appropriate combinations of long and short acting pain medications were prescribed, recognized as the standard of care in the pain management literature. Medications prescribed were at appropriate doses, as also noted in the pain management literature. Frequent urine drug screens were required, and when illegal substances were present or there was an absence of the prescribed medication, the patient was counseled appropriately. All psychiatric comorbidities, including past substance abuse and addiction, were considered as part of the treatment of each individual patient. Combinations of medications prescribed which could have potentially adverse consequences were carefully monitored and patients were cautioned regarding potential complications.

18

Dkt. No. 125-1 at 4-5. The report contains no discussion of standards generally accepted in the medical field for treatment of pain. There is no discussion of individual patients. Halikas does not explain how he came to the conclusions he reached. He states only that he "reviewed" the records of some of the patients as well as the statements made by the government's expert, Dr. King. Id. at 4. Halikas's conclusory positions cannot be tested; they are summary conclusions. Neither can they be subjected to peer review or publication. There is no way for the court to know whether his position would be generally accepted in the relevant scientific community without further information on how he came to his decisions.

For this reason, the court has ordered that Halikas must provide an updated report by the end of the day on **March 22, 2021**, explaining his methodology—what he did to review patient files, review Lisa Hofschulz's procedures, familiarize himself with standards, etc. The amended report must explain the bases for his conclusions. It must identify any "literature" which Halikas claims supports his conclusions.

3.     *Will Halikas's testimony be helpful to the trier of fact?*

Among the issues for a jury to decide at trial will be the question of whether Lisa Hofschulz followed accepted medical standards in prescribing pain medication, whether she had reason to know that some patients were at risk for addiction (or were addicted already), whether patients were medication-seeking. While the parties need much more detail on Halikas's methods and how he reached his conclusions, his education and background in teaching,

speaking, publishing and board/committee service indicate that his testimony could be helpful to the trier of fact in determining the answers to some of these questions.

## IV.   Conclusion

The court **DENIES** the government's motion to exclude testimony of Dr. James Halikas. Dkt. No. 125. The court **ORDERS** that no later than the end of the day on **March 22, 2021**, defendant Lisa Hofschulz must file an amended expert witness report for Dr. Halikas, providing the additional information required by this order.

Dated in Milwaukee, Wisconsin this 22nd day of February, 2021.

BY THE COURT:

HON. PAMELA PEPPER
Chief United States District Judge