UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

               Plaintiff,

                                 Case No. 18-cr-145-pp

   v.

LISA HOFSCHULZ,
and ROBERT HOFSCHULZ,

               Defendants.

---

**ORDER DENYING GOVERNMENT'S MOTION TO EXCLUDE TESTIMONY OF DR. JAMES HALIKAS (DKT. NO. 155)**

---

## I.    Procedural Background

In its order denying the government's first motion to exclude the testimony of Dr. Halikas, the court provided a detailed description of the procedural background of the case. See dkt. no, 152. The court stated:

> In June 2018, the grand jury indicted the defendants on charges of conspiring to distribute controlled substances outside of a medical practice and not for a legitimate medical purpose and unlawfully distributing controlled substances outside of a medical practice and not for a legitimate medical purpose. Dkt. No. 1. The indictment alleged that Lisa Hofshulz (a licensed nurse practitioner and owner of Clinical Pain Consultants) and Robert Hofschulz provided customers with "excessive" dosages of opioids for cash. Id. At the arraignment and plea hearing, Attorney Brent Nistler appeared as counsel for Ms. Hofschulz. Dkt. No. 6.
>
> The court set a jury trial for October 7, 2019. Dkt. No. 27. Two months later, on November 30, 2018, Attorney Ronald W. Chapman, II, a member of the Michigan bar, filed an appearance on behalf of Ms. Hofschulz. Dkt. No. 19. Attorney Nistler also remained counsel of record.

1

In a pretrial order dated January 31, 2019, the court ordered that no later than September 12, 2019, the parties must file a final pretrial report that included "[a] short narrative statement detailing the background and qualifications of any expert witness whom either party expects to testify." Dkt. No. 28 at ¶5.

On February 26, 2019, the grand jury returned a superseding indictment. Dkt. No. 29. Ms. Hofshulz, through Attorney Chapman, filed a motion to suppress evidence. Dkt. No. 33. Magistrate Judge William E. Duffin recommended that the court deny the motion, dkt. no. 37; Attorney Chapman objected on Ms. Hofschulz's behalf, dkt. no. 42. The court overruled the objections and denied the motion to suppress. Dkt. No. 44. Two weeks later, Attorney Chapman moved to withdraw, asserting that he had joined the case at the request of Attorney Nistler and that there had been an "irrevocable breakdown in the attorney-client relationship" and that Ms. Hofschulz wanted to continue only with Attorney Nistler. Dkt. No. 45. The court granted the motion. Dkt. No. 48. At that point, the pretrial report (disclosing the identities of experts) was due in just over a month.

On August 2, 2019, the government asked for additional time to file the pretrial report and an adjournment of the final pretrial conference; one of the prosecutors had become United States Attorney and the other had transferred to another district. Dkt. No. 47. The defendants did not object to this motion, and the court extended the deadline for filing the pretrial report—and disclosing experts—to September 19, 2019. Dkt. No. 49.

On September 18, 2019—the day before the final pretrial report was due—defendant Lisa Hofschulz asked the court to adjourn the final pretrial conference and the trial. Dkt. No. 58. At a hearing that same day, defense counsel reported that Ms. Hofshulz's expert, a Dr. Odell, was not available to testify at the October trial. Dkt. No. 59. Defense counsel—at that time, Attorney Brent Nistler— told the court that he could not provide Ms. Hofschulz with a proper defense without an expert. Id. at 1. The government vehemently objected to an adjournment, arguing that Ms. Hofschulz continued to run her clinic and that the government had agreed not to question Odell about the recent suspension of his license. Id. Defense counsel asked to speak with the court off the record about why Dr. Odell could not testify; the court granted that request, and after the off-the-record discussion, granted Ms. Hofschulz's motion to adjourn the trial. Id. at 2. The court rescheduled the trial for February 18, 2020, to give Ms. Hofschulz the opportunity to find an expert. Id. It ordered that the parties must disclose the identities of experts, along

2

with their reports and supporting documentation, no later than December 20, 2019. Id. at 2.

