UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                              Case No. 18-cr-145-pp

LISA HOFSCHULZ,
and ROBERT HOFSCHULZ,

        Defendants.

**ORDER DENYING ROBERT HOFSCHULZ'S MOTION FOR ACQUITTAL (DKT. NO. 173); DENYING LISA HOFSCHULZ'S MOTION FOR NEW TRIAL (DKT. NO. 183) AND GRANTING THE GOVERNMENT'S AMENDED MOTION FOR FORFEITURE OF PROPERTY (DKT. NO. 182)**

The grand jury charged the defendants with conspiracy to sell, distribute or dispense controlled substances outside of a professional medical practice and not for a legitimate purpose; it also charged Lisa Hofschulz with thirteen substantive counts of distributing and dispensing controlled substances outside of a professional medical practice and not for a legitimate medical purpose and Robert Hofschulz with four substantive counts of that same offense. Dkt. No. 29. Finally, it charged Lisa Hofschulz with knowingly and intentionally distributing Oxycodone and morphine outside of a professional practice and not for a legitimate purpose, alleging that this act resulted in the death of F.E. Id. at 8. On August 13, 2021, after a two-week trial, a jury found the defendants guilty on all counts. Dkt. No. 168.

1

On September 13, 2021, defendant Robert Hofschulz filed a motion for judgment of acquittal. Dkt. No. 173. On October 20, 2021, defendant Lisa Hofschulz filed a motion for new trial and a motion for judgment of acquittal. Dkt. No. 183. That same day—October 20, 2021—the government filed an amended motion for forfeiture of property as to both defendants. Dkt. No. 182.

## I.    Procedural Background

On June 26, 2018, the grand jury returned a fourteen-count indictment charging Lisa and Robert Hofschulz with distributing and conspiring to distribute controlled substances outside of a professional medical practice and not for a legitimate medical purpose. Dkt. No. 1. The indictment included one count of conspiracy to distribute and thirteen counts of distribution under 21 U.S.C. 841(a)(1). Id. Robert Hofschulz was charged in four of the distribution counts, while Lisa Hofschulz was charged in all thirteen. Id. The defendants were not detained pending trial. The indictment included a two-paragraph forfeiture notice. Id. at 8.

On February 26, 2019, the grand jury returned a superseding indictment. Dkt. No. 29. The superseding indictment repeated the fourteen charges from the original indictment and added a charge against Lisa Hofschulz for distribution of a controlled substance resulting in the death of patient F. E. Dkt. No. 29 at 8. The superseding indictment included an identical forfeiture notice as the original indictment. Id. at 9.

On April 12, 2019, Lisa Hofschulz filed a motion to suppress evidence of the toxicology report, autopsy report, death certificate and any other evidence

2

regarding the cause of F.E.'s death. Dkt. No. 33. Magistrate Judge William E. Duffin issued a report recommending that this court deny that motion. Dkt. No. 37. Lisa Hofschulz timely filed an objection to the recommendation. Dkt. No. 42. On July 19, 2019, this court overruled Lisa Hofschulz's objections, adopted Judge Duffin's recommendation and denied Lisa Hofschulz's motion to suppress. Dkt. No. 44.

On August 2, 2019, one of Lisa Hofschulz's attorneys, Ronald W. Chapman II, filed a motion to withdraw, dkt. no. 45, which the court granted, dkt. no. 48. On September 18, 2019 Lisa Hofschulz filed a motion for continuance, asking that the dates for the final pretrial conference and the trial be pushed back ninety days. Dkt. No. 58. The court granted the motion, scheduling the final pretrial conference for January 31, 2020 and the trial for February 18, 2020. Dkt. No. 59.

On September 27, 2019, Lisa Hofschulz filed a motion to substitute as her counsel Attorneys Beau Brindley and Michael Thompson.[1] Dkt. No. 60. The government responded it did not object to the substitution so long as it did not impact the trial date. Dkt. No. 61. Attorney Brindley then filed a reply, stating that he was scheduled to be in trial in the Northern District of Illinois on February 18, 2020 and thus could not participate in Lisa Hofschulz's trial on the date the court had scheduled it. Dkt. No. 62. The court scheduled an October 15, 2019 hearing on the motion to substitute counsel. Lisa Hofschulz

---

[1] She filed this motion only nine days after the court, over the government's vehement objections, had agreed to adjourn the trial to February 18, 2020 to allow the defense to resolve issues with an expert witness. Dkt. No. 64 at 3.

3

then filed a motion to continue *that* hearing, explaining that her attorney was scheduled to begin a trial in Cook County, Illinois on October 15, 2019. Dkt. No. 63. The court canceled the hearing but emphasized that it was not going to adjourn the February 2020 trial date; the court withheld ruling on the motion to substitute counsel to allow Lisa Hofschulz to determine whether she still wished to retain an attorney who had stated that he was not available on the scheduled trial date. Dkt. No 64. On October 21, 2019, Lisa Hofschulz filed a status report confirming that attorney Brindley was her counsel of choice and stating that Attorney Brindley had confirmed that "if necessary, he will be ready and available to try this case on February 18, 2020 as scheduled." Dkt. No. 65. The court granted the motion to substitute the following day. Dkt. No. 66.

As the February 18, 2020 trial date approached, the government began filing trial documents. On December 20, 2019, the government filed its notice of expert disclosures, listing Dr. Timothy King, Anesthesiologist; Dr. Brian Linert, Forensic Pathologist; Anthony Baize, Inspector General for the Wisconsin Department of Health and Human Services; and Laura Reid, Diversion Investigator for the United States Drug Enforcement Administration (DEA). Dkt. No. 69. On January 17, 2020, the government filed its motions *in limine.* Dkt. No. 70. A week later, the government filed its pretrial report. Dkt. No. 71. Neither defendant filed anything.

On January 30, 2020—the day before the January 31, 2020 final pretrial conference and with the trial set for February 18, 2020—Lisa Hofschulz filed a

motion to continue the trial. Dkt. No. 72. In the eight-page motion, Attorney Beau Brindley explained that several trials had been rescheduled in other districts in ways he could not have foreseen when advised Lisa Hofschulz that he could be ready for the February 2020 trial. Id. at 1-3. He also explained that in the midst of these scheduling changes, his wife's emotional support animal had suffered a series of health conditions that culminated in his passing away, negatively impacting Attorney Brindley's wife's emotional state. Id. at 3-5. He concluded that the combination of events—the trial preparations for the other cases, the trial schedule and the issues in his personal life—had left him emotionally and physically exhausted; he stated that his wife needed him and that he could not be prepared for trial in this case by February 18, 2020. Id. at 6-8.

The court held the pretrial conference the next day, at which time the government opposed the motion to adjourn. Dkt. No. 78 at 1. Attorney Brindley responded that he needed only a short adjournment, and advised the court that "if the court forced him to go to trial February 18, he would have to stand up and state that he was unprepared to proceed." Id. The court denied the defendant's motion to continue trial that same day and continued the final pretrial conference to February 14, 2020 to address the motions *in limine*. Dkt. No. 78.

On February 3, 2020, Lisa Hofschulz filed her proposed *voir dire* and jury instructions. Dkt. No. 75. The court docketed its proposed draft *venire* orientation, *voir dire* questions and preliminary jury instructions. Dkt. No. 79.

5

On February 13, 2020, Lisa Hofschulz filed a second motion to continue. Dkt. No. 80. The motion again discussed Attorney Brindley's substantial trial schedule and personal issues; it also discussed a recent injury suffered by Lisa Hofschulz. Id. On February 14, 2020, the court held the remainder of the final pretrial conference. Dkt. No. 82. The court granted in part and deferred ruling in part the government's motions *in limine*. Dkt. Nos. 82, 87. The court also explained that it was not going to grant counsel's second motion to adjourn the trial. Id. at 1. The court noted that counsel had not provided any medical records demonstrating that participating in the trial would threaten Lisa Hofschulz's health. Id. The court stated that it would start the trial on Tuesday, February 18, 2020, as scheduled, and that it would not adjourn the trial absent evidence from a doctor showing that it would pose a serious risk to Lisa Hofschulz's health if the trial were to take place. Dkt. No. 87 at 2.