Nine days later, Attorney Beau Brindley filed a motion to substitute as counsel for Ms. Hofschulz. Dkt. No. 60. When the government filed a response insisting that it did not want a change of counsel to result in an adjournment of the February 18, 2020 trial date, dkt. no. 61, Attorney Brindley responded that given his schedule, it was "impossible" for him to conduct the trial on February 18, 2020, dkt. no. 62. The court issued a written order, indicating that it would not reschedule the February 18, 2020 trial, noting that it had adjourned the trial "solely because of its concern that the defendant would be denied her right to present a defense if it did not do so." Dkt. No. 64 at 6. The court deferred ruling on Attorney Brindley's motion to substitute, so that Ms. Hofschulz could consider whether she wanted to retain him knowing that he was unavailable on February 18, 2020. Id. at 6-7. Attorney Brindley subsequently indicated that he would make the February 18, 2020 date work, dkt. no. 65, and the court allowed him to substitute for Attorney Nistler, dkt. no. 66. Again, the deadline for disclosing experts was December 20, 2020—two months later.

As ordered, the government filed its notice of expert disclosures on December 20, 2020. Dkt. No. 69. The defendants did not file anything. On March 13, 2020—after a series of events the court need not recount here, but which included adjourning the February 18, 2020 trial date on the morning of trial[1]—the court set another deadline, ordering the parties to disclose the identities of their expert witnesses, and the reports of those witnesses, no later than sixty days prior to November 19, 2020—around September 21, 2020. Dkt. No. 99. On September 21, 2020, the government filed a notice disclosing four experts. Dkt. No. 111. The defendants did not file anything.

---

[1] In pleadings relating to the court's conditioning the adjournment of the trial on Attorney Brindley's withdrawal from the case, Attorney Brindley responded to the court's observation that prior to the aborted February 18, 2020 trial, he did not file an expert witness disclosure. Dkt. No. 102 at 10. Attorney Brindley objected to the court's implication that his failure to identify an expert indicated that he was not prepared to proceed to trial, stating that "[t]he problem with this logic is that it presumes that, if given ample time, Mr. Brindley would have felt the need to file motions *in limine* or to utilize an expert witness." Id. Attorney Brindley listed several cases in which he had defended clients on charges similar to those faced by Ms. Hofschulz where he did not utilize expert witnesses and argued that "his preference for not using experts in these opiate prescription cases is well-established." Id. at 10-11.

3

On October 16, 2020, the government filed its consolidated motions *in limine*. Dkt. No. 114. Among them was a motion asking the court to preclude the defendants from calling expert witnesses at trial. Id. at 15. The motion recounted that late in the evening on September 21, 2020, Ms. Hofschulz's counsel had sent the government an email "purporting to be" her expert witness disclosure, naming a Dr. James Halikas and providing his *curriculum vitae*. Id. at 16. The government argued that the content of the email did not comply with Fed. R. Crim. P. 12(b)(C) regarding disclosure of an expert witness's opinions. Id. at 16-19.

At the October 28, 2020 final pretrial conference (one of several in the case), the court denied the government's motion to preclude the defendants from calling expert witnesses. Dkt. No. 117 at 2. It ordered the defendants to file Halikas's report by November 9, 2020. Id.

At a status conference on November 3, 2020, the court removed the December 7, 2020 trial date from the calendar due to its concerns over the high number of confirmed COVID-19 cases in Wisconsin. Dkt. No. 119. Attorney Brindley indicated that his expert needed more time to prepare his report; the court ordered that by November 30, 2020, Ms. Hofschulz must disclose the identity of her expert or experts and the expert reports. Id. at 2. On November 30, 2020, Attorney Brindley filed a motion for extension of time to file Ms. Hofschulz's expert report, dkt. no. 120, which the court granted, dkt. no. 121. The court gave Ms. Hofschulz a deadline of December 14, 2020 by which to file her expert reports. Id. Lisa Hofschulz did not file anything prior to that deadline. At this point, Attorney Brindley had been representing Ms. Hofschulz for almost fourteen months, had obtained two extensions of the expert disclosure deadline and had failed to seek extensions (or provide the expert report) by three other deadlines.