On February 17, 2020, Lisa Hofschulz filed a motion for competency evaluation. Dkt. No. 83. The motion stated that on February 10, 2020, Lisa Hofschulz "collapsed . . . lost consciousness, fell to the pavement, struck her head, and was totally unresponsive." Id. at 1. She said she was taken to Northwestern Hospital by emergency services where she was unable to effectively breath on her own. Id. Lisa Hofschulz also filed a motion to reconsider her request to continue or, in the alternative, to withdraw counsel. Dkt. No. 85. The motion stated that Attorney Brindley would be ethically bound to withdraw in the absence of a continuance, because he was unprepared. Id. at 1. Attorney Brindley also filed a signed note from Dr. James N. Lampe,

which stated that Lampe had seen Brindley on February 17, 2020 for a crisis evaluation. Dkt. No. 86. In his note, Dr. Lampe stated, "[i]t is my professional opinion that a mental and physical break from his work and from general life demands is needed at this time in order to effect recovery without risking increased symptoms." Id.

On the morning of February 18, 2020, the parties assembled in the courtroom for what was to be the jury trial. Dkt. No. 88. The court noted that Lisa Hofschulz had not provided medical evidence showing that a trial would be dangerous to her health. Id. at 1. It stated that the document from Northwestern Memorial Hospital, called an After Visit Summary, did not support her assertions about the seriousness of her condition. Id. Addressing Lisa Hofschulz's motion to reconsider the court's denial of her motions for continuance or, in the alternative, to allow Attorney Brindley to withdraw, the court stated that "while its congested calendar played a role in its decision to deny the motions to continue, the main reason it had denied the motions was because the court had deep concerns that the defendant was trying to game the system by delaying the trial." Id. at 2. The court then recounted the arguments presented by Attorney Brindley and stated that it believed the defendant had engaged in gamesmanship. Id.

After a brief recess, the court advised Lisa Hofschulz that if she wanted to continue with Attorney Brindley as her counsel, the case would proceed to trial that day. If Attorney Brindley was not prepared to proceed that day, the court said, it would allow him to withdraw and Lisa Hofshulz would need to

7

find new counsel. Id. at 3. After consulting with Lisa Hofschulz, Attorney Brindley informed the court that while Lisa Hofschulz wanted him to continue as her lawyer, ethically he was required to withdraw because he was not prepared. Id. The court allowed Attorney Brindley to withdraw, adjourned the trial and scheduled a status conference for February 28, 2020 by which time Lisa Hofschulz should attempt to find new counsel. Id.

On February 20, 2020, the court issued an extensive order denying Lisa Hofschulz's second motion to continue, deferring ruling on her motion for a competency evaluation, denying her motion to reconsider her request to continue and granting Attorney Brindley's motion to withdraw as counsel. Dkt. No. 89. That same day, it entered a text-only order terminating Attorney Thompson's representation as well, because he was Attorney Brindley's assistant at the Law of Offices of Beau B. Brindley. Dkt. No. 90.

At the February 27, 2020 status conference, Lisa Hofschulz reiterated that Attorney Brindley was her counsel of choice, but told the court that she was making arrangements to retain Vadim Glozman; she asked for twenty-one days to make the necessary financial arrangements. Dkt. No. 95 at 1. The government requested a trial date as soon as possible, suggesting that the court might ask one of its colleagues to take already-scheduled trials so that this one could proceed. Id. The court adjourned the hearing to March 13, 2020, so that it could review its calendar and so that it could stay on top of Lisa Hofschulz's progress in hiring a new lawyer. Id. at 2. At the March 13, 2020 conference, Attorney Glozman appeared and explained that Lisa Hofschulz had

8

agreed to his representation as the lead attorney "on the condition that the court allow him to have Attorney Beau Brindley as his co-counsel." Dkt. No. 99 at 1. The court explained that it would not allow Attorney Brindley to act as co-counsel given its concerns about his candor with the court. Id. at 2. Noting that the newly emergent COVID-19 pandemic might affect any scheduled trial date, the court scheduled a final pretrial conference for November 18, 2020 and trial for December 7, 2020. Id. at 2. The court made clear that any attorney Lisa Hofschulz wanted to retain must be ready to go to trial on that date. Id. at 2-3. The court ordered the parties to disclose the identities of all expert witnesses and any reports no later than sixty days before November 19, 2020. Id. at 3.

On March 27, 2020, Attorney Glozman filed a notice of attorney appearance. Dkt. No. 101. That same day, Lisa Hofschulz filed a motion for reconsideration of denial of counsel of choice. Dkt. No. 102. On September 1, 2020, the government filed a motion requesting a status conference. Dkt. No. 106. The court scheduled a status conference for September 15, 2020. On September 14, 2020, the court granted Lisa Hofschulz's motion to reconsider its decision to remove Attorney Brindley from representation. Dkt. No. 107. The court reversed its previous decision and permitted Attorneys Brindley and Thompson to represent Lisa Hofschulz with lead counsel Glozman. Id.

At the September 14, 2020 status conference, Lisa Hofschulz and her attorneys confirmed that she was ready to move forward with the December 7, 2020 trial. Dkt. No. 112 at 1. The parties stated that they did not need to resubmit motions or other trial documents filed before the last trial unless

those documents needed to be updated. Id. The court ordered that motions *in limine* were due October 14, 2020 and responses were due by October 21, 2020. Dkt. No. 110. The court ordered that the final pretrial report was due October 21, 2020. Id.

On September 21, 2020, the government filed a notice of plaintiff's expert disclosures. Dkt. No. 111. On October 14, 2020, the government filed its motions *in limine*, dkt. no. 113, and amended those motions on October 16, 2020, dkt. no. 114. The parties filed a joint pretrial report on October 21, 2020. Dkt. No. 115. On October 28, 2020, the court held a final pretrial conference in which it granted in part, denied in part and deferred ruling in part on the government's consolidated motions *in limine* and denied as moot Lisa Hofschulz's motion for a competency evaluation. Dkt. No. 116-117. During this hearing, the court and the parties discussed the potential impact of the COVID-19 pandemic on the pending trial. Id.

On November 3, 2020, the court held a status conference and removed the final pretrial and conference from the calendar. Dkt. No. 119. The court explained that the number of confirmed positive cases of COVID-19 in Wisconsin had climbed since the last hearing and told the parties that it was too great a risk to jurors and the parties to hold a trial at that time. Id. at 1. The parties agreed to the adjournment. Id. Lisa Hofschulz's attorney made an oral motion for a twenty-one-day extension from the November 7, 2020 deadline for his expert to prepare his report, and the court granted that motion. Id. at 1-2. The court ordered that the defense expert's report and

supporting documents were due on November 30, 2020. Id. at 2. The court also scheduled a status conference for December 7, 2020. Id.

At the December 7 status conference, the court scheduled a final pretrial conference for February 18, 2021 and a jury trial for March 15, 2021 through March 26, 2021. Dkt. No. 123. Several days later, the court ordered the parties to file proposed jury instructions and any changes to the joint pretrial report by February 11, 2021. Dkt. No. 124.

On January 19, 2021, the government filed a motion to exclude the testimony of the defendant's expert, James Halikas, under Daubert v. Merrell Dow Pharmaceuticals. Dkt. No. 125. On February 2, 2021, the government filed a motion for an in-person final pretrial conference. Dkt. No. 128. Lisa Hofschulz opposed this motion, dkt. no. 135, and the court held a status conference to discuss the matter, dkt. nos. 140, 144. At the conference, the parties expressed their concerns about the trial proceeding as scheduled in March. Dkt. No. 144 at 1-2. The court determined that it would leave the February 18, 2021 final pretrial conference on the calendar and granted the government's motion to conduct the final pretrial conference in person for those parties wishing to appear in person. Id. at 2-3.