On January 19, 2021, the government filed a motion to exclude the testimony of Dr. James Halikas under Daubert v. Merrell Dow Pharmaceuticals. Dkt. No. 125. The government explained that on December 17, 2020, one of the prosecutors received an email from Attorney Brindley that stated, "I have finally received Dr. Halikas's report. It was emailed to me yesterday evening. I am attaching it here for your review." Id. at 1. See also, Dkt. No. 125-1 at 1. The government attached to the motion Dr. Halikas's six-page report. Dkt. No. 125-1. It also attached his fifty-four page, September 9, 2008 *curriculum vitae*, dkt. no. 125-3, as well as a September 21, 2020 email to the same AUSA from Attorney Brindley, dkt. no. 125-4. This email (dated two months before the

4

December 20, 2020 deadline for disclosing experts and their reports) stated:

> Attached is the CVO for our potential expert witness regarding addiction medicine and pain management: Dr. James Halikas[.]
>
> I believe you are familiar with Dr. Halikas from the investigation in this case.
>
> Simply stated, we expect that Dr. Halikas would opine that, after reviewing all available records for the patients who are listed in the indictment, he does not find that Ms. Hofshulz's prescriptions were either (1) unreasonable; or (2) outside the normal course of professional practice when taking into account concerns regarding addiction and the presentations and symptoms shown by the patients in question.
>
> He has not provided any expert report. If we decide to call him as a witness, then I will supplement this disclosure with any report that he submits.

Id.

> Lisa Hofschulz responded to the government's motion on February 4, 2020. Dkt. No. 133. The government filed its reply the next day. Dkt. No. 137.

Dkt. No. 152 at 1-7.

In denying the government's motion, the court analyzed the factors courts consider in determining whether an expert's opinions are reliable. Id. at 13 (citing Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 593-94 (1993)). The court first concluded that Halikas was qualified to testify as an expert on the topics of "prescribing drugs and . . . understanding how certain drugs can be addictive in certain individuals." Id. at 17. The court also concluded that Halikas's testimony "could be helpful to the trier of fact" in determining the answers to questions such as whether defendant Lisa

5

Hofschulz followed accepted medical standards in prescribing pain medication, whether she had reason to know that some patients were addicted or were at risk for addiction and whether some patients were medication-seeking. Id. at 19-20.

The court concluded, however, that it did not have enough information to determine whether Halikas's methodology was reliable. Id. at 17-18. The court ordered "that no later than the end of the day on **March 22, 2021,** defendant Lisa Hofschulz must file an amended expert witness report for Dr. Halikas, providing the additional information required by this order." Id. at 20 (emphasis in original). The court specified that Halikas's updated report must include an explanation of "his methodology—what he did to review patient files, review Lisa Hofschulz's procedures, familiarize himself with standards, etc. The amended report must explain the bases for his conclusions. It must identify any 'literature' which Halikas claims supports his conclusions." Id. at 19. Lisa Hofschulz provided the amended expert witness report to the government, who filed the report along with the government's second motion to exclude the expert testimony. See Dkt. No. 155-1. The amended report is dated March 23, 2021 (the day after it was due). Id. at 18.

The amended report is longer and more detailed. Dkt. No. 155-1. It includes new opinions on race and income-level bias in medical treatment. Id. at 16-18. The amended report provides analysis on eight of the defendant's patients and responds to criticisms made by the government's expert witness, Dr. King.

6

The government filed this second motion to exclude the testimony of Halikas on July 1, 2021, citing <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993), and Federal Rule of Criminal Procedure 16. Dkt. No. 155. Given the proximity of the August 2, 2021 trial date, the court ordered the defendant to file respond to the motion by July 12, 2021 and the government to reply by July 16, 2021. Dkt. No. 156. Lisa Hofschulz filed her response on July 12, 2021, dkt. no. 159, and the government replied on July 15, 2021, dkt. no. 160.

## II.    Parties' Arguments

### A.    <u>Government's Motion</u>

The government argues that Halikas's amended report lacks objective support. Dkt. No. 155 at 3. The government asserts that the amended report is devoid of any analysis and says it provides only conclusory opinions. <u>Id.</u> It asserts that the opinions expressed in the amended report are not testable, and therefore lack reliability. <u>Id.</u>

The government asserts that the amended report more resembles a closing argument than expert testimony. <u>Id.</u> The government suggests that Halikas's opinions stray outside the boundaries of his expertise by including commentary on the racial makeup and socio-economic patterns of the defendant's patients, the cause of death of F.E. and purported deficiencies in the police investigation into F.E.'s death. <u>Id.</u> at 3-4. It asserts that Halikas's opinions on race and income are irrelevant to the facts of this case. <u>Id.</u> at 8. It argues that the amended report fails, as did the original report, to explain how

7

Halikas reached the conclusion that certain prescription practices were "appropriate" and failed to discuss standards generally accepted in the medical field for pain management. Id. at 10. Finally, the government argues that because Halikas's report simply offers legal conclusions and improper arguments, the court should exclude him as a witness; in the alternative, the government asks the court to limit his testimony to only relevant medical evidence, rather than argument. Id. at 14.