On February 17, 2021, the defendants filed a joint motion to adjourn the trial, citing the high COVID-19 numbers in the state. Dkt. No. 145. On February 18, 2021, the court held the final pretrial conference. Dkt. Nos. 149-151. The court adjourned the March 15, 2021 trial and rescheduled it for August 2, 2021. Id. at 2-3. The court also ordered Lisa Hofschulz to provide the

11

government with an amended report for Dr. Halikas by March 22, 2021 and described what must be included in that report. Id. at 3. On February 22, 2021, the court denied the government's motion to exclude the testimony of Dr. James Halikas. Dkt. No. 152.

On March 10, 2021, the government filed a supplement to its proposed jury instructions. Dkt. No. 153. On July 1, 2021, the government filed another motion to exclude the testimony of Dr. James Halikas under Daubert. Dkt. No. 155.

On July 12, 2021, the court issued an order regarding disputed proposed jury instructions, preliminarily concluding that it would give the jury instructions proposed by the government and not those proposed by the defendants. Dkt. No. 158. The court added that its ruling was subject to review and revision based on the evidence presented at trial. Id. On July 23, 2021, the court denied the government's second motion to exclude the testimony of Dr. Halikas but restricted his testimony to the mechanics of addiction and the prescription of drugs. Dkt. No. 161.

On July 26, 2021, the court docketed its proposed draft *venire* orientation, *voir dire* questions and preliminary jury instructions. Dkt. No. 162. The jury trial began August 2, 2021 and the jury returned its verdict on August 13, 2021, finding both defendants guilty verdict on all counts. Dkt. No. 169.

On August 19, 2021, the government filed its first motion for order of forfeiture. Dkt. No. 173. On September 13, 2021, Robert Hofschulz filed a motion for acquittal. Dkt. No. 173. That same day, Lisa Hofschulz filed a

motion for a thirty-day extension of time to file her post-trial motions, explaining that her counsel was unable to file motions within thirty days of the trial because the transcripts that he had ordered had not been completed. Dkt. No. 174. The court granted Lisa Hofschulz's motion, giving her until October 20, 2021 to file her post-trial motions. Dkt. No. 178. The court also denied without prejudice the government's motion for entry of a preliminary order of forfeiture. Id.

On October 15, 2021, Lisa Hofschulz filed a motion to continue sentencing, asserting that her post-trial motions would be extensive and that the government would need sufficient time to respond. Dkt. No. 179. Additionally, Attorney Brindley stated that he was scheduled to appear in Riverside, California on October 29, 2021 for another trial and that there was inherent uncertainty about what date that trial would actually begin. Id. at 1-2. Lisa Hofschulz also directed the court to four *cert* petitions pending before the Supreme Court, the resolution of which could impact this case. Id. at 2-3. The court granted the motion and rescheduled sentencing from November 2, 2021 to December 10, 2021 while making clear that its decision was not based on the cases pending before the Supreme Court. Dkt. No. 189.

On October 20, 2021, the government filed an amended motion for forfeiture of property. Dkt. No. 182. That same day, Lisa Hofschulz filed a motion for new trial and a motion for a judgment of acquittal. Dkt. No. 183.

13

## II.    Robert Hofschulz's Motion (Dkt. No. 173)

Robert Hofschulz asks the court for an entry of judgment of acquittal under Federal Rule of Criminal Procedure 29(c) as to Counts 1, 8, 9, 11 and 12 of the indictment. Dkt. No. 173 at 1. He asserts that the motion is based on "insufficiency of the evidence as to each element of each count in that no rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt." Id. The motion consists of one paragraph.

The government points out that the court denied Robert Hofschulz's motion for acquittal at the close of the government's case. Dkt. No. 194 at 1. The government asserts that the court "found there was ample evidence for the jury to convict Mr. Hofschulz," and argues that the reasons the court gave for denying the motion at the close of the government's evidence apply "with equal (and arguably more) force now that the jury has found Defendant guilty of all counts." Id.

A court considering a Rule 29 motion asks "whether, after viewing the evidence in light most favorable to the government, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." United States v. Torres-Chavez, 744 F.3d 988, 993 (7th Cir. 2014) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). The movant "bears a heavy, indeed, nearly insurmountable, burden." United States v. Warren, 593 F.3d 540, 546 (7th Cir. 2010). The court must defer to the credibility determinations of the jury and may overturn a verdict "only when the record contains no evidence, regardless of how it is weighed, from which the jury

14

could find guilt beyond a reasonable doubt." <u>Torres-Chavez</u>, 744 F.3d at 993 (citing <u>United States v. Blassingame</u>, 193 F.3d 271, 284 (7th Cir. 1999)).

The jury convicted Robert Hofschulz of one count of conspiring to distribute controlled substances outside of a professional medical practice and not for a legitimate purpose and four substantive counts of distributing controlled substances outside of a professional medical practice and not for a legitimate purpose. Dkt. No. 169 at 4. When he moved for acquittal under Fed. R. Crim. P. 29(a) at the close of the government's evidence closing, his attorney gave a more detailed argument on how the evidence was purportedly insufficient. Dkt. No. 188 at 11-13. Counsel argued that Robert Hofschulz was not a provider or a prescriber, that there was no evidence that he was in a room during any patient exam or interaction, that there was no evidence that he discussed what to prescribe or how much or to whom. <u>Id.</u> at 12. He argued that no patient had identified Robert Hofschulz from the clinic. <u>Id.</u> He argued that Robert Hofschulz was not medically trained. <u>Id.</u> He also relied on arguments made by Lisa Hofschulz's counsel. <u>Id.</u> at 11.

In denying Robert Hofschulz's motion at the close of the government's case, the court concluded that there was sufficient evidence to sustain a conviction on all counts. <u>Id.</u> at 15. It stated the evidence showed that three different nurse practitioners made Robert Hofschulz aware that what was happening at the clinic was not within the regular course of a professional medical practice—not just that the clinic was prescribing high doses but that there were no examinations being conducted, that there were pill count issues

15

and that there were discrepancies in the urinalysis results. Id. at 16. The clinic was not providing any examinations while nonetheless prescribing high doses of narcotics. Id. The court found that one clinic staff member had emailed Robert Hofschulz, mentioning that she refused to hand out pre-signed prescriptions; this prompted Robert Hofschulz to hire a nurse—Donna Kowske—for a period when Lisa Hofschulz was to be out of town. Id. The court stated, "apparently the purpose of hiring [the nurse] was to hand out prescriptions even though Lisa Hofschulz was not going to be seeing the patients for whom those prescriptions were going to be written." Id.

There was also evidence that the nurse practitioners had pointed out to Robert Hofschulz their concerns about the fact that the clinic did not have a collaborating physician. Id. Robert Hofschulz then become involved in what the court described as the "rather strange dance" of bringing in Dr. Purtock, an anesthesiologist, and having him sign an agreement. Id. The evidence indicated that Dr. Purtock came to the clinic only two or three times to have lunch, id. at 16-17, and the evidence did not indicate that Dr. Purtock acted in a consulting capacity at any point, id. at 17.

The court recounted that the evidence indicated Robert Hofschulz would have had reason to know that the clinic did not have much of the equipment one would expect to see in a medical clinic, such as examining tables (there was only one in the office). Id. The court concluded that a reasonable jury could determine that Robert and Lisa Hofschulz conspired with each other to run a "practice that was outside the regular course of medical practice in the

16

United States," and that there was no "need for Mr. Hofschulz to have had medical knowledge to have had notice of these issues and to proceed as if he didn't." Id.

Regarding the substantive counts, the court observed that each of them involved the nurse, Donna Kowske, handing out pre-signed prescriptions to patients Lisa Hofschulz had not seen (because Lisa Hofschulz was out of town). Id.

After the court issued that ruling, the defendants presented their evidence. Robert Hofschulz took the stand and testified. The court can infer from the jury's verdict that it did not find his testimony credible. During deliberations, the jury asked the court whether one defendant could be "charged with conspiracy and not the other." Dkt. No. 168 at 1. After consulting with the parties, the court responded, "Please carefully review Instruction No. 4.07 [Separate Consideration—Multiple Defendants Charged with Same or Multiple Crimes] and Instruction No. 5.09 [Conspiracy—Definition of Conspiracy]." Id. at 2. After receiving this response, the jury returned a guilty verdict against Robert Hofschulz on the conspiracy count and the substantive counts.