B.    Defendant's Response

Lisa Hofschulz concedes that Halikas may not testify on the cause death of F.E. or the subsequent police investigation into that death, implying that the government should not have wasted ink arguing the issue. Dkt. No. 159 at 1. She says that "Dr. Halikas will not be asked any questions regarding the cause of death of F.E. nor the investigation into his death by the defense, and will be instructed not to offer such opinions unless directly questioned on them." Id. at 2. Further, the defendant says that Halikas will be instructed not to make legal conclusions or present argument. Id. at 10. Rather, "[h]is testimony will be limited to proper expert opinions concerning the treatment practices of Lisa Hofschulz." Id.

As to testimony on the race and income level of the defendant's patients, the defendant argues that the conclusions are based on Halikas's "own expertise, experience, and reading of scientific studies." Id. She asserts that his opinions and their bases may be challenged through cross-examination, but that the government's own opinions as to their merit are not relevant to their

8

admissibility. Id. at 2-3. The defendant also argues that the income level of patients is relevant to the case, as it relates to "the course of treatment they receive in this country." Id. at 3. The defendant says it is unclear thus far whether the race of patients is relevant, and that if it is not relevant, the defense will not elicit that information. Id. at 4. She then suggests that it may be relevant to the treatment patients receive with respect to pain management. Id. The defendant asks that the court defer ruling on the issue until Halikas testifies, or grant this portion of the government's motion without prejudice and return to it at that time. Id.

Finally, as to Halikas's testimony regarding the "appropriateness" of Lisa Hofschulz's precriptions, the defendant argues that Halikas has satisfied the court's requests and that the government's expectations exceed what is required of an expert disclosure. Id. She describes Halikas's methodology and asserts that his amended report "details over multiple pages his familiarity with specific pain management and opioid prescription guidelines, as well as the limitations of their applicability." Id. This purportedly includes a discussion of the CDC Guidelines, which the government's expert relied upon, and the American Society of Interventional Pain Physicians Guidelines for Responsible Opioid Prescribing. Id. (citing Dkt. No. 155-1 at 12-13).

The defendant contends that Halikas's amended report explains the basis of his conclusions, listing the following:

> (1) his "own personal experience as a physician using pain medications for patient treatment"; (2) his "understanding of the clinical standards and their evolution over the period of (his) career"; (3) his "reading of the pain literature"; (4) his "attendance at

conferences on pain management given by the American Society of Addiction Medicine; (5) his "executive participation in that same organization as Chairman of Medical Education over 25 years for more than 2000 physicians"; his "participation and membership in the American Academy of Addiction Psychiatry, the Society of Biological Psychiatry, the American Psychiatric Association (and) the American Society of Addiction Medicine"; (6) his "research dating back to the 1960s, including publication of over 100 refereed articles on the subjects" of addiction, abuse, and "the development of criteria for determining the level of appropriate treatment for drug and alcohol abusers;" (7) his 54-year career as a practicing physician with attendant training, experience, and positions; and (8) his own manual of clinical treatment that presented the standards of care for medical pain management.

Id. at 5-6 (quoting Dkt. No. 155-1 at 1-2). She says any challenges to the conclusions may be addressed on cross-examination or rebuttal through the government's expert. Id. at 6. The defendant also says that Halikas provided the scholarly works through citations in his amended report. Id. (citing Dkt. Nos. 155-1 at 4, 8, 12-14, 17-21).