Robert Hofschulz's post-trial motion raised no new arguments. He has not met the "nearly insurmountable" burden under Rule 29(c) and the court cannot conclude that the extensive record contains no evidence from which a reasonable jury could find guilty beyond a reasonable doubt. The court will deny Robert Hofschulz's motion for a judgment of acquittal.

**III.     Lisa Hofschulz's Motions (Dkt. No. 183)**

   A.     Motion for Judgment of Acquittal

          1.     *Parties' Arguments*

Lisa Hofschulz moves for a judgment of acquittal under Fed. R. Crim. P. 29(c), arguing that the evidence was not sufficient for a reasonable jury to find that she issued prescriptions without a legitimate medical purpose.[2] Dkt. No. 183 at 1-2.

Lisa Hofschulz argues the evidence showed that she had a legitimate medical purpose in prescribing the medications to each of the patients in the counts of conviction. Beginning with C.H., Lisa Hofschulz asserts that C.H. had a "documented history of a very real and very painful condition" of which Lisa Hofschulz had been given proof. Id. at 2. Lisa Hofschulz argues that C.H. had received opiate medications from other providers, had told Lisa Hofschulz that she was suffering and had told Lisa Hofschulz that the medications Lisa Hofschulz had prescribed were working. Id. Although C.H. acknowledged at trial that she had lied to Lisa Hofschulz, Lisa Hofschulz emphasizes that C.H. testified that Lisa Hofschulz was trying to help her by prescribing the medications. Id. Lisa Hofschulz asserts that given that testimony, "it is not possible for the government to prove beyond a reasonable doubt that [C.H.'s]

---

[2] Lisa Hofschulz concedes that "[v]iewing the evidence in the light most favorable to the government, it can be assumed that the government produced sufficient evidence to meet its burden in regards to establishing that the prescriptions were written outside the usual course of professional practice." Dkt. No. 183 at 1-2.

prescriptions were intentionally written for no legitimate medical purpose." Id. at 2-3.

Lisa Hofschulz argues that K.K. "suffered from a very serious and very real painful condition," and like C.H. testified that Lisa Hofschulz was trying to help her by prescribing her medication. Id. at 3. Lisa Hofschulz asserts that D.T., the mother of R.Z., testified that R.Z. "suffered from excruciating pain" as a result of having been shot, that R.Z.'s mental health issues prevented him from getting treatment from other providers and that Lisa Hofschulz was the only person who would help. Id. at 3-4. Lisa Hofschulz argues that while her "records may have been improper, she may not have required enough visits, and her procedures may have been out of the ordinary when treating [R.Z.]," D.T. testified that the treatments helped R.Z.'s pain. Id. at 4. Lisa Hofschulz makes similar arguments about patients R.M., F.E., A.T., I.M. and P.G., each of whom had expressed and/or presented evidence to Lisa Hofschulz of a history of pain and each of whom (except F.E., who is deceased) had said that the medications Lisa Hofschulz prescribed helped with the pain. Id. at 4-5. Lisa Hofschulz explains that she provided these patients with prescriptions to help control their pain. Id.

Lisa Hofschulz acknowledges that C.W. testified that he had not been in pain; she asserts that C.W. went to her for the purpose of deceiving and manipulating her into giving him pain medications. Id. at 6. She says that C.W. lied about his abuse of pain medications and brought in pictures of a past car accident to try to convince her. Id. Lisa Hofschulz argues that "[n]othing about

19

the lack of oversight or requirement of additional records changes the fact that this patient did all he could to convince Lisa Hofschulz he was in pain," and that "[t]here is no evidence that she disbelieved him." Id.

Lisa Hofschulz asserts that the court erred in its analysis of the Rule 29 motion she brought during the trial. Id. She faults the court for pointing out that her argument at trial focused only on the "legitimate medical purpose" element and not on the "outside the scope of professional practice" element. Id. She argues that the government must prove *both* that she wrote the prescriptions outside the usual course of profession practice *and* that she wrote them with no legitimate medical purpose. Id. at 6-7 (citing United States v. Kohli, 847 F.3d 483, 489-91 (7th Cir. 2017)). She emphasizes that this is a conjunctive test, asserting that "[i]f there was a legitimate medical purpose (i.e. if the patient had a documented painful condition) to which the practitioner responded with prescriptions, then the usual course of professional practice is irrelevant in this Circuit." Id. at 7.

The government responds that Lisa Hofschulz prescribed medication without a legitimate medical purpose because she prescribed to patients who: "(1) had a known history of drug abuse (F.E., K.K., A.T.); (2) sought early refills (C.W.); (3) engaged in doctor shopping (P.G., K.K., C.H, A.T.); and (4) displayed alarmingly irregular toxicology results (P.G., F.E., C.H., K.K., R.M., I.M., A.T.)." Dkt. No. 191 at 4. It compares this pattern to the conduct of the defendant in Kohli, whose conviction for the same offense was affirmed by the Seventh Circuit. Id. at 3. The government asserts that Lisa Hofschulz

often prescribed opiates to (1) patients she rarely (or never) examined or evaluated (R.Z., A.T., R.M., J.P.); (2) patients who presented her with no imaging results or normal imaging results (R.Z., C.W., and A.Z.); (3) and patients who had a history of other doctors discontinuing or recommending discontinuing opiate therapy (F.E., K.K.).

Id. at 4. The government points to evidence that Lisa Hofschulz prescribed dangerous combinations of drugs (such as benzodiazepines and opioids) and drugs that posed risks to her patients based on their medical conditions (pregnancy, heart conditions, alcoholism). Id. It further points to evidence showing that other medical professionals at the clinic had opined to Lisa Hofschulz that some of her prescriptions either were unnecessary or that the dosages were too high. Id. at 4-5. Lastly, the government highlights Dr. King's expert opinion that Lisa Hofschulz was not practicing medicine at all, because she did not formulate a legitimate diagnosis of any condition for which prescription of opiates would be appropriate and because she continued to prescribe the same (and sometimes higher) doses "without any objective evidence that the patients were experiencing *functional* improvement." Id. at 5.

The government argues that all this evidence, together, provides a basis for a reasonable jury to find that Lisa Hofschulz was not prescribing medication with a legitimate medical purpose. Id. (citing Kohli, 847 F.3d at 490-91; United States v. Bek, 493 F.3d 790, 799-800 (7th Cir. 2007); Akhtar-Zaidi v. Drug Enforcement Administration, 841 F.3d 707, 712 (6th Cir. 2016); United States v. Armstrong, Criminal No. 05-130, 2007 WL 809509, *3 (E.D. La. Mar. 14, 2007)).

21

Lisa Hofschulz replies that the evidence the government points to speaks to whether she acted within the usual course of professional medical practice, rather than whether she had a legitimate medical purpose behind her prescriptions. Dkt. No. 200 at 1-2. She says that even if her "practices were not as careful as they should have been or she was too accepting of excuses offered by her patients for inconsistent urinalysis results," that does not demonstrate that she had anything other than a legitimate purpose in issuing the prescriptions. Id. She also asserts that the government misstated the evidence and the law in its response "to make similarities" to the Kohli facts "more prevalent than they are." Id. at 3. She further attacks the government's interpretation of certain evidence relating to substance abuse, refill procedures, "doctor shopping" and irregular toxicology. Id. Lisa Hofschulz then repeats her core argument—that "[t]he *purpose* for which Lisa Hofschulz *intended* to write each and every prescription was for the treatment of a legitimate pain condition"—and asks the court to consider the relevance and impact of those cases in which the Supreme Court has granted *certiorari,* Kahn v. United States (21-5261) and Ruan v. United States (20-1410). Id. at 5-7.