The defendant also addresses what she believes to be "further quibbles" raised by the government. The first is whether Halikas's amended report "discuss[es] standards generally accepted in the medical field for pain management," insisting that it does. Id. at 7. The defendant next challenges the government's contention that Halikas's amended report fails to explain how he reached his conclusions and whether they would be generally accepted in the scientific community. Id. Next, the defendant addresses the government's concerns over Halikas's use of the term "appropriate" in his amended report. Id. at 8. Finally, the defendant challenges the government's arguments based on Halikas's calculation of the dosages the defendant prescribed to patients. Id. at 9.

10

C. <u>Government's Reply</u>

The government says it raised the allegedly settled question of whether Halikas could testify about F.E.'s cause of death and the investigation into it because it is concerned that, despite the court's prior rulings, defense counsel will ask Halikas about those topics or Halikas will volunteer testimony about those topics. Dkt. No. 160 at 1-2. It reiterates the importance of prohibiting Halikas from testifying on the cause of, or investigation into, F.E.'s death. Dkt. No. 160 at 1. The government asserts that the court should prohibit the defense from asking any questions relating to either of these issues and asks the court to "admonish Dr. Halikas prior to his testimony that he may not offer any such opinions, full stop." <u>Id.</u> at 2.

Second, the government opines that the information in the amended report about the race and income level of patients appears designed to imply that the prosecution is biased. <u>Id.</u> at 2-3. It argues that the court already has ruled, in the context of the motions *in limine*, that such arguments or allegations are prohibited and that the defendant did not contest those rulings. <u>Id.</u> The government asks that if the court allows Halikas to testify, it "provide clear guidance to both the defendant and Dr. Halikas about the need to exclude any questions or testimony that bear on such arguments." <u>Id.</u> at 3.

Third, the government reiterates that Halikas's amended report is conclusory and lacks explanation. <u>Id.</u> It insists the amended report fails to explain "*how* [Halikas's] experience or the literature or the standards lead him to the *conclusion* that Hofschulz's prescribing was appropriate." <u>Id.</u> The

11

government argues that the report fails to satisfy Rule 16(b)(1)(C) and ignores the topics on which the court held him to be qualified to testify. Id. at 3-4.

As to the additional arguments made by defendant, the government elected not to respond. Id. at 4.

### III. **Analysis**

#### A. Applicable Law

Federal Rule of Evidence 702 and Daubert govern the admissibility of expert testimony. The court, as gatekeeper, "is responsible for ensuring that proposed expert testimony 'is not only relevant, but reliable.'" Timm v. Goodyear Dunlop Tires N. Am., Ltd., 932 F.3d 986, 993 (7th Cir. 2019) (quoting Daubert, 509 U.S. at 589). "In assessing reliability, 'the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions.'" Id. (quoting Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000)).

This determination requires to court to engage in a three-step analysis. "It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue." Gopalratnam v. Hewlett-Packard Co., 877 F.3d 771, 779 (7th Cir. 2017) (citing Myers v. Ill. Cent. R.R. Co., 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted). The Seventh Circuit has clarified that "the district court must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." Id.

12

(emphasis in original). It is the burden of the party seeking to introduce an expert to show that they meet the Daubert standard. Id. at 782.

Rule 702 indicates that an expert witness may be qualified as an expert "by knowledge, skill, experience, training or education." An expert need not have particular academic credentials to be qualified; "anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." Tuf Racing Prods, Inc. v. Am. Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000).

To be relevant for purposes of Rule 702, the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Relevant evidence is evidence "that has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Daubert, 509 U.S. at 587 (quoting Fed. R. Evid. 401). "Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies *Daubert's* relevancy requirement." Smith, 215 F.3d at 718-19. If an expert uses hypothetical explanations for causes of an event, those hypotheticals must have "analytically sound bases," rendering them "more than mere 'speculation' by the expert." Id. at 719 (quoting DePaepe v. Gen. Motors Corp., 141 F.3d 715, 720 (7th Cir. 1998)). The question of whether the expert's theory is correct given the circumstances of a particular case is a factual one left for the jury to determine.

The factors the trial court should consider when determining if an expert's opinion is reliable are:

> (1) "whether [the expert's theory or technique] can be (and has been) tested";
> (2) "whether the theory or technique has been subjected to peer review and publication";
> (3) "the known or potential rate of error"; and
> (4) "general acceptance" in the "relevant scientific community."

Daubert, 509 U.S. at 593–94.