2.    *Analysis*

The Seventh Circuit has held that "[t]o convict a prescribing physician under § 841(a) of the Controlled Substances Act, the government must prove that the physician knowingly prescribed a controlled substance outside the usual course of professional medical practice and without a legitimate medical purpose." Kohli, 847 F.3d at 489-90 (citing United States v. Pellmann, 668 F.3d

x

22

918, 923 (7th Cir. 2012)); <u>United States v. Chube II</u>, 538 F.3d 693, 698 (7th Cir. 2008); 21 C.F.R. §1306.04(a)).

In <u>Kohli</u>, the Seventh Circuit stated

In this case, the government presented ample evidence establishing that Dr. Kohli intentionally abandoned his role as a medical professional and unlawfully dispensed controlled substances with no legitimate medical purpose. Indeed, Dr. Kohli's own patient files . . . showed that he regularly prescribed highly addictive and potentially dangerous Schedule II opioids to patients who (1) had a known history of drug abuse; (2) repeatedly sought early refills based on dubious claims that their medications had disappeared; (3) frequently "multi-sourced" their prescriptions by simultaneously obtaining additional quantities of controlled substances from other providers; and (4) displayed alarmingly irregular toxicology results suggesting both obvious drug abuse and possible secondary drug dealing. Based on this evidence, a reasonable jury could infer that Dr. Kohli knowingly prescribed controlled substances to patients who were issuing thee prescriptions, and thus that he deliberately made the prescriptions outside the ordinary scope of professional practice and with no acceptable medical justification.

<u>Kohli</u>, 847 F.3d at 490.

The court acknowledged that Dr. Kohli had presented conflicting evidence, such as his own testimony that he had provided prescriptions to his patients in a good-faith effort to manage their chronic pain. <u>Id.</u> It observed, however, that the jury was not required to believe that evidence and that credibility questions were reserved to the jury. <u>Id.</u> (citations omitted). In response to Kohli's argument that the jury must have erroneously believed that it was a crime to prescribe narcotics to patients who, in addition to suffering from chronic pain, are addicted to pain medication, the court stated that "the issue was whether [Kohli] deliberately prescribed outside the bounds of medicine and without a genuine medical basis," and concluded that the

23

government had presented substantial evidence that he had. Id. at 490-491. The court stated,

> A rational jury could thus conclude that those prescriptions were essentially non-medical in nature and served no legitimate medical purpose—regardless of whether the patients were addicted to the drugs (non-addicted patients can misuse drugs too), and regardless of whether they suffered from medical conditions that might otherwise warrant treatment with those same drugs under different circumstances.

Id. at 491.

The Seventh Circuit reached a similar conclusion in Bek. The defendant in Bek was charged with the same crime as Lisa Hofschulz under 21 U.S.C. §841(a)(1). Recounting the evidence presented to the jury, the Seventh Circuit stated that

> [w]itnesses described practices inconsistent with legitimate medical care: uniform, superficial, and careless medical examinations (e.g., blood pressures taken through clothing); exceedingly poor record-keeping, which one expert called "astonishing" (e.g., reporting temperatures of 98.6° for nearly every patient); and a disregard of blatant signs of drug abuse. The experts testified that Bek prescribed the "same menu" and same dosages of drugs to different patients, regardless of body build and kidney function. Further, they noted that contrary to accepted medical practice, Bek prescribed multiple medications having the same effects (e.g., two muscle relaxants prescribed at a time), and drugs that are dangerous when taken in combination.

Bek, 493 F.3d at 799. The court affirmed the conviction on all but one count (regarding a patient whose medical records were not produced and about whom no expert testified, id.).

Much of Lisa Hofschulz's argument relates to her disagreement with the jury instruction the court gave. Prior to trial, she asked the court to give the following "good faith" instruction:

24

Lisa Hofschulz contends that she prescribed controlled substances in good faith. The offenses charged in the indictment require proof that Lisa Hofschulz knowingly and intentionally distributed controlled substances outside the usual course of professional practice and not for a legitimate medical purpose. If you find that Lisa Hofschulz acted in good faith, that would be a complete defense for these charges because good faith on the part of Lisa Hofschulz would be inconsistent with her acting knowingly and intentionally. A person acts in good faith when he or she has an honestly held belief of the truth of the statements being given to them even though the belief turns out to be inaccurate or incorrect. Good faith in this context means good intentions and the honest exercise of professional judgment as to a patient's medical needs.

Dkt. No. 158 at 8. She also asked the court to give the following instruction:

In your experiences, some of you may be familiar with or have heard of medical malpractice or the standard of care. This is not a medical malpractice case. Those terms are used in civil cases when a patient is seeking damages. Medical malpractice is the unwarranted departure from generally accepted standards of medical practice allegedly resulting in injury to a patient. This, however, is a criminal case, and you must apply the instructions I am giving to you now and determine whether Lisa Hofschulz distributed or dispensed a controlled substance outside the usual course of professional practice and not for a legitimate medical purples. You are not deciding whether Lisa Hofschulz should be liable for medical malpractice.

Id. at 9.

Reviewing Supreme Court and Seventh Circuit precedent (including Kohli and Bek), as well as decisions from other circuits, the court declined to give these instructions. It concluded that the standard for determining whether a defendant acted in good faith was objective, not subjective; the court reasoned that a subjective standard would leave to each individual medical prescriber the definition of "course of professional medical practice." Id. at 45.

At trial and in this post-trial motion, Lisa Hofschulz presents a slightly different version of a "good faith" test. She implies that a prescriber always

25

issues a prescription for a legitimate medical purpose if she is told by a patient that the patient is in pain. She testified that her job was to reduce or alleviate pain. She testified that if a patient's urinalysis test showed that the patient was drinking to excess or using drugs other than what she had prescribed, that was a message to her that she was not effectively treating that patient's pain. If the patient went through his or her pills too quickly, that was an indication that Lisa Hofschulz was not effectively treating the patient's pain. She testified that it was not her job to question her patients' complaints of pain or to challenge them. In essence, her position was that if a patient told her the patient was in pain, her job was to give that patient whatever drugs it took to cause the patient to report a decrease in or cessation of that pain, and that that was a "legitimate medical purpose." The only other witness who testified that this theory constituted a legitimate medical purpose was Lisa Hofschulz's expert, Dr. Halikas. Dr. Halikas's testimony stood in stark contrast to that of the government's expert, Dr. King, and arguably stood in stark contrast to logic.

There was more than sufficient evidence for a reasonable jury to conclude that Lisa Hofschulz prescribed medication with no legitimate medical purpose. The evidence showed that Lisa Hofschulz routinely prescribed highly addictive opioids to patients who had not provided her with imaging and without obtaining imaging herself. It showed occasions where she increased prescriptions when patients were reporting improvements on their current levels of medication. It showed that she prescribed medications without first

26

taking a patient's vital signs or conducting an examination. It showed that she continued to prescribe powerful controlled substances to people who were abusing alcohol or other drugs or who failed pill counts. It showed that she continued to prescribe medications to patients who had tested negative for the drugs she had prescribed them. It showed that she prescribed medication to at least one patient—R.Z.—who had not come into the office. It showed that she prescribed powerful controlled substances to someone who was pregnant. It showed that she accepted only cash payments at a flat rate for returning patients.[3] It showed that when she was out of town, she came up with a system to ensure that those patients continued to make those cash payments. Despite testimony that she could have written up to three signed prescriptions at a time, dated them one month apart and given the three months' worth of prescriptions to the patients before leaving town, Lisa Hofschulz (and Robert Hofschulz) required those patients to come in, pay their $200 flat fee and get the prescriptions (that Lisa Hofschulz had written and sent overnight from out of state) from nurse Donna Kowske—who could not lawfully write prescriptions—ensuring that she would receive the flat rate for multiple visits from each patient while she was gone. She handed out prescriptions to individuals who came in under the influence of drugs and alcohol, who were visibly unwell (F.E. was skeletal at the time Lisa Hofschulz gave him his last

---

[3] The evidence showed that some of these patients had BadgerCare, Wisconsin's health care coverage program for low-income residents; patients were allowed to use BadgerCare to pay for their urinalysis tests, but not for prescriptions.

prescription before his death, and he arrived back home having soiled his pants) and to individuals who did not visit her office (such as with R.Z. and R.M.).