> B.     Application of the Law to the Facts

> 1.     *Is Dr. Halikas Qualified?*

In the court's February 22, 2021 order denying the government's first motion to exclude the testimony of Halikas, the court held:

> the court finds that Halikas does have education, training and experience in prescribing drugs and in understanding how certain drugs can be addictive in certain individuals. That kind of experience is relevant to some of the issues in this case—whether Ms. Hofschulz prescribed to people whom she knew or suspected to be addicts, whether the medications she handed out were likely to cause addiction. The court concludes that Halikas is qualified to opine on these issues. He likely is not qualified to opine on every issue that will arise at trial, and the government will be able to cross-examine and to probe him on that fact.

Dkt. No. 152 at 17-18. The court has found that Halikas is qualified to testify on issues regarding prescribing drugs and how certain drugs can be addictive. This would include information regarding how certain drugs are metabolized and how tolerance affects an individual's treatment. It would also include testimony rebutting the opinions of the government's expert, Dr. King, on these subjects.

14

Halikas's amended report includes opinions on the death of patient F.E., as well as the subsequent investigation. See Dkt. No. 155-1 at 3-4. The court already has ruled that Halikas may not offer such opinions. Nothing in his background supports finding that he is an expert on cause of death determinations or evidence handling, both of which he has offered opinions on in his amended report. See Id. at 3-4. The defendant implies that it was unnecessary for the government to raise this issue because the court already has ruled that Halikas may not testify on these topics. Yet the amended report states that "on the face of it, [F.E.] likely ingested about 'half' of each prescription, along with alcohol in substantial quantities," and it says, "[t]his likely overdose was probably an accidental overdose in a drunken state, but it could equally likely be a suicide attempt in the state of an alcoholic blackout, when such events occur." Id. at 3. It goes on speculate as to the likelihood that F.E. died by suicide and discusses literature regarding alcohol use in suicides. Id. at 3-4. The defendant's protestations that the government need not have wasted time arguing this issue is disingenuous and ignores the fact that Halikas's amended report clearly opines on topics about which the court ruled he could not testify. The government is worried that the defense and Halikas will ignore the court's rulings; the content of the amended report gives the government reason to worry.

The government also correctly notes that the defendant says Halikas will not testify about these topics unless he is "questioned" about them. Defense counsel may not question Halikas about these topics, nor may the government.

15

The court has not found that Halikas is qualified as an expert on these topics, because he is *not* qualified as an expert on these topics. He may not testify about them and the parties may not ask him about them, and the court will grant the government's request to admonish Halikas about that fact prior to his testimony.

Halikas's amended report also includes opinions on the race and income level of the defendant's patients and how those factors affect medical treatment. He states that

> [i]nterventional pain management requires insurance patients or quite well-to-do patients because injections and other interventional techniques are quite expensive. Thus, patients without insurance, patients who are the working poor, or patients on Medicaid, usually do not have access to either interventional pain management or elective surgery which might be useful (e.g. rhizotomy).
>
> Medical pain management often sees this type of patient because they are charged only for an office visit, not for any procedure. In the case of Lisa Hofschulz' clinic, Clinical Pain Consultants, most of her patients (about 70%) are black, poor, unemployed or on only Medicaid insurance. Hence, her treatment options were limited by the financial circumstances of her patients. She effectively treated the patient [sic] she had with the tools that their personal circumstances made available.
>
> There is data on race, socioeconomic status, and gender, effecting access to pain services and mental health services. There is even data on doctors' misconceptions about black versus white pain thresholds, skin thickness, number of pain fibers in the skin, and likelihood of diversion. In a survey of medical residents, it was found that 25% believed that black people had "thicker skin" and decreased number of sensory nerves in their skin. [citation]. Patient records demonstrate that Ms. Hofschulz did not permit such biases to impact her treatment of patients. Every patient was treated pursuant to the same philosophy.

Id. at 16-17.

The report then goes on to cite literature finding that African-Americans are less likely to be treated with opioids for certain kinds of pain and opining that persons of certain financial status are more likely to suffer chronic pain. Id. at 17-18.