A reasonable jury could look at these facts and determine that Lisa Hofschulz was prescribing high doses of medication to her patients for a purpose other than a legitimate medical one—the purpose of making money. The fact that some or many of the patients actually were in pain or had lied about being in pain does not preclude a jury's determination that she did not issue the prescriptions for a legitimate medical purpose.

Lisa Hofschulz spills much ink arguing that these facts may be relevant to the question of whether she prescribed medication outside the usual course of professional medical practice—the element she now concedes that the government presented sufficient evidence to prove—but that they are not relevant to the question of whether she prescribed medication for a legitimate medical purpose. This argument appears to be an effort to skirt the court's conclusion in its order ruling on the jury instructions that an individual provider cannot decide for him- or herself the "usual course of professional medical practice." But a reasonable jury could look at these facts and conclude beyond a reasonable doubt that Lisa Hofschulz was issuing prescriptions for other than a legitimate medical purpose—that she was issuing all of these prescriptions under these circumstances for the purposes of making money, and a lot of it. The jury rejected Lisa Hofschulz's version of events, which it was

28

entitled to do. <u>Kohli</u>, 847 F.3d at 490 (stating that the jury was not required to believe the defendant's testimony).

The court will deny Lisa Hofschulz's motion for a judgment of acquittal.

B.     <u>Motion for New Trial</u>

Lisa Hofschulz also moved for a new trial under Fed. R. Crim. P. 33. Dkt. No. 183 at 7. That rule provides that, on "the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

Lisa Hofschulz moves for a new trial on six grounds: (1) jury instructions; (2) improper expert opinions; (3) prosecutorial misconduct; (4) irrelevant and prejudicial evidence; (5) improper legal conclusions; and (6) a catch-all for miscellaneous objections.

1.     <i>Jury Instructions</i>

Lisa Hofschulz first argues that the court erred by denying the good faith instruction that she had requested. Dkt. No. 183 at 7-8. She incorporates all her previous arguments. <u>Id.</u> at 8 (citing dkt. nos. 77, 144, 153).

The court thoroughly addressed this issue in its fifty-page ruling on the jury instructions. Dkt. No. 158. The court provided a brief history of §841 as it relates to convictions of licensed medical providers and explained that "whether a defendant charged with unlawfully prescribing controlled substances acted in good faith must be determined using an <i>objective</i> standard, not a subjective one." <u>Id.</u> at 45. The court's order included an analysis of Supreme Court and Court of Appeals decisions, each of which led it to believe that an objective

29

standard applied. Id. at 38-45 ("The subjective standard Lisa Hofschulz proposes does not comport with Moore [423 U.S. 122 (1975)], and as some of the courts above have noted, it would nullify [21 C.F.R.] §1306.04(a) by allowing each individual prescriber to decide the 'course of professional medical practice.'"). The court also concluded that the government's proposed instructions were not inconsistent with the language previously affirmed by the Seventh Circuit and the Supreme Court. Id. at 45-47.

Lisa Hofschulz disagrees with the court's conclusion and believes that the resolution of the cases in which the Supreme Court has accepted *certiorari* will prove the court's analysis wrong. That remains to be seen. But Lisa Hofschulz has presented no argument or case law that convinces the court that its analysis was flawed. Lisa Hofschulz is not entitled to a new trial based on the jury instructions.

2. <em>Improper Expert Opinions</em>

Lisa Hofschulz next argues that the court erred by allowing several nurse practitioners "to testify to their opinions about whether certain treatments of patients at her clinic were outside the usual course of professional practice, over her objection." Dkt. No. 183 at 9. She takes issue with this testimony because the government did not identify the nurse practitioners as expert witnesses prior to trial and, she says, the court should not have permitted them to offer opinions on matters reserved for expert opinion, such as whether Lisa Hofschulz was operating outside the usual medical practice. Id.

The government responds that the nurse practitioners testified about their own experiences and observations while working for Lisa Hofschulz. Dkt. No. 191 at 9. The government insists that it elicited this testimony for the purpose of demonstrating that the defendants had notice of the problems in the operation of their clinic and the dangers posed to the patients. Id. It says that this testimony went to the defendants' knowledge and intent. Id. The government also contends that the opinions were intended to rebut any argument that it cherry-picked a handful of patients from an otherwise legitimate pain clinic. Id. at 9-10.

Lisa Hofschulz replies that the nurse practitioners' testimony was offered to show that the "example patients" were representative of the clinic's general practice. Dkt. No. 200 at 12. She says the testimony was offered to demonstrate the practices as a whole and therefore was not lay opinion but opinion based on expertise. Id.

"Lay testimony that is in the form of an opinion is permissible if it is rationally based on the witness's perception, helpful to understand the witness's testimony, and not based on specialized knowledge." United States v. Bowling, 952 F.3d 861, 868 (7th Cir. 2020) (citing Fed. R. Evid. 701). "The Federal Rules of Evidence limit—but do not bar—lay witnesses' ability to testify as to their opinions and inferences, even about ultimate issues in the case." United States v. Locke, 643 F.3d 235, 239 (7th Cir. 2011).

The nurse practitioners testified based on their own knowledge. They testified to their observations through the lens of their education and training,

31

offering their views about how the defendants' clinic operated during their employment and—perhaps more important—the concerns they had shared with the defendants. The nurse practitioners had specialized knowledge, but they testified about things they had seen and heard. They testified as fact witnesses, within the context of their understanding of their jobs.

Lisa Hofschulz is not entitled to a new trial based on improper expert opinions.

### 3. *Prosecutorial Misconduct*

Lisa Hofschulz argues that the prosecution deliberately misled the jury during closing argument. Dkt. No. 183 at 9. Specifically, she says that "government counsel deliberately misled the jury during closing arguments by arguing that Lisa Hofschulz made up or invented her description of [F.E.]'s kidney disease." Id. She directs the court to the portion of the government's closing argument in which the prosecutor stated,

> [t]here's no record, there's no documentation of anything Lisa said about [F.E.] in this supposed end state renal failure. She wrote a lot of random stuff down in that record, she copied and pasted that he fell yesterday at the VA, she talked about a surgery on his buttocks. Okay. Those are relevant. More relevant than end stage renal failure? It doesn't make sense. But it's a pretty nice story. The records show that [F.E.]'s health conditions were controlled in 2013.

Id. at 10 (quoting dkt. no. 176 at 35-36). Lisa Hofschulz insists that the government's statements could have altered the jury's view of her credibility. Id. Lisa Hofschulz says that this alleged intentional misconduct requires a new trial and dismissal with prejudice of Count Fifteen. Id.

The government responds:

> Specifically, Defendant claims that the United States lied to the jury about F.E. having end stage renal failure. Notably, the United States never made any representation about whether or not F.E. actually had end stage renal failure. Indeed, whether F.E. had end stage renal failure was irrelevant. Nobody ever claimed renal failure killed F.E. So the only thing that mattered was what Ms. Hofschulz *knew* about F.E.'s health conditions when she was prescribing him opioids, and how, if at all, that knowledge impacted her prescribing. Thus, the United States argued that the jury could infer that, despite her testimony to the contrary, Ms. Hofschulz had no knowledge of F.E.'s "end stage renal failure" based on the totality of her patient files. An argument for an inference is not a misrepresentation.

Id. at 10-11. The government also argues that the V.A. records (which the defendant did not seek to admit at trial) did not show that F.E. was in end-stage renal failure. Id. at 11.

Lisa Hofschulz's reply repeats her initial argument. She adds that her testimony, through deductive reasoning, must have been based on her conversations with F.E. Dkt. No. 200 at 13.

"The district court has broad discretion in deciding whether to grant a new trial based on prosecutorial misconduct." United States v. Freeman, 650 F.3d 673, 683 (7th Cir. 2011). "The inquiry is two-fold: first, whether there was prosecutorial misconduct; second, whether it prejudiced the defendant." Id. "Whether a prosecutor's comments to the jury rise to the level of prosecutorial misconduct depends initially on whether the prosecutor's conduct was improper." United States v. Turner, 651 F.3d 743, 751 (7th Cir. 2011).