The defendant has not demonstrated that Halikas is qualified to testify about these sociological issues, but more to the point, the tone of his report indicates that he raises these issues to show what a good person Lisa Hofschulz is—in other words, as character evidence. The only portion of his opinions that the court finds might be relevant is the portion discussing the fact that interventional pain management is expensive, that that a prescriber who is treating a patient who does not have insurance may be more limited in prescription options than one who is treating an insured patient. The court agrees with the government that Halikas may not testify about misperceptions about people of color and their responses to pain management methods or the difficulties some individuals may have—due to race or socioeconomic status— in obtaining pain management treatment. The court will withhold ruling on whether he may testify about the limited options available to a prescriber when treating someone of limited means or someone who does not have insurance.

> 2.    *Is Dr. Halikas's Methodology Reliable?*

The government asserts Halikas's amended report is too conclusory to be reliable. Where a summary of the defendant's expert witness's testimony is required under Federal Rule of Criminal Procedure 16(b)(1)(C), the summary must describe, among other things, "the bases and reasons for those opinions."

17

Halikas describes his method as:

> I have been asked to prepare a report of my analysis of the eight patients involved in the indictment of Ms. Lisa Hofschulz and a response to Doctor King's criticisms. I reviewed electronic copies of the patient charts and the medical records that were sent me on a disk which provided the documentation supporting the medical diagnoses causing the patient's pain. I reviewed the clinical practices of Ms. Hofschulz as documented in her patient visit notes. I also reviewed Doctor King's spreadsheet report as it was sent me.

Dkt. No. 155-1 at 1. As to how he reached his conclusions, Halikas says:

> The basis of my conclusions as the defense expert witness is as follows: my own personal experience as a physician using pain medications for patient treatment, my understanding of the clinical standards and their evolution over the period of my career, my reading of the pain literature, my attendance at conferences on pain management given by the American Society of Addiction Medicine, my executive participation in that same organization as Chairman of Medical Education over 25 years for more than 2000 physicians, my participation and membership in the American Academy of Addiction Psychiatry, the Society of Biological Psychiatry, the American Psychiatric Association (where I am a Life Fellow), and the aforementioned American Society of Addiction Medicine.

> My conclusions are further informed by my personal research dating back to the 1960s, including publication of over 100 refereed articles on the subjects of marijuana, alcohol, alcoholic blackouts, heroin addiction, methadone maintenance treatment programs, drug craving, cocaine dependence, adolescent substance abusers, sldd row alcoholics, and the development of criteria for determining the level of appropriate treatment for drug and alcohol abusers.

> This report is further informed by my 54 years as a licensed physician; my medical training at Duke University school of medicine; my psychiatric residency training at Washington University in St. Louis; my time as a Research Fellow for the National Institute of Drug Abuse; my medical school faculty career in psychiatry at Washington University in St. Louis, the Medical College of Wisconsin, and the University of Minnesota between the years 1970-1998, where I, at various times, ran an outpatient clinic, headed a Research Institute in Alcohol and Other Drug Abuse, was vice president at de Paul rehabilitation hospital in Milwaukee, ran a specialty methadone maintenance treatment program, directed an addiction medicine fellowship, was principal investigator on more

18

than 30 research projects, and was director of a psychiatric residency program. The report is further informed by my 45 year participation on the board of directors of Tellurian, a nonprofit treatment organization that runs more than 33 different types of programs in Dane County, Wisconsin.

This report is also informed by an unpublished manual of clinical treatment that presented the standards of care for medical pain management which I prepared from the literature for the clinicians in my current role as Medical Director for Clinical Pain Consultants: the "Halikas Manual of Medical Pain Management", copyright 2018; and finally, by my experience with every, single, patient in pain, that has been in my care over 54 years.

Id. at 1-2.

The question is whether this methodology provides a proper basis for his conclusions. Much of Halikas's amended report is a narrative discussion of the eight patients' medical issues and respective treatments. Some portions of the amended report address the reasonableness of individual patients' prescriptions. For example, when discussing patient P.G., Halikas wrote:

A dose of oxycodone of 30 mg per pill with instructions to take 6 pills per day, perhaps every 2 to 3 hours for pain, or, with instructions to take 2 pills 3 times per day, breakfast, mid-afternoon, and bedtime, would result in a total number of pills to be dispensed of 180 for the month. If the patient is instructed to take 7 pills per day, the total number of pills to be dispensed would be 210; or, if the patient is given 8 pills per day, such as 2 pills 4 times per day, breakfast, lunch, dinner, and bedtime, the total number of pills to be dispensed would be 240 for the month. This is arithmetic. These numbers are not an excessive dose or excessive frequency for someone who is tolerant to short acting opiates, that is, someone who has been on them for several years for chronic pain. A non-narcotic medication, gabapentin, which is used as an adjunctive drug in pain management is often dispensed as 300 mg, 2 caps 4 times daily, or 8 per day, for a total of 240 per month. The larger number of pills per month is often preferred by the physician and the patient versus a larger dose per pill because it provides the patient with more flexibility to adjust the dose based on circumstances of daily activities.

19

Id. 5-6. Halikas's opinions on the prescription doses reveals that his method of analyzing the appropriateness of the defendant's prescriptions is to consider whether he would have done the same. He also makes general comments on treatment strategy, based on his years of experience in the field. Halikas also provided a list of citations at the end of his report. These citations include titles such as "Opioids in chronic pain" and "Sedative Prescriptions Are Common at Opioid Initiation: An Observational Study in the Veterans Health Administration." Id. at 19. While it would have been beneficial to tie these sources to specific opinions, the citations appear to track the opinions expressed in Halikas's report.

It appears that the bases for Halikas's opinions are his own experience and training. While the court understands the government's concerns, those concerns go to the weight the jury should give Halikas's opinons. He *has* a methodology—it is to look at what Lisa Hofschulz did and ask if he'd do it himself. He *has* cited to literature, even if he has not linked that literature directly to some of his opinions. There are times when his opinions are conclusory, but the government may challenge that on cross-examination.

The court concludes that Halikas's amended report provides the information the court found missing in the first report, even if that information may be less precise than would be preferable. The government may test the reliability of Halikas's "methodology" on cross during trial.

### 3. Will Dr. Halikas's Testimony be Helpful to the Trier of Fact?

Halikas's statements on the appropriateness of prescriptions are relevant to the case. As the court said in its previous order:

> Among the issues for a jury to decide at trial will be the question of whether Lisa Hofschulz followed accepted medical standards in prescribing pain medication, whether she had reason to know that some patients were at risk for addiction (or were addicted already), whether patients were medication-seeking. While the parties need much more detail on Halikas's methods and how he reached his conclusions, his education and background in teaching, speaking, publishing and board/committee service indicate that his testimony could be helpful to the trier of fact in determining the answers to some of these questions.

Dkt. No. 152 at 19-20.

The court also has found that the statement in Halikas's amended report—"treatment options were limited by the financial circumstances of her patients. She effectively treated the patient [sic] she had with the tools that their personal circumstances made available," dkt. no. 155-1 at 16-17, may be helpful to the trier of fact, depending on the other testimony at trial about the standards of practice in the United States. There is no reason to believe, as the government alleges, that this information is barred by the court's previous orders or inflammatory. See Dkt. No. 160 at 2-3. The only discussion of "bias" in the government's earlier motion *in limine* related to alleged bias in the investigation and prosecution of the defendants. See Dkt. No. 114 at 5-6.

### C. Summary

The court will deny the motion to exclude Halikas as a witness. He is qualified to testify regarding the mechanics of addiction and the prescription of drugs. He may not testify about the cause of death of F.E. and subsequent

investigation regarding patient F.E. or about the relationship between race and pain management practices. The court reserves ruling on whether he may testify about the impact of a patient's socio-economic status on a prescriber's options for treatment.

The government also has argued that Halikas's amended report reads like an attack on the practice of holding pain medication providers to account for unlawful prescribing. The court cautions defense counsel that Halikas may not testify on legal conclusions or make arguments rather than providing opinion testimony. See Good Shepherd Manor Found., Inc. v. City of Momence, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."). Of course, if the government questions Halikas about any biases he may have against prosecutions such as this one, or in favor of the defendant, he may respond to those questions both on cross and in re-direct.

## IV.  Conclusion

The court **DENIES** the government's motion to exclude testimony of Dr. James Halikas. Dkt. No. 155.

The court **ORDERS** that Dr. Halikas's testimony is governed by the restrictions in this order.

Dated in Milwaukee, Wisconsin this 23rd day of July, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

22