The government's statement during closing was not improper, because it did not mischaracterize the evidence.

Lisa Hofschulz testified that F.E. was in end-stage renal failure when she was treating him (to explain why she was prescribing the types and amounts of

33

drugs she had been prescribing). The evidence showed, however, that her notes of her interactions with F.E. did not mention end-stage renal failure. The government argued in closing—accurately—that Lisa Hofschulz's own records did not support her claim that she knew of or was aware of a diagnosis of end stage renal failure (and argued that if Lisa Hofschulz had bothered to write in her notes that F.E. fell or had surgery on his buttocks, one would think she would have written something as notable as the fact that he was in end-stage renal failure if she has been aware of such information). The V.A. medical records provided by the defense do not support Lisa Hofschulz's assertion that F.E. was in end-stage renal failure. The documents state that F.E. was *at risk* for renal failure, not that he was *in* end-stage renal failure. See dkt. no. 184 at 1 at 1; dkt. no. 184-2 at 2; dkt. no. 184-3 at 2. The government did not mischaracterize evidence by stating that there was no record or documentation of Lisa Hofschulz's claim that F.E. was in end-stage renal failure when she was treating him.

Because the government's statement was not improper, the court need not address the rest of the analysis. Lisa Hofschulz is not entitled to a new trial based prosecutorial misconduct.

### 4. *Irrelevant and Prejudicial Evidence*

Lisa Hofschulz next argues that the court admitted over her objection irrelevant and prejudicial evidence related to involvement in child abuse by one of her patients. Dkt. No. 183 at 11. She argues that "[a] patient being involved in criminal conduct unrelated to drug abuse or misuse of the medications she

34

was prescribing had no bearing on whether the prescriptions she issued for that patient were for a legitimate medical purpose or in the usual course of professional medical practice." Id.

The government responds by clarifying that while the defense did object to the testimony relating to child abuse, she did so on the basis of hearsay and improper impeachment, not on relevance or undue prejudice. Dkt. No. 191 at 19. It asserts that Lisa Hofschulz's failure to challenge the evidence as prejudicial or irrelevant constitutes waiver of the argument. Id. (citing Williams v. Jader Fuel Co., Inc., 944 F.2d 1388, 1405 (7th Cir. 1991); Hale v. Firestone Tire & Rubber Co., 756 F.2d 1322, 1333-34 (8th Cir. 1985); United States v. Broadnax, 475 F. Supp. 2d 783, 795 (N.D. Ind. 2007)).

The government also argues that the evidence was relevant and not unduly prejudicial. Id. at 20. It asserts that the questions posed to Lisa Hofschulz on cross-examination relating to the DOJ's child abuse investigation were aimed at eliciting testimony that Lisa Hofschulz had knowledge that several of her patients had been involved in the conduct from which the investigation arose. Id. The government argues it is relevant whether she knew these patients were abusing prescription drugs and causing harm to children while on those drugs. Id.

"When a defendant does not object to the admission of evidence during the trial, the objection is waived and cannot be raised for the first time in a motion for new trial or on appeal." Naeem v. McKesson Drug Co., 444 F.3d 593, 610 (7th Cir. 2006) (citing United States v. Hack, 205 F.2d 723, 727 (7th

Cir. 1953)); United States v. Lampkins, 47 F.3d 175, 179 (7th Cir. 1995)

("Raising the issue in his post-trial motion 'does not cure [the defendant's]

wavier of the objection by failing to raise it at trial.'") (quoting United States v.

Huels, 31 F.3d 476, 479 n.1 (7th Cir. 1994)).

Lisa Hofschulz did not object on the ground of prejudice during this

portion of the testimony. While she made several objections, her objections

challenged the questions and testimony as hearsay, "improper pro[ff]er" and

improper impeachment. Dkt. No. 191-9 at 2, 9. Lisa Hofschulz's first objection

stated,

> Judge, I am going to object to hearsay to anything about what she's
> been told about some set of facts. I am [s]truck because counsel is
> presenting this as if there are facts and then asking the witness to
> stating in the form of the questions that these things are a matter of
> fact that these things happened and asked the witness if she knows
> about it. Asking if she knows about it is one thing. Suggesting it is
> a matter of a fact asking it happened is something else. This is about
> her being told to something. I object to hearsay.

Id. at 2. In her second and third objections, which were addressed during the

same side bar, her attorney stated,

> I object first to the statement that's not what she told the nursing
> board the same way my statement to Dr. King is improper pro[ff]er.
> This is too. And then the second thing I object to is improper
> impeachment. What it says is they told me that there was an
> allegation and it happened earlier and it was about a man did. And
> the next sentence is also [R. L]. It doesn't say that that was part of
> what they told her at the time. That may have been knowledge she
> had subsequent so. I am saying this is directly inconsistent. It is
> not. She answered these questions. I don't think we can get anymore
> out of this. I think at this point it will be asked and answered. I don't
> think it is directly impeaching.

Id. at 9. None of these objections challenge the relevance or prejudicial effect of the questions or testimony. Lisa Hofschulz has waived any relevance or prejudice objections on this issue.

Even if the defendant had made a Rule 403 objection during the trial, the court likely would have overruled it. Whether Lisa Hofschulz had reason to know that her patients were abusing drugs that she had prescribed, and whether she then continued to prescribe those drugs despite that knowledge, is relevant to whether she had a legitimate medical purpose for prescribing the drugs. The facts underlying the DOJ investigation, as revealed through cross-examination, supported the government's theory that Lisa Hofschulz knew her patients were abusing the drugs she had prescribed to them. The testimony was not unduly prejudicial because the portions relating to child abuse related to the conduct of others, not Lisa Hofschulz. The portions related to Lisa Hofschulz involved her prescriptions to patients and their abuse of those drugs.

Lisa Hofschulz is not entitled to a new trial based on the testimony regarding the DOJ investigation into one or more of her patients' involvement in child abuse.

5. *Improper Legal Conclusions*

Lisa Hofschulz next argues that the court improperly allowed Dr. King, the government's expert witness, to provide legal conclusions during his testimony. Dkt. No. 183 at 12.

The government responds that Lisa Hofschulz failed to point to any specific portion of Dr. King's testimony; it assumes that she is referring to his

testimony "that Ms. Hofschulz's prescriptions were issued outside the usual course of professional practice and not for a legitimate medical purpose." Dkt. No. 191 at 20. The government contends that this argument is precluded by Kohli. Id. (citing Kohli, 847 F.3d at 491-92).

Like Lisa Hofschulz, the defendant in Kohli argued "that the district court erred by allowing Dr. Parran to testify about applicable legal standards and legally dispositive issues in violation of Federal Rule of Evidence 704."[4] 847 F.3d at 491. The Seventh Circuit stated that Rule 704 allows experts to testify about an ultimate issue in the case. Id. (citing Fed. R. Evid. 704(a). What an expert may *not* do is state an opinion about "whether the defendant did nor did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Id. (citing Fed. R. Evid. 704(b)) (quotation marks omitted). The Kohli court concluded that Dr. Parran's testimony "touch[ing] on the applicable standard of care among medical professionals—a standard that is no doubt closely linked to § 841(a)'s prohibition on prescribing outside the 'usual course of professional medical practice'" was appropriate expert testimony. Id. at 492 (citing Chube II, 538 F.3d at 698).

Dr. King's testimony offered nothing more than his expert opinion on the standard of care for medical professionals such as Lisa Hofschulz. The defendant has not pointed to any specific lines of testimony in which Dr. King strayed outside the boundaries of his role under Fed. R. Evid. 704(a).

---

[4] Dr. Parran was an addiction specialist and internal medicine physician. Kohli, 847 F.3d at 487.

Lisa Hofschulz is not entitled to a new trial based on Dr. King's testimony as it relates to any legal conclusions.

6.     *Other Objections*

Finally, Lisa Hofschulz "moves for a new trial based on all of her other objections made before and during the trial, each of which was improperly overruled by the court." Dkt. No. 183 at 12. She notes that this includes the period during which she was "deprived counsel of her choice." Id.

The government addresses this as an omnibus motion based on the cumulative impact of her overruled objections. Dkt. No. 191 at 21. Addressing Lisa Hofschulz's argument about her right to counsel of choice, the government asserts that the *court* did not deprive her of this right; it granted Attorney Brindley's motion to withdraw. Id. (citing dkt. no. 89). The government notes that several months later, the court reversed that decision and allowed Attorney Brindley to represent Lisa Hofschulz. Id. (citing dkt. nos. 102, 107).

To demonstrate cumulative error, the defendant must show that "(1) 'at least two errors were committed in the course of the trial,' and (2) 'considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial.'" United States v. Chavez, 12 F.4th 716, 732 (7th Cir. 2021) (quoting United States v. Marchan, 935 F.3d 540, 549 (7th Cir. 2019)).

The defendant specifically points to a single alleged error—the court depriving her of her counsel of choice. Otherwise, she refers generally to her

other objections before and during trial. The one alleged error the defendant specifically identifies had no meaningful effect on the outcome of the case.

The day before the scheduled February 18, 2020 trial, Attorney Brindley filed a motion asking the court to adjourn that trial or, in the alternative, to allow him to withdraw as counsel. Dkt. No. 85. The court denied the motion to adjourn the trial but granted his motion to withdraw. Dkt. No. 90. In its order, the court recounted the various justifications Attorney Brindley had provided for his multiple requests to adjourn the trial. Perceiving a lack of candor by Attorney Brindley, the court granted his request to withdraw and gave Lisa Hofschulz time to hire a new attorney. On September 14, 2020, on the request of Lisa Hofschulz and Attorney Glozman, the court reversed its decision and permitted Attorney Brindley to rejoin the case with Mr. Glozman remaining the lead counsel. Dkt. No. 107.

Between the date that Attorney Brindley withdrew from the case and the date the court allowed him to resume representation, nothing of any significance occurred in the case; indeed, the pandemic struck less than a month later and the court suspended all jury trials. The court held two status conferences in that time. Attorney Brindley was back in his representative capacity by September 14, 2020, nearly a year before the August 2, 2021 trial. He mounted a tenacious defense which included expert and lay witness testimony and many exhibits. He participated in pretrial motions practice. Attorney Brindley has presented no evidence that his seven-month absence,

ending more than a year before trial, affected Lisa Hofschulz's ability to mount a vigorous defense at the August 2021 trial.

Lisa Hofschulz is not entitled to a new trial based on the cumulative effect of her overruled objections.

## IV.    Amended Motion for Forfeiture of Property (Dkt. No. 182)

On October 13, 2021, the court denied without prejudice the government's original motion for entry of preliminary order of forfeiture. Dkt. No. 178. It did so because (1) the amount the government sought in its motion was inexplicably different than the amount referenced in its August 11, 2021 memorandum; and (2) the government failed to explain how it arrived at that amount. Id. at 2. The court instructed the government to attach any relevant evidence, such as evidence presented at trial, to its any amended motion. Id. at 3.

According to the forfeiture notice,

1. Upon conviction of the controlled substance offense alleged in Count One of this Indictment, pursuant to Title 21 United States Code, Section 853, any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of the violation and any property used, or intended to be used, in any manner or part, to commit or to facilitate the commission of the violation, including but not limited to a sum of money equal to the amount of proceeds obtained as a result of the offense.

2. If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, pursuant to 21 U.S.C. § 853(p).

41

Dkt. No. 1 at 8.

The government asks for an entry of a preliminary order of forfeiture in the amount of $2,265,380. Dkt. No. 182 at ¶8. The amended motion explains that this calculation is based on "the analysis of the tax returns of Clinical Pain Consultants, Lisa Hofschulz, and Robert Hofschulz." Id. at ¶5. The government attached evidence supporting this figure to the amended motion as Exhibit A. Dkt. No. 182-1. It clarifies that the earlier amount—$2,246,082—came from "an analysis of CPC's JP Morgan Chase account." Dkt. No. 182 at ¶6. It attached a document supporting this figure as Exhibit B. Dkt. No. 182-2. The government asserts that the amount derived from tax records is a more accurate reflection of the gross receipts resulting from the defendants' conduct. Dkt. No. 182 at ¶7.

Lisa Hofschulz argues that the amount the government requests is "grossly excessive and unsupported by any evidence that has ever been presented to the Court." Dkt. No. 196. She argues that the government has not demonstrated that all the amount requested was derived from her criminal conduct. Id. at 1 (citing 21 U.S.C. §853(a)(1)). She asserts that the government has not established that all her profits from CPC were proceeds of criminal activity. Id. at 2.

Robert Hofschulz makes a similar argument. He says that "1) the amount the Government seeks is vastly disproportionate to proceeds [Robert Hofschulz] received from [CPC] and 2) there exists an insufficient nexus between his

conduct and the forfeiture sought and granting the Government's request would be unjust as applied to him." Dkt. No. 199 at 2.

Section 853(a)(1) of Title 21 states that person convicted of a violation of the federal drug laws "shall forfeit" any property "constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." Section 853(d) says that there is a rebuttable presumption "at trial that any property of a person convicted of a felony under this subchapter or subchapter II is subject to forfeiture under this section if the United States establishes by a preponderance of the evidence that (1) such property was acquired by such person during the period of the violation of this subchapter or subchapter II or within a reasonable time after such period; and (2) there was no likely source for such property other than the violation of this subchapter or subchapter II."

Federal Rule of Criminal Procedure 32.2(b)(1)(A) puts the burden on the court to determine—"as soon as practical after a verdict or finding of guilty"— what property is subject to forfeiture. It states that "[i]f the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." Rule 32.2(b)(1)(B) says that the court may base that determination on evidence already in the record, as well as any additional evidence the parties may submit that the court accepts as relevant and reliable. And if the forfeiture is contested, either party may request that the court conduct a hearing. Neither defendant has requested a hearing.

Case 2:18-cr-00145-PP   Filed 12/09/21   Page 43 of 45   Document 220

The defendants were convicted of conspiring to distribute controlled substances at CPC. Dkt. No. 169. From their work at CPC, they amassed $2,265,380, based on their tax records. This amount was the basis for the analysis provided by IRS Agent Michael Magner at trial. Dkt. No. 182 at ¶5 (citing dkt. no. 182-1).

The defendants appear to argue that the government has not demonstrated, by a preponderance of the evidence, that there was no likely source for any of this money other than unlawful prescription of controlled substances. They imply that surely some of the income the clinic took in was from prescriptions issued in the usual course of professional medical practice and for a legitimate medical purpose. But the government presented evidence at trial that Lisa Hofschulz's practices generally were not consistent with the usual course of professional medical practice and not for legitimate medical purposes. From failing to conduct examinations to prescribing drugs without seeing imaging to refusing to accept insurance and demanding cash payments for every office visit to continuing to prescribe medications to individuals despite clear evidence of drug abuse, the evidence presented over the two weeks of trial showed by a preponderance of the evidence that the operation of the clinic was outside the usual course of the medical profession and not for legitimate medical purposes.

The court will grant the government's amended motion for entry of a preliminary order of forfeiture.

## V.    Conclusion

The court **DENIES** Robert Hofschulz's motion for judgment of acquittal. Dkt. No. 173.

The court **DENIES** Lisa Hofschulz's motion for judgment of acquittal and new trial. Dkt. No. 183.

The court **GRANTS** the government's amended motion for entry of a preliminary order of forfeiture. Dkt. No. 182.

The court **ORDERS** that a money judgment in the amount of $2,265,380, representing proceeds derived from the defendants' conspiracy to distribute and distribution of controlled substances outside of a professional medical practice and not for a legitimate medical purpose is levied against defendants Lisa Hofschulz and Robert Hofschulz.

Dated in Milwaukee, Wisconsin this 9th day of December, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

45